**22-14274**

IN THE

# United States Court of Appeals

## FOR THE ELEVENTH CIRCUIT

❖

GRAY TELEVISION, INC.,

*Petitioner,*

—v.—

FEDERAL COMMUNICATIONS COMMISSION, UNITED STATES OF AMERICA,

*Respondents.*

ON PETITION FOR REVIEW FROM THE
FEDERAL COMMUNICATIONS COMMISSION

## BRIEF FOR PETITIONER

DAVID E. MILLS
ROBERT M. MCDOWELL
ROBBY LEE RAY SALDAÑA
COOLEY, LLP
1299 Pennsylvania Avenue NW,
  Suite 700
Washington, DC 20004

*Attorneys for Petitioner*
  *Gray Television, Inc.*

*Gray Television, Inc. v. Fed. Comm'cns Comm.*
No. 22-14274

## <u>CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1 through 26.1-3, Petitioner Gray Television, Inc. ("Petitioner" or "Gray") submits the following Certificate of Interested Persons and Corporate Disclosure Statement.

To the best of Petitioner's knowledge, the following is a list of all trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this case or appeal, including subsidiaries, conglomerates, affiliates, parent corporations, any publicly held corporation that owns 10% or more of the party's stock, and other identifiable legal entities related to a party:

1.  Atlanta Assembly, LLC, *Subsidiary of Gray Media Group, Inc.*

2.  Citrin, Sarah E., *Counsel for Respondent Federal Communications Commission*

3.  Cooley LLP, *Counsel for Petitioner*

4.  Dynamic Captioning, LLC, *Subsidiary of Gray Media Group, Inc.*

5.  Federal Communications Commission, *Respondent*

6.  Feore, John R., Cooley LLP, *Counsel for Gray Television, Inc. (Forfeiture Proceeding)*

7.  Folliard III, Robert J., *Gray Television, Inc., Senior Vice President of*

*Government Relations & Distribution*

8.   Gray Media Group, Inc., *Subsidiary of Petitioner*

9.   Gray Television, Inc. (GTN), *Petitioner*

10.  Gray Television Licensee, LLC, *Subsidiary of Gray Media Group, Inc.*

11.  Joslin, William P., *Gray Media Group, Inc., Assistant General Counsel and Assistant Secretary*

12.  Kreisman, Barbara A., *Federal Communications Commission, Chief – Video Division, Media Bureau*

13.  Latek, Kevin P., *Gray Television, Inc., Executive Vice President and Chief Legal and Development Officer*

14.  McDowell, Robert M., *Cooley LLP, Counsel for Petitioner*

15.  Miller, Keith S., *Gray Television, Inc., Vice President, Assistant General Counsel*

16.  Mills, David E., *Cooley LLP, Counsel for Petitioner*

17.  Nicholson, Robert B., *Counsel for Respondent United States of America*

18.  PowerNation Studios, LLC, *Subsidiary of Gray Media Group, Inc.*

19.  Rademacher, Jason E., *Counsel for Gray Television, Inc. (Forfeiture Proceeding)*

20.  Raycom Sports Network, LLC, *Subsidiary of Gray Media Group, Inc.*

21.  Saldaña, Robby L.R., *Cooley LLP, Counsel for Petitioner*

22.    Scher, William J., *Counsel for Respondent Federal Communications Commission*

23.    Stewart, Joan, *Wiley Rein LLP, Counsel for Gray Television, Inc.*

24.    Tupelo Media Group, LLC, *Subsidiary of Gray Media Group, Inc.*

25.    United States of America, *Respondent*

26.    Wendel, Henry H., *Cooley LLP, Counsel for Gray Television Licensee, LLC*

To the best of Petitioner's current knowledge, no other persons, associations of persons, firms, partnerships, or corporations have an interest in the outcome of this case or appeal.

*/s/ David E. Mills*
David E. Mills
Robert M. McDowell
Robby L.R. Saldaña
COOLEY LLP
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400
dmills@cooley.com
rmcdowell@cooley.com
rsaldana@cooley.com

*Counsel for Petitioner*
*Gray Television, Inc.*

**STATEMENT REGARDING ORAL ARGUMENT**

Petitioner requests oral argument on this Petition for Review ("Petition") of a final order of the Federal Communications Commission ("FCC").

This Petition presents a question of first impression: whether the FCC may use its general rulemaking authority to regulate and prohibit the purchase of programming by a broadcaster by asserting that the purchase is the "functional equivalent" of a broadcast license transfer when the agency has already conceded that such transactions are beyond its authority to regulate as license transfers, and Congress did not delegate authority to the FCC to regulate the "functional equivalent" of license transfers.

In addition, this Petition raises important questions regarding whether the FCC has the power to restrict First Amendment speech in this manner, whether the agency may punish a regulated party without giving fair notice of rule changes made during the administrative proceeding, and whether unprecedented penalties assessed under the circumstances are proper.

Because many of these are questions of first impression in this Circuit, oral argument will assist the Court in deciding this case.

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT ...............................................i

TABLE OF CONTENTS.................................................................................. ii

TABLE OF CITATIONS ..................................................................................v

STATEMENT OF JURISDICTION................................................................1

STATEMENT OF THE ISSUES.....................................................................1

STATEMENT OF THE CASE..........................................................................4

STATEMENT OF FACTS ................................................................................6

I.    RELEVANT STATUTORY AND REGULATORY
      BACKGROUND. ....................................................................................6

II.   FACTUAL BACKGROUND....................................................................9

      A.    The Anchorage DMA and the Anchorage Transaction. ......................9

      B.    Gray's Cooperation in response to the FCC's Concerns. ..................12

      C.    The Notice of Apparent Liability.....................................................12

      D.    Gray's Request for Cancellation. ....................................................13

      E.    The Forfeiture Order. .......................................................................15

STANDARDS OF REVIEW ..........................................................................17

SUMMARY OF THE ARGUMENT .............................................................18

ARGUMENT ..................................................................................................20

I.    THE FCC EXCEEDED ITS AUTHORITY IN ITS APPLICATION
      OF NOTE 11 TO THE ANCHORAGE TRANSACTION.........................20

      A.    The FCC Exceeded Its Authority Over License Transfers Under
            § 310(d) of the Communications Act..................................................21

            1.    The FCC Had No § 310(d) Authority Over the
                  Anchorage Transaction Because There Was No License
                  Transfer. ..................................................................................21

            2.    The FCC Has No Authority Over Transactions It Deems
                  the "Functional Equivalent" of a License Transfer. ................23

3.    The FCC's Ancillary Authority Does Not Justify Enforcement of Note 11 Against Gray. ...................................25

B.    The FCC Has No Authority Over Gray's Programming Choices Under § 326 of the Communications Act or the First Amendment. ........................................................................28

II.    THE FCC ERRONEOUSLY CONCLUDED THAT GRAY VIOLATED NOTE 11. ................................................................32

A.    The FCC Improperly Redefined its Regulation to Ignore Undisputed Evidence that Gray Already Owned Two Top-Four Stations at the Time of the Transaction and to Find that Gray Violated Note 11 By Creating a "New" Top-Four "Combination."................................................................33

B.    The FCC Erroneously Found that Gray "Independently Violated" Note 11 By Deeming the Anchorage Transaction the "Functional Equivalent" of a License Transfer.................................38

III.    THE FCC'S FAILURE TO PROVIDE FAIR NOTICE OF ITS NOVEL INTERPRETATIONS OF NOTE 11 REQUIRES VACATUR. ................................................................................40

A.    The FCC Gave No Notice of Its Novel "Most Recent Ratings Available" and "New" Top-Four "Combination" Interpretations of Note 11. ..............................................................40

B.    The FCC Unfairly Penalized Gray for Its Reasonable Interpretation of the Rule Against Swaps. .........................................42

IV.    THE FCC ERRONEOUSLY IMPOSED AN UNPRECEDENTED MAXIMUM FORFEITURE PENALTY. ....................................46

A.    The FCC's Application of a Daily Base Forfeiture to the Purported Note 11 Violation Was Contrary to Precedent and Practice. ................................................................46

B.    The FCC Committed Multiple Errors in its Forfeiture Penalty Adjustment Analysis. .........................................................48

1.    The FCC Arbitrarily and Capriciously Affirmed an Illusory "Egregiousness" Finding. ...........................................48

2.    The FCC Did Not Consider the Circumstances of the Purported Violation or Gray's Good Faith. .............................50

3.    The FCC's "Substantial Economic Gain" Finding Was
Unsupported by Competent Evidence. ....................................51

CONCLUSION ......................................................................................................54

CERTIFICATION OF COMPLIANCE WITH FRAP 32(G)(1) ...........................55

# TABLE OF CITATIONS

## Cases

*Am. Library Ass'n v. FCC,*
    406 F.3d 689 (D.C. Cir. 2005)....................................................*passim*

*AT&T Corp. v. FCC,*
    86 F.3d 242 (D.C. Cir. 1996).........................................................51, 53

*Autauga Cty. Emergency Mgmt. Commun. Dist. v. FCC,*
    17 F.4th 88 (11th Cir. 2021) ........................................................17

*Bidi Vapor LLC v. United States FDA,*
    47 F.4th 1191 (11th Cir. 2022) .......................................................50

*Califano v. Sanders,*
    430 U.S. 99 (1977)...........................................................................18

*Century Comm'cns Corp. v. FCC,*
    835 F.2d 292 (D.C. Cir. 1987)........................................................30

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,*
    467 U.S. 837 (1984).........................................................................21

*Christensen v. Harris Cty.,*
    529 U.S. 576 (2000)...................................................................36, 37

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
    401 U.S. 402 (1971)........................................................................18

*Collins v. Experian Info. Solutions, Inc.,*
    775 F.3d 1330 (11th Cir. 2015) ......................................................24

*Columbia Broad. System, Inc. v. Democratic Nat'l Committee,*
    412 U.S. 94 (1973)..........................................................................29

*Community-Service Broad. of Mid-America, Inc. v. FCC,*
    593 F.2d 1102 (D.C. Cir. 1978)................................................29, 30

*Dep't of Homeland Sec. v. Regents of the Univ. of California,*
    140 S. Ct. 1891 (2020).....................................................................26

*Dickson v. Sec'y of Defense*,
   68 F.3d 1396 (D.C. Cir. 1995)...........................................................50

*E. Hydroelectric Corp. v. FERC*,
   887 F.3d 1197 (11th Cir. 2018) ..................................................17, 18

*FCC v. League of Women Voters*,
   468 U.S. 364 (1984).........................................................................29

*FCC v. Nat'l Citizens Comm. for Broad.*,
   436 U.S. 775 (1978)...........................................................26, 27, 30

*FCC v. Prometheus Radio Project*,
   141 S. Ct. 1150 (2021)......................................................................10

*Finberg v. United States Dep't of Agric.*,
   6 F.4th 1332 (D.C. Cir. 2021).........................................................52

*Friedman v. Sebelius*,
   686 F.3d 813 (D.C. Cir. 2012).........................................................48

*General Elec. Co. v. EPA*,
   53 F.3d 1324 (D.C. Cir. 1995).........................................................41

*Glazer v. Reliance Std. Life Ins. Co.*,
   524 F.3d 1241 (11th Cir. 2008) .......................................................34

*Glycine & More, Inc. v. United States*,
   880 F.3d 1335 (Fed. Cir. 2018) ...........................................36, 38, 39

*Kansas City v. Dep't of Hous. & Urban Dev.*,
   923 F.2d 188 (D.C. Cir. 1991).........................................................49

*Kisor v. Wilkie*,
   139 S. Ct. 2400 (2019)..........................................................33, 40, 42

*Landau v. RoundPoint Mortg. Servicing Corp.*,
   925 F.3d 1365 (11th Cir. 2019) .......................................................33

*Legal Envtl. Assistance Found. v. United States EPA*,
   276 F.3d 1253 (11th Cir. 2001) ...........................................36, 37, 38

*McElroy Electronics Corp. v. FCC,*
    990 F.2d 1351 (D.C. Cir. 1993) ........................................................45

*McHenry v. Bond,*
    668 F.2d 1185 (11th Cir. 1982) ..................................................39, 46

*Motion Picture Ass'n of Am., Inc. v. FCC,*
    309 F.3d 796 (D.C. Cir. 2002) ....................................................23, 26

*Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm*
    *Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ...........................................................................49

*Mozilla Corp. v. FCC,*
    940 F.3d 1 (D.C. Cir. 2019) .......................................................22, 24

*Nat'l Broad. Co. v. United States,*
    319 U.S. 190 (1943) ....................................................................26, 27

*Rafferty v. Denny's, Inc.,*
    13 F.4th 1166 (11th Cir. 2021) ........................................................35

*Ramaprakash v. FAA,*
    346 F.3d 1121 (D.C. Cir. 2003) ..................................................39, 46

*RTC Transp., Inc. v. Interstate Com. Comm'n,*
    708 F.2d 617 (11th Cir. 1983) .........................................................51

*Russello v. United States,*
    464 U.S. 16 (1983) ...........................................................................24

*Satellite Broad. Co. v. FCC,*
    824 F.2d 1 (D.C. Cir. 1987) ..........................................40, 42, 43, 44

*Schurz Comm'cns, Inc. v. FCC,*
    982 F.2d 1043 (7th Cir. 1992) .........................................................31

*Sierra Club v. Martin,*
    168 F.3d 1 (11th Cir. 1999) .............................................................32

*SNR Wireless Licenseco, LLC v. FCC,*
    868 F.3d 1021 (D.C. Cir. 2017) .......................................................46

*Sorenson Commc'ns, Inc. v. F.C.C.*,
659 F.3d 1035 (10th Cir. 2011) ...........................................................24

*Southern Co. v. FCC*,
293 F.3d 1338 (11th Cir. 2002) ..................................................21, 23

*Time Warner Entm't Co., L.P. v. FCC*,
240 F.3d 1126 (D.C. Cir. 2001)..................................................30, 31

*Trinity Broad. v. FCC*,
211 F.3d 618 (D.C. Cir. 2000)..............................................40, 41, 44

*Turner Broad. Sys. v. FCC*,
512 U.S. 622 (1994)....................................................................29, 30

*United States Sugar Corp. v. EPA*,
830 F.3d 579 (D.C. Cir. 2016)...........................................................49

*United States v. O'Brien*,
391 U.S. 367 (1968)...........................................................................30

*United States v. Storer Broad. Co.*,
351 U.S. 192 (1956)....................................................................26, 28

*Universal Camera Corp. v. NLRB*,
340 U.S. 474 (1951).........................................................................53

*Vidiksis v. EPA*,
612 F.3d 1150 (11th Cir. 2010) ..........................................17, 18, 46

*Wachovia Bank, N.A. v. United States*,
455 F.3d 1261 (11th Cir. 2006) .......................................................21

**FCC Authorities**

*Central Illinois Public Service Company*,
15 F.C.C.R. 1750 (1999).....................................................................47

*In re Fireweed Comm'cns, LLC & Gray Television Licensee, LLC*
31 F.C.C.R. 6997 (2016).......................................................................9

*In the Matter of Gresham Commc'ns, Inc. & Charles W. Cherry, II Receiver Assignee & Charles W. Cherry, II Receiver for Gresham Commc'ns, Inc. & Caswell Cap. Partners, LLC Assignee*,
26 F.C.C.R. 11895 (2011).....................................................................39

*In Re Application of FM Broadcasters of Douglas Cnty. (Formerly, Gee Jay Broad., Inc.) Assignor & Tri City Commc'ns, Inc. Assignee*,
10 F.C.C.R. 10429 ..............................................................................39

*In re Deerfield Media Licensee, LLC*,
35 F.C.C.R. 13098 (2020).....................................................................47

*In re Enserch Corp.*,
15 F.C.C.R. 13551 (2000).....................................................................47

## FCC Rulemakings

*In the Matter of 2014 Quadrennial Regul. Rev. F Rev. of the Commission's Broad. Ownership Rules & Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*,
29 F.C.C.R. 4371 (2014)..............................................22, 27, 43, 44

*2014 Quadrennial Regulatory Review – Review of the FCC's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996 et al.*,
31 F.C.C.R. 9864 (2016) ..........................................................*passim*

*In re 2014 Quadrennial Regulatory Review—Order on Reconsideration and Notice of Proposed Rulemaking*,
32 F.C.C.R. 9802 (2017).....................................................................10

## Statutes

5 U.S.C. § 706.................................................................................*passim*

28 U.S.C.
§ 2342(1) .............................................................................................1
§ 2344...................................................................................................1

47 U.S.C.

§ 154(i) ................................................................................*passim*
§ 225 .......................................................................................24
§ 301 .........................................................................................7
§ 303(r) ..............................................................................*passim*
§ 307–310 .................................................................................7
§ 326 ..................................................................................*passim*
§ 332(d)(3) .............................................................................24
§ 503(b)(2)(A) .......................................................................46
§ 503(b)(2)(E) ..................................................................48, 50

**Other Authorities**

47 C.F.R.

§ 1.80(b)(10) ...............................................................48, 49, 50
§ 73.622(e) ...............................................................................7
§ 73.3555 ...........................................................................*passim*


First Amendment...............................................................*passim*

Black's Law Dictionary (10th ed. 2014) .................................35

Black's Law Dictionary (11th ed. 2019) .................................49

**Articles**

Alex DeMarban, *One Company Will Own Anchorage's 2 Local TV
    News Stations after Deal with GCI*, Anchorage Daily News (Jul.
    31, 2020), https://www.adn.com/business-
    economy/2020/07/31/one-company-will-own-anchorages-2-local-
    tv-news-stationsafter-deal-with-gci/ ...............................................53

Best States for Business 2019, Forbes,
    https://www.forbes.com/places/ak/?sh=254c6efb6800); A33............11

BIA ADVantage, BIA Advisory Services, www.advantage.bia.com ...................11

Casey Grove, *Questions Remain after GCI Sells Television Assets to
    Competitor*, Alaska Public Media (Aug. 9, 2020),
    https://www.alaskapublic.org/2+020/08/09/questions-remain-after-
    gci-sells-television-assets-to-competitor ...........................................53

*2020 3-Year Economic Outlook Report*, Anchorage Economic
    Development Corporation (Aug. 8, 2020),
    https://aedcweb.com/wp-
    content/uploads/2020/08/0369_20_AEDC_2020-3-Year-
    Outlook_V5.pdf ...............................................................................11

Tim Bradner, *Economy Struggles Amid Pandemic*, Alaskanomics.com
    (July 17, 2020), https://www.alaskanomics.com/2020/07/economy-
    struggles-amidpandemic.html; 2020 3-Year ......................................11

*Unprecedented Spending for 2020 Political Ads*, PBS News Hour
    Weekend (Oct. 31, 2020)
    https://www.pbs.org/newshour/sh.w/unprecedented-spending-for-
    2020-political-ads ......................................................................52, 53

## STATEMENT OF JURISDICTION

This Court has jurisdiction to review a final order of the FCC under 28 U.S.C. § 2342(1).  Gray filed this petition for review ("Petition") within 60 days of the Forfeiture Order.  28 U.S.C. § 2344.

## STATEMENT OF THE ISSUES

The FCC found that Gray Television, Inc. ("Gray"), a broadcaster in the Anchorage, Alaska, Designated Market Area ("DMA"), violated the agency's purported prohibition on transactions that result in ownership of two Top-Four stations in a single DMA when it purchased programming—the CBS network affiliation—from another broadcaster (the "Anchorage Transaction" or "Transaction"), and the agency issued a Forfeiture Order assessing the maximum penalty against Gray.  The issues presented are:

1.   Whether the Forfeiture Order should be vacated as exceeding the agency's authority when:

    a.   The FCC had no authority under § 310(d) of the Communications Act, which grants authority to regulate broadcast license transfers, because the Transaction was a programming purchase, not a license transfer;

    b.   Congress did not delegate authority to the FCC to regulate the "functional equivalent" of a license transfer, which was the FCC's stated basis for its authority over the Transaction, along with a passing

reference to its "ancillary authority," which also was lacking; and

c.    Absent authority to regulate the Transaction as a license transfer or the "functional equivalent" of one, the Forfeiture Order exceeds statutory and constitutional limits on the FCC's authority under § 326 of the Communications Act and the First Amendment because it penalizes Gray's programming choices without furthering any legitimate government interest.

2.    Whether the FCC erroneously concluded that the Anchorage Transaction "resulted in" Gray owning two Top-Four stations in the same DMA in violation of the "Rule Against Swaps" found at Note 11 to 47 C.F.R. § 73.3555 when:

a.    The FCC misapplied the plain language of the station ranking rule applicable to Note 11 to disregard undisputed evidence that Gray already owned two Top-Four stations in the DMA at the time of the Transaction, and therefore the Transaction did not "result in" Gray owning two Top-Four stations in the DMA;

b.    The FCC reinterpreted and added language to Note 11 to prohibit transactions that result in a "new" Top-Four "combination," allowing the agency to find a violation even though the Transaction did not "result in" Gray's ownership of two Top-Four stations, as the rule

2

plainly requires; and

c.  The FCC found that the Anchorage Transaction "independently violated" Note 11 because it was the "functional equivalent" of a license transfer by purportedly leaving KTVA(TV) with almost a "bare license," although KTVA(TV) retained its broadcasting license and facilities and resumed broadcasting with different programming shortly after the Transaction.

3.  Whether the Forfeiture Order should be vacated on due process grounds when:

a.  The FCC failed to give Gray prior notice of its new interpretation of Note 11 to require that the audience share data necessary to determine a station's ranking must be the most recent ratings "available" at the time the transaction agreement is executed, rather than the most recent data showing the station's ranking at the time the transaction agreement is executed;

b.  The FCC failed to give Gray prior notice of its new interpretation of Note 11 to prohibit sales transactions that purportedly result in a "new" Top-Four "combination"; and

c.  Gray reasonably interpreted Note 11 as the Rule Against Swaps, given the FCC's extensive discussion in the Second Order explaining that Note 11 prohibits affiliation swaps, which plainly did not apply to

Gray's affiliation purchase in the Anchorage Transaction.

4.    Whether the FCC erroneously imposed an unprecedented statutory maximum forfeiture on Gray when:

a.    The FCC's daily base forfeiture penalty departed from the FCC's precedent and practice in "analogous cases"; and

b.    The FCC committed multiple errors in its penalty adjustment analysis, including:

    i.    Purportedly "affirming" an "egregiousness" finding that was not previously made and was unsupported by any evidence;

    ii.    Failing to consider relevant statutory and regulatory factors concerning the circumstances of the alleged violation and Gray's good faith; and

    iii.    Relying on insufficient evidence—a single news article with no relevance to the Anchorage Transaction—to conclude that Gray received "substantial economic gain" from the Transaction.

## STATEMENT OF THE CASE

Gray petitions for review of the FCC's Forfeiture Order, which imposes an unprecedented penalty on Gray based on its purchase of the CBS network affiliation from KTVA(TV) in the Anchorage Transaction.  Among other errors, the FCC concluded that the Transaction violated a regulation that restricts "affiliation swaps"

that "result in" ownership of two Top-Four stations in the same DMA, *i.e.*, Note 11 to 47 C.F.R. § 73.3555. The Transaction here did not involve a swap, nor did it "result in" ownership of two Top-Four stations in the same DMA because Gray already owned two Top-Four stations in the DMA at the time it executed the transaction agreement.

Nevertheless, as soon as the FCC expressed concerns about the Anchorage Transaction, and although Gray did not believe it had violated the regulation, Gray reconfigured its Anchorage DMA operations to address the agency's concerns. Notwithstanding these circumstances and Gray's good faith efforts, the FCC issued a Notice of Apparent Liability for Forfeiture ("*NAL*"), proposing a maximum fine of $518,283. The FCC denied Gray's request for cancellation of the *NAL* and issued the Forfeiture Order—a split decision with a written dissent.

This case demonstrates the danger of allowing an agency to define its authority. Congress delegated specific authority to the FCC to regulate license transfers under the Communications Act. The FCC concedes that that delegation does not reach affiliation purchases or swaps, but it takes an unbounded view of its "ancillary authority" to reach any transaction it deems the "functional equivalent" of a license transfer. In contrast to broader delegations of authority elsewhere in the statute, Congress did not delegate such "functional equivalent" authority to the FCC. In the absence of such authority, the Forfeiture Order is simply an improper

regulation of Gray's programming choices, which the Communications Act and the First Amendment prohibit.

Even if the FCC had such authority (it does not), it found a regulatory violation where none occurred. Gray already owned two Top-Four stations in the Anchorage DMA at the time of the Transaction, so the Transaction could not—and did not—"result in" a prohibited duopoly,[1] as one Commissioner made clear in his dissent. To nevertheless find a violation, the FCC reinterpreted its rule without prior notice to Gray (or anyone), to prohibit "new" Top-Four "combination[s]."

Finally, the Commission imposed a maximum penalty on Gray that applied a daily base forfeiture penalty—departing from FCC precedent in unauthorized transfer of control cases. The FCC also improperly failed to consider Gray's cooperation and reasonable interpretation of the Rule Against Swaps.

Accordingly, Petitioner respectfully requests that the Court grant the Petition and vacate the Forfeiture Order.

## STATEMENT OF FACTS

## I.    RELEVANT STATUTORY AND REGULATORY BACKGROUND.

The Communications Act authorizes the FCC to license the use of broadcasting frequencies for radio and television stations in the United States. 47

---

[1] The term "duopoly" here means an entity's ownership of two full-power television stations in a single DMA.

U.S.C. §§ 301, 307–310.  The Act generally requires an applicant to apply for a term-limited license and license renewals.  *Id*. §§ 307–309.  The Act also establishes certain "license ownership restrictions."  *Id.* § 310.  Among these restrictions is a requirement that "no . . . station license, or any rights thereunder, shall be transferred . . . to any person except upon application to the Commission and upon finding by the Commission that the public interest, convenience, and necessity will be served thereby."  *Id*. § 310(d).

In connection with its licensing authority, the FCC has promulgated regulations that impose restrictions on licensees.  Among these restrictions is the "Local Television Multiple Ownership Rule."  47 C.F.R. § 73.3555(b).  Under this rule, "[a]n entity may directly or indirectly own, operate, or control two television stations licensed in the same Designated Market Area (DMA) (as determined by Nielsen Media Research or any successor entity)" in two circumstances.  47 C.F.R. § 73.3555(b)(1).  Specifically, under the "Top-Four Prohibition,"[2] a single owner can own two station licenses in the DMA if "[a]t the time the application to acquire or construct the station(s) is filed" with the FCC "at least one of the stations is not ranked among the top four stations in the DMA, based on the most recent all-day (9 a.m.-midnight) audience share, as measured by Nielsen Media Research or by any

---

[2] In the second circumstance, not relevant here, multiple local ownership is permitted if "[t]he digital noise limited service contours of the stations (computed in accordance with § 73.622(e)) do not overlap."  47 C.F.R. § 73.3555(b)(1).

comparable professional, accepted audience ratings service." *Id.* § 73.3555(b)(1)(ii).  The FCC can forbear application of the Top-Four Prohibition if it finds that doing so "serve[s] the public interest." *Id.* § 73.3555(b)(2).

The FCC has promulgated various "notes" to § 73.3555(b).  In 2016, the FCC adopted Note 11, which provides that:

> An entity will not be permitted to directly or indirectly own, operate, or control two television stations in the same DMA through the execution of any agreement (or series of agreements) involving stations in the same DMA, or any individual or entity with a cognizable interest in such stations, in which a station. . . acquires the network affiliation of another station . . . if ***the change in network affiliations*** would ***result in*** the licensee of the new affiliate, or any individual or entity with a cognizable interest in the new affiliate, directly or indirectly owning, operating, or controlling ***two of the top-four rated television stations*** in the DMA at the time of the agreement.

*Id.* § 73.3555(b), n.11 (emphasis added).  The Note instructs that "[p]arties should also refer to the Second Report and Order. . ." *Id.*[3]

In the Second Order, the FCC explained that it adopted Note 11 to prohibit "affiliation swaps"—*i.e.*, when stations swap their network affiliations—which the FCC deemed to be the "functional equivalent of a license transfer."  Second Order, 31 F.C.C.R. at 9883–9884 ¶¶ 47–52 & nn. 113–142.  The FCC also explained that the newly-prohibited affiliation swaps were "distinguished easily from other,

---

[3] *See 2014 Quadrennial Regulatory Review – Review of the FCC's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, 31 F.C.C.R. 9864 (2016) ("Second Order").

legitimate actions" reflecting "organic growth," "such as producing higher quality or more extensive local programming or acquiring higher quality syndicated programming." *Id.* at 9883 ¶ 48 n.128.  Acknowledging that it lacked authority under § 310(d) to regulate affiliation swaps (because they are not license transfers), the FCC purported to invoke its "ancillary authority" under §§ 154(i) and 303(r) of the Communications Act to make rules "necessary to carry out the provisions" of the Act.  *Id.* at 9882 ¶ 47 n.122; *see also* 47 U.S.C. §§ 154(i); 303(r).

## II.    FACTUAL BACKGROUND

### A.    The Anchorage DMA and the Anchorage Transaction.[4]

Gray entered the Anchorage DMA in 2016 when it acquired NBC affiliate KTUU-TV.  A31.  Shortly thereafter, Gray acquired a second full-power station in the DMA, MyNetworkTV-affiliated KYES-TV, pursuant to a failing station waiver approved by the FCC.[5]  *See In re Fireweed Comm'cns, LLC & Gray Television Licensee, LLC*, 31 F.C.C.R. 6997, 7002 (2016) ("*In re Fireweed*").[6]  KYES-TV had

---

[4] These facts are from Gray's Request for Cancellation, filed with the FCC on August 6, 2021.  A19–73.

[5] Under a failing station waiver, the FCC may waive the Local Television Multiple Ownership Rule if the station has an all-day audience share of no more than 4%; the station has had negative cash flow for three consecutive years immediately prior to the application; and merger of the two stations would result in tangible and verifiable public interest benefits that outweigh any harm to competition and diversity.  *See In re Fireweed*, 31 F.C.C.R. at 6998.

[6] Gray's acquisition of KYES-TV required a failing station waiver because: (1) in 2016, in addition to the limitations on multiple local station ownership discussed *supra* at 7 & n.2, the FCC also employed an "8-voices test," under which an

operated antiquated facilities that failed to serve many of the viewers in the Anchorage DMA. A31. Gray invested hundreds of thousands of dollars to modernize the station's broadcasting facilities, including upgrading the station's channel and adding local and breaking news programming. A32.

In July 2020, because of Gray's substantial investment and improvements, KYES-TV became the fourth-rated full-power television station in the Anchorage DMA. *Id.* At the time, KTUU-TV was ranked first. A37. Thus, Gray owned two Top-Four stations in the DMA as of July 2020, when the Anchorage Transaction occurred. This did not violate FCC rules because the FCC does not prohibit ownership of two Top-Four stations in the same DMA that results from "organic growth." Second Order, 31 F.C.C.R. at 9883 ¶ 48 n.128.

Meanwhile, KTVA(TV), the CBS affiliate in the Anchorage DMA, was struggling. A34. In 2018, budget realities forced KTVA(TV) to lay off many newsroom staff, and the station explored a sale of its assets in 2019 and 2020. *Id.* But out-of-market buyers were not interested in an Anchorage market facing

---

applicant could not purchase a second local television station in a market unless there would be at least 8 independently owned television stations in the market following the transaction; and (2) there were not 8 independently owned local television stations in the Anchorage DMA following Gray's acquisition of KYES-TV. The FCC repealed the 8 voices test in 2017 in *In re 2014 Quadrennial Regulatory Review—Order on Reconsideration and Notice of Proposed Rulemaking*, 32 F.C.C.R. 9802 (2017), which the Supreme Court upheld. *See FCC v. Prometheus Radio Project*, 141 S. Ct. 1150 (2021).

significant economic headwinds. *Id*. Alaska was rated the worst state in the U.S. for business and, along with Anchorage, had a struggling economy.[7] A32. Local television broadcast advertising revenue in Anchorage had been decreasing for years.[8] A33. Recognizing KTVA(TV)'s difficulties, CBS reached out to Gray to explore shifting the CBS affiliation from KTVA(TV) to KYES-TV. A34.

Gray and KTVA(TV) (through Denali Media Holdings) entered into an agreement in which Gray would purchase certain of KTVA(TV)'s assets, including the CBS affiliation and the right to hire various KTVA(TV) employees. A34. Gray did not purchase KTVA(TV)'s station license, and KTVA(TV) retained its broadcasting facilities, leaving KTVA(TV) free to operate as an independent station or through a different network affiliation (which it did in September 2021). A8. The parties executed the agreement on July 24, 2020. A34. While KYES-TV was the fourth ranked station in the DMA at the time, the purchase of the CBS affiliation

---

[7] A32 (citing *Best States for Business 2019*, Forbes, https://www.forbes.com/places/ak/?sh=254c6efb6800); A33 (citing Tim Bradner, *Economy Struggles Amid Pandemic*, Alaskanomics.com (July 17, 2020), https://www.alaskanomics.com/2020/07/economy-struggles-amidpandemic.html; *2020 3-Year Economic Outlook Report*, Anchorage Economic Development Corporation (Aug. 8, 2020), https://aedcweb.com/wp-content/uploads/2020/08/0369_20_AEDC_2020-3-Year-Outlook_V5.pdf).

[8] In 2019, BIA Advisory Services estimated that local television broadcast advertising revenue in Anchorage was $21.9 million. A33 (citing data accessed from BIA ADVantage, BIA Advisory Services, www.advantage.bia.com). Two years earlier in 2017, BIA estimated that total broadcast advertising revenue was $27.1 million, reflecting a 19.19% drop in advertising revenue in just two years. *Id*.

(and related programming) made KYES-TV the second ranked station.  A6.

### B.    Gray's Cooperation in response to the FCC's Concerns.

On December 1, 2020, the FCC sent Gray a letter of inquiry regarding the Anchorage Transaction.  A35.  In a meeting on January 25, 2021, FCC staff expressed their view that the Rule Against Swaps prohibited the Transaction.  A35. Gray did not agree, but nonetheless developed a plan to reconfigure its Alaska operations.  *Id*.

Under the plan shared with FCC staff, Gray would move the CBS program stream to a low-power station in the DMA and simulcast that station's programming on a multicast program stream of KTUU-TV, Gray's other full power station.[9]  *Id*. This plan required technical changes, approval from CBS, coordination with multichannel video providers and program guide publishers, and notice to viewers, among other things.  *Id*.  Gray agreed to minor changes requested by FCC staff and completed the changes by March 3, 2021, as promised to the FCC.  *Id*.

### C.    The Notice of Apparent Liability.

On July 7, 2021, the FCC issued the *NAL*.  *First*, the FCC concluded that by

---

[9] This reconfiguration resolved the FCC's stated concerns because the multiple ownership restrictions in 47 C.F.R. § 73.3555(b) apply only to the primary program stream of full-power television stations.  The primary program streams of low-power stations and the multicast program streams of full-power and low-power stations do not factor into the FCC's multiple ownership analysis, even if those program streams are among the Top 4 rated program streams in a DMA.

purchasing "the CBS affiliation from KTVA(TV) for KYES-TV, Gray caused a change in network affiliation that *resulted in* Gray's owning and operating two of the top-four stations in the Anchorage DMA," and thus "apparently violated Note 11." A76 (emphasis added).

*Second*, the FCC proposed a forfeiture of $518,283. A77. Although it had "not previously proposed a forfeiture for" a Note 11 violation, the FCC applied the base forfeiture of $8,000 for "unauthorized substantial transfer of control" cases. A79. The FCC applied that penalty to each day between "July 31, 2020—the date that Gray acquired the CBS affiliation—to March 3, 2021." A80. The statute capped the maximum penalty at $518,283. *Id*.

*Finally*, the FCC stated it had reasons "to upwardly adjust" the forfeiture. *Id*. The FCC noted Gray's "significantly higher-than-usual ability to pay." *Id.* The FCC also claimed the Anchorage Transaction's timing "enabled Gray to take advantage of the record-setting political advertising expenditures in the months leading up to the 2020 election," as evidenced by a PBS Newshour article. The FCC purportedly "reviewed" the "downward adjustment" factors and thought none was "sufficiently compelling." *Id.*

### D.    Gray's Request for Cancellation.

On August 6, 2021, Gray requested that the FCC cancel the *NAL* and proposed forfeiture. A25. *First*, Gray explained that the Anchorage Transaction did not

violate Note 11's Rule Against Swaps because KYES-TV was already a Top-Four station at the time Gray purchased the CBS affiliation from KTVA(TV). A37, 40–41. Gray submitted the July 2020 Comscore Audience Share Data showing that KYES-TV was rated fourth in the DMA. A37.

*Second*, Gray explained that it had reasonably interpreted Note 11 as the Rule Against Swaps given the Second Order's extensive explanation that Note 11 addresses affiliation swaps. A44–50. Gray objected to the FCC's failure to provide notice that it would apply Note 11 to affiliation purchases. *Id*.

*Third*, Gray objected that the FCC's authority over license transfers did not encompass a station's affiliation change. A57–60. Gray noted that the FCC's assertion of authority over the Transaction as the "functional equivalent" of a license transfer was improper and unsupported by the evidence. *Id*. Gray challenged the FCC's authority under § 326 of the Communications Act and the First Amendment, which prohibit the FCC from penalizing Gray's programming choices. A60–61.

*Finally*, Gray objected to the FCC's proposed forfeiture penalty. A62–66. Gray objected that the proposed daily base forfeiture penalty was contrary to FCC precedent and practice. A62–63. Gray explained that its good faith cooperation with the FCC, its reasonable belief that it had not violated the Rule Against Swaps, and its use of the CBS affiliation to serve viewers in the Anchorage DMA warranted cancellation. A64–65.

### E.    The Forfeiture Order.

On November 1, 2022, the FCC issued the Forfeiture Order in a split 3-1 decision. A1. Confronted with the *NAL*'s flaws, the FCC modified its reasoning. *First*, the FCC concluded that Gray violated Note 11 because "Gray's acquisition of KTVA(TV)'s programming, including the CBS affiliation, and its placement of that programming on the primary stream of KYES-TV ***resulted in*** a ***new*** top-four ***combination***." A4 (emphasis added). The FCC denied that Gray already owned two Top-Four stations because the July 2020 Comscore data for KYES-TV was "not the 'most recent' ratings ***available*** at the time the agreement was 'executed'" on July 24, 2020. A5. The FCC turned to the June 2020 Nielsen data (to which Gray did not subscribe), which purportedly ranked KYES-TV fifth in the DMA. *Id.*

*Second*, the FCC concluded that "regardless of whether Gray already legally possessed a top-four combination through organic growth at the time of the transaction, acquisition of the CBS affiliation would still have 'result[ed] in' ownership of a new top-four combination . . . in violation of Note 11." A6. Gray purportedly violated this new interpretation because "Gray's common ownership of KTUU-TV and KYES-TV post-transaction would have resulted in a combination of the market's first and second-ranked stations. . ." *Id.*

*Third*, the FCC concluded for the first time that "[o]n alternative and independent grounds . . . Gray violated Note 11 because the affiliation acquisition. .

. was the functional equivalent of a station license transfer." A8. In the FCC's view, the Anchorage Transaction effectively left KTVA(TV) with a "bare license." *Id.*

*Fourth*, the FCC disputed its failure to provide notice that it would apply the Rule Against Swaps to programming sales. A9. The FCC claimed that Note 11 "does not contain the word swap or any similar limitation." *Id.* Ignoring extensive references to "affiliations swaps" in the Second Order, the FCC pointed to the Second Order's stray reference to "sale" and Note 11's "broad goal" as sufficient notice. A9–10.

*Fifth*, the FCC disagreed that the *NAL* exceeded its authority under § 326 and the First Amendment. A10. The FCC opined that an "affiliation transfer" has the "same result" as a transfer of control or assignment of a license, "which would be subject to [FCC] review and required to comply with the Local Television Ownership Rule." *Id.* Invoking its "general rulemaking authority," the FCC stated that "the NAL's application of Note 11 does not . . . violate the First Amendment and Section 326, because the restriction is not content-based," but rather had the "content-neutral" goal of "promoting competition." A11.

*Finally*, the FCC affirmed the $518,283 forfeiture penalty. *Id.* In so doing, the FCC purported to "affirm" a finding, not found in the *NAL*, that "the egregiousness of the misconduct . . . warranted an upward adjustment." A12. The FCC stated that the purported violation "reflect[ed] the brazen attempt by the owner

of the top-rated broadcast station in a market to acquire the affiliation of the second-ranked station. . ."  A14.

Commissioner Simington disagreed with the FCC majority.  In his dissent, he explained that "[w]hether Gray, at the time of the transaction, owned two of the top-four rated televisions stations in Anchorage must matter if the Rule provides that affiliation swaps 'result[ing] in' a duopoly are prohibited."  A17.  He objected that the Forfeiture Order "goes beyond precedent and against the text of our rules."  A18.

## STANDARDS OF REVIEW

In reviewing a final FCC order, this Court applies the APA's review standards. *Autauga Cty. Emergency Mgmt. Commun. Dist. v. FCC*, 17 F.4th 88, 98 (11th Cir. 2021).  The Court will vacate an agency order that is "contrary to constitutional right" or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. §706(2)(B), (C).

The Court "must set aside agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *E. Hydroelectric Corp. v. FERC*, 887 F.3d 1197, 1201 (11th Cir. 2018) (quoting 5 U.S.C. § 706(2)(A)).  "[T]he court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Vidiksis v. EPA*, 612 F.3d 1150, 1154 (11th Cir. 2010) (quotation marks and citation omitted).  While deferential, judicial "inquiry into the facts is to be searching and careful."

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).

This Court will overturn an agency's sanction "if it is either 'unwarranted in law or is without justification in fact.'" *E. Hydroelectric Corp.*, 887 F.3d at 1201 (quoting *Vidiksis*, 612 F.3d at 1154).

## SUMMARY OF THE ARGUMENT

The Forfeiture Order should be vacated for four reasons:

***First***, the FCC lacked the authority to issue the Forfeiture Order.  Congress specifically delegated to the FCC authority over license transfers under § 310(d) of the Communications Act, but the Anchorage Transaction did not involve a license transfer.  Both before and after the Transaction, Gray possessed the licenses for KTUU-TV and KYES-TV, and Denali possessed (and to this day possesses and operates) KTVA(TV)'s license.  To circumvent that limitation on its authority, the FCC deemed the Transaction the "functional equivalent" of a license transfer and claimed without explanation that §§ 154(i) and 303(r)—known as ancillary authority—allowed it to regulate.  But Congress did not delegate authority to the FCC to prohibit transactions that may be the "functional equivalent of" license transfers (language Congress used in other contexts but not here), nor could the FCC stretch its "ancillary authority" to prohibit the Transaction.  Consequently, the FCC had no authority to penalize and cannot justify penalizing Gray's programming

choices, which are protected by § 326 of the Communications Act and the First Amendment.

***Second***, even if it had authority to issue Note 11, the FCC erroneously concluded the Anchorage Transaction violated it.  To find a violation where none existed, the FCC redefined the station ranking rule applicable under the Note to disregard Gray's uncontroverted evidence showing that Gray ***already owned*** two Top-Four stations in the DMA at the time of the Transaction and therefore the Transaction did not ***result in*** Gray owning two Top-Four stations.  The FCC also improperly redefined and expanded Note 11 during this proceeding to prohibit a sales transaction if it results in a "*new*" Top-Four "*combination*."  Finally, the FCC concluded that Gray "independently violated" Note 11 because the Transaction was the "functional equivalent" of a license transfer by purportedly leaving KTVA(TV) with a "bare license."  Note 11 is silent on the "functional equivalent" of a license transfer, and nothing in the Second Order treats a so-called "bare license" transaction as a license transfer or its "functional equivalent."  Moreover, the FCC's "bare license" finding was contrary to the record and inconsistent with FCC precedent.

***Third***, even if the FCC's new interpretations of Note 11 might have been reasonable, principles of fair notice do not allow the FCC to modify the rules during a proceeding and penalize the broadcaster based on new interpretations.  The FCC's new interpretations of Note 11 to redefine the meaning of "results in," to modify the

applicable rankings rule, and to alter the regulation to prohibit "new" Top-Four "combinations" were critical modifications that required prior notice.

*Fourth*, the FCC committed multiple errors in assessing a statutory maximum penalty. The FCC erroneously assessed a daily base forfeiture penalty, which departed from FCC precedent. In considering the adjustment criteria under the statute and regulations, the FCC manufactured a new "egregiousness" justification despite Gray's cooperation and the absence of that rationale in the *NAL*. The FCC also failed to consider relevant factors, including the circumstances of the alleged violation and Gray's good faith efforts to comply with the FCC's rules. And the FCC relied on a "substantial economic gain" justification with no factual support.

Each of the foregoing errors warrants vacatur of the Forfeiture Order.

## ARGUMENT

## I.    THE FCC EXCEEDED ITS AUTHORITY IN ITS APPLICATION OF NOTE 11 TO THE ANCHORAGE TRANSACTION.

The Court should vacate the Forfeiture Order because the FCC exceeded its authority. 5 U.S.C. §706(2)(B), (C). "The [FCC] has no constitutional or common law existence or authority, but only those authorities conferred upon it by Congress." *Am. Library Ass'n v. FCC*, 406 F.3d 689, 698 (D.C. Cir. 2005) (internal quotation marks omitted). Here, the FCC exceeded its authority under §§ 310 and 326 of the Communications Act, and under the First Amendment.

### A.    The FCC Exceeded Its Authority Over License Transfers Under § 310(d) of the Communications Act.

Congress has conferred on the FCC authority over license transfers.  47 U.S.C. § 310(d).  The FCC has relied on that authority to promulgate regulations applicable to licensees, including the multiple ownership rules that include Note 11.  *See* 47 C.F.R. § 73.3555.  As reflected in the Second Order, the FCC has deemed it necessary to invoke its ancillary authority under §§ 154(i) and 303(r) of the Communications Act to adopt non-statutory ownership rules.  But the FCC cannot use ancillary authority to adopt or enforce rules ***untethered*** to its authority over license transfers or renewals, as it did here.

### 1.    The FCC Had No § 310(d) Authority Over the Anchorage Transaction Because There Was No License Transfer.

To determine whether the FCC exceeded its authority under § 310(d), this Court looks to the statute's plain language.  *See Southern Co. v. FCC*, 293 F.3d 1338, 1343 (11th Cir. 2002).  "If the intent of Congress is clear, that is the end of the matter[.]"  *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984); *Wachovia Bank, N.A. v. United States*, 455 F.3d 1261, 1267 (11th Cir. 2006) (same).

Section 310(d) plainly authorizes the FCC to regulate only the transfer of station licenses.  It provides that:

> No . . . ***station license***, or any rights thereunder, shall ***be transferred***, . . . in any manner, voluntarily or involuntarily, directly or indirectly, . .

. to any person except upon application to the [FCC] and upon finding
by the FCC that the public interest, convenience, and necessity will be
served thereby.

47 U.S.C. § 310(d) (emphasis added).  The FCC has conceded it lacks authority

under § 310(d) over affiliation swaps, as it explained in the proposed rulemaking

that led to Note 11's adoption.  In the FCC's words, "[b]ecause . . . affiliation swaps

do not involve the assignment or transfer of a station license, the transaction is not

subject to prior [FCC] approval under [§] 310(d). . ."[10]

By invoking its "ancillary authority" in the Forfeiture Order, the FCC

implicitly acknowledged that it lacked authority under § 310(d) to restrict the

Anchorage Transaction because there was no license transfer.  A11.  Gray acquired

KTVA(TV)'s network affiliation—leaving KTVA(TV)'s broadcast license and

facilities intact.  Thus, absent some other authority, the Forfeiture Order must be

vacated.  *See Mozilla Corp. v. FCC*, 940 F.3d 1, 74–86 (D.C. Cir. 2019) (per curiam)

(vacating portion of FCC order that was beyond FCC's statutory authority); *Am.

Library Ass'n*, 406 F.3d at 708 (vacating FCC order after concluding FCC lacked

statutory authority).

---

[10] *In the Matter of 2014 Quadrennial Regul. Rev. F Rev. of the Commission's Broad.
Ownership Rules & Other Rules Adopted Pursuant to Section 202 of the
Telecommunications Act of 1996*, 29 F.C.C.R. 4371, 4391 ¶ 47 (2014) ("*FNPRM*").

### 2.     The FCC Has No Authority Over Transactions It Deems the "Functional Equivalent" of a License Transfer.

The FCC concluded that it had authority over the Anchorage Transaction and Gray "independently violated" Note 11 because (in the FCC's view) the Transaction was the "functional equivalent" of a license transfer.  A8, 10–11.  The FCC reasoned that it had such authority because an "affiliation transfer" could achieve the "same result" as a license transfer, which "would be" subject to the FCC's § 310(d) authority.  A10.

The fundamental flaw in the FCC's argument is that Congress never delegated to the FCC authority to regulate transactions it deems the "functional equivalent" of license transfers.  Section 310(d)'s delegation is precise, and the FCC's view that Congress should have delegated more authority cannot override the statute's actual scope.  *See Am. Library Ass'n*, 406 F.3d at 699 (FCC's interpretation of its authority "is not entitled to deference absent a delegation of authority from Congress to regulate in the areas at issue'" (quoting *Motion Picture Ass'n of Am., Inc. v. FCC*, 309 F.3d 796, 801 (D.C. Cir. 2002)); *Southern Co.*, 293 F.3d at 1346–47 (rejecting "[t]he FCC's attempt to mandate capacity expansion" as "outside of the purview of its authority under the plain language of the statute").

Section 310(d) is the only statute concerning license transfers, and it does not broadly grant authority to regulate swaps the agency deems the "functional equivalent" of a license transfer or that might "achieve the same result" as a license

23

transfer.  47 U.S.C. § 310(d).  Indeed, Congress could have used the phrase "functional equivalent" in § 310(d), as it did elsewhere in the Communications Act in delegating authority to the FCC.  For example, Congress delegated authority to the FCC to regulate "private mobile services," which Congress defined as "any mobile service . . . that is not a commercial mobile service or the *functional equivalent* of a commercial mobile service, as specified by regulation of the Commission."  47 U.S.C. § 332(d)(3) (emphasis added); *see also Mozilla Corp.*, 940 F.3d at 44 (noting in commercial mobile service context that "the Commission properly underscore[d] its statutory 'discretion' to define functional equivalence" (emphasis added)).  Congress also directed the FCC to ensure the availability of nationwide access to "*functionally equivalent*" telecommunications relay services "to hearing-impaired and speech-impaired individuals in the United States."  47 U.S.C. § 225(a)(3), (b)(1) (emphasis added); *see also Sorenson Commc'ns, Inc. v. FCC*, 659 F.3d 1035, 1042 (10th Cir. 2011) ("Section 225 does not define 'functionally equivalent' and therefore leaves the definition to the FCC.").

As the Supreme Court has made clear, "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally or purposely in the disparate inclusion or exclusion."  *Russello v. United States*, 464 U.S. 16, 23 (1983) (brackets and quotations omitted); *Collins v. Experian Info. Solutions, Inc.*, 775 F.3d 1330,

1335 (11th Cir. 2015) (same).  That presumption squarely applies here.  Section 310(d) specifically grants authority over license transfers and does not grant broad authority to regulate other transactions that the FCC deems the "functional equivalent" of license transfers.  It is up to Congress, not the FCC, to decide whether to expand the FCC's authority.  *See Am. Library Ass'n v. FCC*, 406 F.3d at 698.

### 3. The FCC's Ancillary Authority Does Not Justify Enforcement of Note 11 Against Gray.

Lacking authority over the Anchorage Transaction under § 310(d), the FCC fell back—in a footnote—on its "ancillary authority" under §§ 154(i) and 303(r) of the Communications Act to adopt rules "necessary" to enforce the Act.[11]  A11.  The FCC combined that footnote with the assertion that "Note 11 is intended to eliminate rule circumvention and *potential* loopholes and accordingly ban[s] affiliation acquisitions," A10 (emphasis in original), presumably meaning that the FCC can generally use its ancillary authority to close perceived "potential loopholes."

The FCC cannot rely on its ancillary authority to justify the Forfeiture Order. *First*, the agency failed in the Forfeiture Order to explain the statutory basis for exercising ancillary *rulemaking* authority to prohibit the Anchorage Transaction in

---

[11] Under 47 U.S.C. § 154(i), the FCC has authority to "make such rules and regulations, and issue such orders, *not inconsistent* with this chapter, as may be necessary in the execution of its functions" (emphasis added).  Similarly, under 47 U.S.C. § 303(r), the FCC has the authority to "[m]ake such rules and regulations and prescribe such restrictions and conditions, not inconsistent with law, as may be necessary to carry out the provisions of this chapter."

an enforcement proceeding (not a rulemaking). In the Forfeiture Order, as in the Second Order, the FCC invoked ancillary authority with a bare citation to §§ 154(i) and 303(r) and a string cite. A11 (citing *FCC v. Nat'l Citizens Comm. for Broad.*, 436 U.S. 775, 793–94 (1978) ("*NCCB*"); *United States v. Storer Broad. Co.*, 351 U.S. 192, 202–03 (1956) ("*Storer*"); *Nat'l Broad. Co. v. United States*, 319 U.S. 190, 219 (1943) ("*NBC*")); Second Order, 31 F.C.C.R. at 9882 ¶ 47 n.122 (same). The FCC failed to explain how these statutes or cases supported the invocation of its ancillary authority here. *Id.* That failure is fatal because this Court cannot uphold an agency action on a ground not invoked when the action was taken. *See Dep't of Homeland Sec. v. Regents of the Univ. of California,* 140 S. Ct. 1891, 1907 (2020) ("It is a foundational principle of administrative law that judicial review of agency action is limited to the grounds that the agency invoked when it took the action" (internal quotation marks omitted)).

*Second*, and more fundamentally, "[t]he FCC must act pursuant to *delegated authority* before" it can act under §§ 154(i) and 303(r), but no delegated authority applies here. *See Motion Picture Ass'n of Am. v. FCC*, 309 F.3d 796, 806 (D.C. Cir. 2002) (emphasis in original) (rejecting FCC's reliance on §§ 154(i) and 303(r) to promulgate video description rules because the FCC cited no statute authorizing the FCC to promulgate such rules). The only authority the FCC could invoke here is § 310(d)'s limited delegation of authority over license transfers—authority the FCC

conceded does ***not*** apply to affiliation swaps or other transactions for affiliations or programming. *See FNPRM*, 29 F.C.C.R. at 4391 ¶ 47.

Indeed, § 310(d) does not apply here, nor did Congress grant broad authority over the "functional equivalents" of license transfers, language Congress used elsewhere when it intended to delegate such authority. *See supra* Part I.A.1–2. Because Congress elected to grant only limited power under § 310(d) to the FCC, and the FCC has not tethered the Forfeiture Order to any other delegated authority, the FCC cannot rely on its "ancillary authority" here. *See Comcast Corp. v. FCC*, 600 F.3d 642, 661 (D.C. Cir. 2010) (rejecting FCC's reliance on ancillary authority to regulate Comcast's network management practice because "[the FCC] has failed to tie its assertion of ancillary authority over Comcast's Internet service to any 'statutorily mandated responsibility'").

Finally, the cases cited in the Forfeiture Order are all distinguishable. In each case, the FCC anchored its rules in the authority Congress delegated to the FCC to grant, renew, or approve a transfer of a broadcast license. *See, e.g.*, *NCCB,* 436 U.S. at 785 n.8, 809–810 (upholding cross-ownership rules that included a prohibition on newspaper owners buying TV or radio stations and a requirement that broadcast station owners divest ownership of a newspaper upon renewal of a station license as ancillary to the FCC's statutory authority to decide whom to license); *NBC*, 319 U.S. at 216–17 (upholding rules under which FCC would not grant license, renewal, or

transfer to station owner that was party to certain types of agreements with network programmers, as within the FCC's statutory licensing authority); *Storer*, 351 U.S. at 194–195 (upholding FCC rule denying additional licenses to station owner that already owned more than five licenses nationwide). These cases make clear that the FCC's authority to create and enforce rules must be ***tethered to*** the FCC's statutory licensing authority.

Here, in the absence of a statutory foundation for Note 11, the agency lacks authority to enforce it. *See Am. Library Ass'n*, 406 F.3d at 692 ("There is no statutory foundation for the broadcast flag rules, and consequently the rules are ancillary to nothing."). Indeed, if the FCC could invoke its ancillary authority over the purchase of a programming affiliation here—where Congress did not delegate such authority under § 310(d)—there would be no principled limit to the FCC's power over broadcast licensees. This case presents a perfect example of an agency defining its own power well beyond its delegated authority.

### B. The FCC Has No Authority Over Gray's Programming Choices Under § 326 of the Communications Act or the First Amendment.

The FCC's effort to expand its authority is particularly problematic here because it violates statutory and constitutional limitations on the FCC's authority. The Forfeiture Order unlawfully penalized Gray's choice to purchase the CBS network affiliation and related programming for the Anchorage DMA. This violates § 326 of the Communications Act and the First Amendment, which prohibit the FCC

from interfering with broadcasters' programming choices.

Under § 326, "*no* regulation or condition shall be promulgated or fixed by the FCC which shall interfere with the right of free speech by means of radio communication." 47 U.S.C. § 326 (emphasis added); *see Turner Broad. Sys. v. FCC*, 512 U.S. 622, 650 (1994) ("The FCC is well aware of the limited nature of its jurisdiction, having acknowledged that it 'has no authority and, in fact, is barred by the First Amendment and [§ 326] from interfering with the free exercise of journalistic judgment.'"). As the Supreme Court has underscored, "the FCC's oversight responsibilities do not grant it the power to ordain any particular type of programming that must be offered by broadcast stations." *Turner Broad. Sys.*, 512 U.S. at 650.

The Forfeiture Order burdens Gray's First Amendment rights by penalizing its programming choices.[12] The FCC conceded that it found a violation due to Gray's acquisition of programming, A4, but sought to justify this interference as

---

[12] The First Amendment protects the programming choices of broadcasters like Gray. *See FCC v. League of Women Voters*, 468 U.S. 364, 378 (1984) ("[B]roadcasters are 'entitled under the First Amendment to exercise 'the widest journalistic freedom consistent with their public [duties].'" (quoting *Columbia Broadcasting System, Inc. v. Democratic Nat'l Committee*, 412 U.S. 94, 110 (1973))); *see also Community-Service Broadcasting of Mid-America, Inc. v. FCC*, 593 F.2d 1102, 1110 (D.C. Cir. 1978) (commercial and noncommercial broadcasters "are entitled to invoke the protection of the First Amendment and to place upon the Government the burden of justifying any practice which restricts free decisionmaking" over "the content or selection of programs to be broadcast").

"content-neutral," A11.  But even a content-neutral regulation must, at a minimum, "*further*[] an important or substantial governmental interest."  *Turner Broad. Sys*., 512 U.S. at 662 (quoting *United States v. O'Brien*, 391 U.S. 367, 377 (1968)) (emphasis added).  The Forfeiture Order fails to meet this burden.

The only governmental interest the FCC identified in the Forfeiture Order is a general interest in promoting competition.  A11.  That general interest cannot justify the intrusion on Gray's rights here.  While courts have stated that "promotion of competition in local markets" may be a proper government interest, *NCCB*, 436 U.S. at 796, "the mere abstract assertion of a substantial governmental interest, standing alone, is insufficient to justify the subordination of First Amendment freedoms," *Century Comm'cns Corp. v. FCC*, 835 F.2d 292, 295 (D.C. Cir. 1987).

The burden on First Amendment rights also is not permitted if the government's action does not ***further*** the asserted interest.  *See Community-Service Broad. of Mid-America, Inc. v. FCC*, 593 F.2d 1102, 1122 (D.C. Cir. 1978) ("[T]he First Amendment does not permit us to tolerate even minimal burdens on protected rights where no legitimate government interest is truly being served.").  The Forfeiture Order fails to explain how it furthered any interest in promoting competition.  *See Time Warner Entm't Co. v. FCC*, 240 F.3d 1126, 1137–38 (D.C. Cir. 2001) (vacating FCC rule as arbitrary and capricious where the FCC "provide[d] nothing but the conclusion" that vertical limits on the cable industry advanced

30

"diversity in programming and fair competition"); *Schurz Comm'cns, Inc. v. FCC*, 982 F.2d 1043, 1050 (7th Cir. 1992) (vacating FCC financial and syndication rules where the FCC's "articulation of its grounds [was] not adequately reasoned" and notes that "if the networks do have market power, the new rules . . . do not seem rationally designed to prevent its exercise").

The Forfeiture Order cited no facts showing that its interference with Gray's programming choice in the Transaction furthered any interest in competition in the Anchorage DMA.  A10–11.  The FCC's recitation of rhetoric from the Second Order—merely referencing the promotion of competition generally—fails to demonstrate that the agency considered the facts here.  A11.  It is well established that such boilerplate recitations do not constitute reasoned decision-making sufficient to justify the Forfeiture Order.  *See Time Warner Entm't Co., L.P.*, 240 F.3d at 1137–38; *Schurz Comm'cns*, 982 F.2d at 1050.

Nothing in the record shows that application of Note 11 to the Anchorage Transaction promoted competition.  Gray has the *same network affiliations* in the Anchorage DMA as it did when the Transaction closed.  The only change Gray made to address the FCC's concerns—which the agency found ended the supposed Note 11 violation—was Gray's movement of the CBS programming from a full-power station to a low-power station.  A3.  Nothing in the record indicates that either the acquisition and placement of CBS programming on a full-power station or the shift

31

of that programming to a low-power station had any effect whatsoever on competition in the DMA. Thus, the FCC has failed to show that its interest in promoting competition justified its interference with Gray's programming choices.

## II.   THE FCC ERRONEOUSLY CONCLUDED THAT GRAY VIOLATED NOTE 11.

Even if the FCC had the authority to apply Note 11 to the Transaction (it did not),[13] the Forfeiture Order should be vacated because the FCC failed to follow its own regulation. *See Sierra Club v. Martin*, 168 F.3d 1, 4 (11th Cir. 1999) ("[C]ourts must overturn agency actions which do not scrupulously follow the regulations and procedures promulgated by the agency itself."). *First*, the FCC redefined Note 11 to add a new requirement that the audience share data used to determine a station's ranking must be the "most recent data available" at the time of the transaction agreement, as opposed to the most recent data showing the ranking at the relevant time. *Second*, the FCC broadened Note 11 to prohibit sale transactions that purportedly result in a "new" Top-Four "combination." *Finally*, the FCC erroneously concluded, contrary to the record, that Gray violated Note 11 because

---

[13] As discussed below, Note 11 was adopted to prohibit two licensees from "swapping" their affiliations without FCC review if that swap would result in ownership of two Top-Four stations in a DMA. *See infra* Part III.B. Leaving aside whether the FCC had authority to promulgate this rule, *see supra* Part I, no swap occurred here. Gray purchased programming from another station in a one-way sales transaction. For this reason, Note 11 does not apply, and the Forfeiture Order should be vacated.

the Transaction was the "functional equivalent" of a license transfer by purportedly leaving KTVA(TV) with almost a "bare license."

### A. The FCC Improperly Redefined its Regulation to Ignore Undisputed Evidence that Gray Already Owned Two Top-Four Stations at the Time of the Transaction and to Find that Gray Violated Note 11 By Creating a "New" Top-Four "Combination."

The FCC disregarded undisputed evidence that KYES-TV was already a Top-Four station at the time the agreement for the Anchorage Transaction was executed in July 2020 and that therefore the Transaction did not "result in" ownership of two Top-Four stations in the DMA.  The agency accomplished this by redefining two aspects of Note 11: (1) how stations are ranked and (2) what it means to "result in" ownership of two Top-Four stations.  This was improper.

To determine the meaning of Note 11, the Court must look at its language. *See Landau v. RoundPoint Mortg. Servicing Corp*., 925 F.3d 1365, 1369–70 (11th Cir. 2019).  "If [the Court's] review of the regulatory language unambiguously answers the question at issue, that is the end of the matter, and [the Court] do[es] not consider how the administering agency construes the regulation."  *Id*.  "The regulation then just means what it means—and the court must give it effect, as the court would any law."  *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019).

Note 11's language is clear: it prohibits an entity from acquiring the network affiliation of another station in the same DMA "if the change in network affiliations would ***result in*** the licensee of the new affiliate . . . directly or indirectly owning,

operating, or controlling *two of the top-four rated* television stations in the DMA at the time of the agreement." 47 C.F.R. 73.3555 n.11 (emphasis added).

Note 11 instructs parties to determine whether a station is a Top-Four station by referring to a method set forth in the Second Order. *Id.* The Second Order provides that "for purposes of making this determination"—*i.e.*, the ranking determination for Note 11—"the new affiliate's post-consummation ranking will be the ranking of the previous affiliate at the time the agreement is executed, determined in accordance with Section [47 C.F.R.] § 73.3555(b)(1)(i)." Second Order, 31 F.C.C.R. at 9885 ¶ 52 n.141. Because § 73.3555(b)(1)(i) also does not set forth a ranking rule, the FCC applied the ranking rule set forth in 47 C.F.R. § 73.3555(b)(1)(ii). Under this regulation, a station's ranking "in the DMA" is "based on the most recent all-day (9 a.m.-midnight) audience share, as measured by Nielsen Media Research or by any comparable professional, accepted audience ratings service." 47 C.F.R. § 73.3555(b)(1)(ii).

Following these instructions, a station's ranking at the time the transaction agreement was executed is determined by its most-recent all-day audience share in the DMA for that time, using Nielsen ratings or the ratings of "any comparable professional, accepted audience ratings service." *Id.*

The phrase "result in" also must be given meaning. *See Glazer v. Reliance Std. Life Ins. Co.*, 524 F.3d 1241, 1245 (11th Cir. 2008) ("[C]ourts should avoid

rendering . . . provisions of a regulation superfluous or inoperative."). Note 11 does not define "result in," so its ordinary meaning applies. *See Rafferty v. Denny's, Inc.*, 13 F.4th 1166, 1180 (11th Cir. 2021). The ordinary meaning of the verb "result" in 2016, when the FCC adopted Note 11, was "[t]o be a physical, logical, or legal consequence; to proceed as an outcome or conclusion." Black's Law Dictionary, *Result* (10th ed. 2014). Citing this definition, Commissioner Simington explained in his dissent that "result" means "a causal relationship between an action and an outcome." A17. As he explained, "the formation of a duopoly *simpliciter* through an affiliate swap is all that the plain language of the Rule prevents. If Gray previously had a duopoly in Anchorage, its behavior was ***not prohibited*** under a plain reading of the Rule." A17–18 (emphasis added).

Applying Note 11's plain language, Gray clearly did not violate the rule. According to the Comscore Audience Share Data for the month of July 2020 (when the transaction agreement was executed), KYES-TV was ranked fourth in the Anchorage DMA, and KTUU-TV, Gray's other station, was ranked first.[14] Therefore, because Gray ***already owned*** two Top-Four stations (KYES-TV and KTUU-TV) at the time Transaction agreement was executed (July 2020), the Transaction did not "result in" Gray owning two Top-Four stations in the DMA.

---

[14] The FCC did not question that the Comscore Audience Share Data is a "professional, accepted audience ratings service" comparable to Nielsen.

To nevertheless find a violation of Note 11, the FCC redefined both the meaning of "results in" and the application of the ranking rule.

*First*, the FCC decided that, even if Gray already owned two Top-Four stations in the DMA at the time of the Transaction, Gray *still* violated Note 11 because the Transaction purportedly "'result[ed] in' ownership of a ***new*** top-four ***combination***." A4 (emphasis added). This expansion of Note 11 finds no support in the Note and must be set aside. Note 11 does not prohibit "new" Top-Four "combination[s]," only swaps that "result in" ownership of two of the Top-Four stations in the DMA. The FCC cannot depart from its regulations and create new standards to reach a preferred result. *See Glycine & More, Inc. v. United States*, 880 F.3d 1335, 1345 (Fed. Cir. 2018) (agency notice was "an incompatible departure from the clear meaning of the regulation" where the notice adopted a new standard for the regulation).

The FCC's only attempt to justify its expansive "new combination" standard is its reliance on Note 11's "broader goal to prevent transactions between licensees in the same DMA that circumvent the Local Television Ownership Rule and diminish competition." A6. This goal-based expansion of the rule cannot be squared with the well-settled principle that an agency cannot rewrite a regulation through interpretation. *See Christensen v. Harris Cnty.*, 529 U.S. 576, 587–88 (2000); *Legal Envtl. Assistance Found., Inc. v. EPA*, 276 F.3d 1253, 1264 (11th Cir. 2001)

36

("Deference . . . is not a license for an agency effectively to rewrite a regulation through interpretation.") (citation omitted).

*Second*, the FCC also decided, without prior notice, that the July 2020 rating must be disregarded in favor of June 2020 data, because June 2020 audience share data was "the 'most recent' ratings *available* at the time the agreement was executed." A5 (emphasis added).  By adding the word "available"—which appears nowhere in the regulation—the FCC could disregard the inconvenient Comscore July 2020 ranking and instead apply its preferred Nielsen June 2020 ranking, which ranked KYES-TV as fifth, essentially manufacturing a violation of Note 11.

This reinterpretation of the station ranking method under Note 11 also was improper.  *See Legal Envtl. Assistance Found.*, 276 F.3d at 1264.  Note 11 directs parties to the Second Order, *see* 47 C.F.R. § 73.3555(b)(1)(ii), n.11, and under the Second Order, a station's ranking *is* its ranking "at the time the agreement is executed."  Second Order, 31 F.C.C.R. at 9885, ¶ 52 n.141.  By inserting the "availability" requirement, the FCC relied on ratings from a month *before* the Transaction agreement was executed, ignoring the data showing KYES-TV's ranking at the time of the agreement.

Both result-oriented interpretations were improper and should be set aside.  The FCC cannot "create de facto a new regulation" through the guise of interpretation.  *See Christensen*, 529 U.S. at 587–88; *Legal Envtl. Assistance Found.*,

276 F.3d at 1264; *see also Glycine & More*, 880 F.3d at 1345 ("Since the 2011 Notice was intended to effectively rewrite the substantive meaning of the regulation without going through the necessary notice-and-comment rule[-]making, it has no legal standing, and thus provides no basis upon which the Secretary could make his decision."). That is precisely what the FCC did in the Forfeiture Order, and it must be vacated.

**B.    The FCC Erroneously Found that Gray "Independently Violated" Note 11 By Deeming the Anchorage Transaction the "Functional Equivalent" of a License Transfer.**

The FCC wrongly found "on alternative and independent grounds . . . that Gray violated Note 11 because the affiliation acquisition . . . was the functional equivalent of a station license transfer" by purportedly leaving KTVA(TV) with effectively a "bare license." A8. The FCC lacked authority to regulate the "functional equivalent" of a license transfer, *see supra* Part I.A.2, but even if it had such authority the FCC erred because Note 11 does not prohibit transactions that are the "functional equivalent" of license transfers and because the FCC arbitrarily departed from its precedent in finding that KTVA(TV) retained only a "bare license."

*First*, the FCC's "functional equivalent" finding was plainly erroneous. Note 11 does not prohibit transactions that are the "functional equivalent" of a license transfer, nor does it prohibit a "bare license" transaction. *See* 47 C.F.R. § 73.3555

n.11. While the Second Order called affiliation swaps the "functional equivalent" of license transfers, 31 F.C.C.R. at 9882–83, ¶¶ 47–48 & n.130, that language appears *nowhere* in the regulations. *See supra* Part I.A; 47 C.F.R. § 73.3555. Thus, the FCC's new "functional equivalent" theory departed from the regulations and cannot support the Forfeiture Order. *See Glycine & More*, 880 F.3d at 1345.

*Second*, the FCC's "bare license" finding was arbitrary and capricious because it departed without explanation from the FCC's precedent on what constitutes a "bare license." *See Ramaprakash v. FAA*, 346 F.3d 1121, 1125 (D.C. Cir. 2003) (agency's failure to explain departure from prior precedent is arbitrary and capricious); *McHenry v. Bond*, 668 F.2d 1185, 1190 (11th Cir. 1982) (same).

Under FCC precedent, a "bare license" issue arises when a licensee has sought to transfer a license to a party without also transferring the means to operate facilities under that license. *See*, *e.g., In the Matter of Gresham Commc'ns, Inc. & Charles W. Cherry, II Receiver Assignee & Charles W. Cherry, II Receiver for Gresham Commc'ns, Inc. & Caswell Cap. Partners, LLC Assigne*e, 26 F.C.C.R. 11895, 11903 ¶ 15 (2011). The FCC has concluded that "the presence of . . . rights and commitments" over transmission facilities "is sufficient to establish that the transaction involves *more than* a bare license . . ." *In Re Application of FM Broad. of Douglas Cnty. (Formerly, Gee Jay Broad., Inc.) Assignor & Tri City Commc'ns, Inc. Assignee*, 10 F.C.C.R. 10429 ¶ 15 (1995) (emphasis added).

Here, the record contradicts the FCC's conclusion that the Transaction left the seller of the programming with nearly a "bare license." A8. Indeed, the FCC conceded that the selling broadcaster retained ownership not only of its license, but also of the "KTVA(TV) transmission facilities," and that it "secured a programming source and resumed operations on September 2, 2021." A2. These facts more than satisfy the FCC's standard to defeat a "bare license" allegation under established FCC precedent, and the FCC's finding cannot support the Forfeiture Order.

## III. THE FCC'S FAILURE TO PROVIDE FAIR NOTICE OF ITS NOVEL INTERPRETATIONS OF NOTE 11 REQUIRES VACATUR.

The Court should vacate the Forfeiture Order because the FCC failed to give Gray fair notice of the FCC's novel interpretations of Note 11. 5 U.S.C. § 706(2)(B). "Traditional concepts of due process incorporated into administrative law preclude an agency from penalizing a private party for violating a rule without first providing adequate notice of the substance of the rule." *Satellite Broad. Co. v. FCC*, 824 F.2d 1, 3 (D.C. Cir. 1987); *see also Kisor*, 139 S. Ct. at 2417–418 (an agency must give "fair warning" to a regulated party of the agency's interpretation of its regulations); *Trinity Broad. of Fl., Inc. v. FCC*, 211 F.3d 618, 628–630 (D.C. Cir. 2000).

### A. The FCC Gave No Notice of Its Novel "Most Recent Ratings Available" and "New" Top-Four "Combination" Interpretations of Note 11.

The FCC cannot rely on its revised ranking rule or "new combination" interpretation in the Forfeiture Order to conclude that Gray violated Note 11 because

the agency failed to provide Gray with prior notice of these new standards. *See Trinity Broad.*, 211 F.3d at 628 (asking "whether 'by reviewing the regulations and other public statements issued by the agency, a regulated party acting in good faith would be able to identify, with ascertainable certainty, the standards with which the agency expects parties to conform'") (citation omitted); *General Elec. Co. v. EPA*, 53 F.3d 1324, 1329 (D.C. Cir. 1995) (same).

The Second Order makes unambiguously clear that a station's ranking is "the ranking . . . at the time the agreement is executed." Second Order, 31 F.C.C.R. at 9885 ¶ 52 n.141. The FCC provided no prior notice that, instead of the actual ranking at the time the agreement is executed, as the Second Order states, the ranking must be derived from audience share data "available" at the time the agreement is executed. This "available" standard was not invented until the Forfeiture Order, and its reasoning and its meaning are still unclear (*e.g.*, why would the actual ranking at the relevant time not be controlling? to whom must the data be available?). Gray reasonably relied on the regulation and the Second Order to submit the most recent data showing KYES-TV's ranking at the time the agreement for the Transaction was executed in July 2020.

In a similar vein, the FCC's rules and the Second Order make clear that Note 11 does not prohibit "*new*" Top-Four "*combination[s]*," only swaps that result in ownership of two of the Top-Four stations in the DMA. *See supra* Part II.A. Note

41

11's plain language does not prohibit an improvement in a Top-Four station's ranking that would purportedly create a "new combination" of Top-Four stations.[15] Accordingly, it was unreasonable to expect Gray to divine that the Transaction was prohibited under the FCC's new interpretation.

Even if there were any ambiguity in the regulation such that the FCC could adopt these new interpretations, the FCC's failure to provide *advance* notice of these new interpretations precluded the FCC from applying them to find a Note 11 violation in this proceeding, and that requires vacatur. *See Satellite Broad.*, 824 F.2d at 4 ("The FCC . . . cannot . . . punish a member of the regulated class for reasonably interpreting Commission rules. . . .[If the FCC] wishes to use that interpretation to cut off a party's right, it must give full notice of its interpretation."); *see also Kisor*, 139 S. Ct. at 2417–18 ("[A] court may not defer to a new interpretation, whether or not introduced in litigation, that creates 'unfair surprise' to regulated parties.") (citation omitted).

**B.    The FCC Unfairly Penalized Gray for Its Reasonable Interpretation of the Rule Against Swaps.**

The Forfeiture Order also violated fair notice principles by applying Note 11—known as the Rule Against Swaps—to a transaction that did not involve an

---

[15] Indeed, the FCC takes no issue with increasing a station's ranking by "acquiring higher quality syndicated programming," even if that results in a new top-four combination.  Second Order, 31 F.C.C.R. at 9883 ¶ 48 n.128.

affiliation swap. When an agency provides inconsistent statements of its regulation, or where the agency's interpretation departs from what a reasonable person would understand, the agency has failed to give the fair notice necessary to impose a penalty on a regulated party. *See Satellite Broad.*, 824 F.2d at 2–3.

Note 11 incorporates the Second Order, 47 C.F.R. § 73.3555 n.11, including its seven-paragraph discussion of Note 11. That discussion not only references "affiliation swap" more than 30 times but also clearly discusses the prohibition as a Rule Against Swaps. For example:

- The FCC explained that commenters "support application of the top-four prohibition to affiliation swaps" because without such a prohibition a broadcaster could "create a prohibited duopoly by swapping the affiliation *of its previously non-top-four ranked station for a top-four network affiliation*, thus, turning the second station into a top-four station in a market without opportunity for Commission review." Second Order, 31 F.C.C.R. at 9881 ¶ 45 (emphasis added).

- The FCC found that "application of the top-four prohibition to affiliation swaps is consistent with previous Commission action and policy." *Id.* at 9882 ¶ 47. The FCC described its purported authority to regulate "affiliation swaps" and found that it has "statutory authority to extend the Local Television Ownership Rule to include affiliation swaps" under its "general rulemaking authority." *Id.* at 9882 ¶ 47 n.122.

- The FCC opined that "affiliation swaps undermine the purpose of the Top four prohibition and the Local Television Ownership Rule as a whole. Application of the top-four prohibition to affiliation swaps is necessary to prevent circumvention of the Local Television Ownership Rule." *Id.* at 9883 ¶ 48.

- The FCC stated the "record demonstrates only a single instance of an affiliation swap that would be subject to the rule[.]" *Id.* at 9884 ¶ 51

43

n.137 (citing *FNPRM*, 29 F.C.C.R. at 4391–92 ¶ 48).[16]

- The FCC concluded that "to close this loophole, we find that affiliation swaps must comply with the top-four prohibition at the time the agreement is executed." *Id.* at 9885 ¶ 52.

Gray reasonably interpreted Note 11 as a Rule Against Swaps. Given the Second Order's consistent and repeated language describing the prohibition as a rule prohibiting swaps, the FCC could not, consistent with due process, apply Note 11 to the Anchorage Transaction, which involved no affiliation swap. *See Trinity Broad.*, 211 F.3d at 628; *Satellite Broad.*, 824 F.2d at 2.

Gray's interpretation of the Rule Against Swaps was further reasonable because the FCC took no issue with a virtually identical transaction in Lincoln, Nebraska. In 2014, two years before the FCC issued the Second Order, Gray purchased the NBC programming affiliation from another station in the Lincoln DMA, where Gray also owned the CBS affiliate station. A26. After extensive negotiations with FCC staff, Gray restructured its Lincoln transaction to purchase the NBC affiliation and move it to its primary channel, which left Gray with two

---

[16] The FCC referred to an instance in which a Top-Four station and a non-Top-Four station in the Honolulu, Hawaii DMA swapped their affiliations as well as the "stations' non-network programming and the stations' call signs." *FNPRM*, 29 F.C.C.R. at 4391 ¶ 48. That transaction was unlike the Anchorage Transaction. First, the Anchorage Transaction was an asset purchase, not a swap. Second, the party in Hawaii that received the affiliation, programming agreements, and other assets from the Top-Four station did not already own two Top-Four stations. *See id.* Thus, unlike the Transaction, "the non-top-four station became a top-four station" as a result of the Hawaii transaction. *Id.*

Top-Four stations in the DMA. *Id.* The FCC plainly did not view this as an attempt to circumvent its rules, because the Second Order refers to an entirely different transaction as the "single instance" of an affiliation swap. *See* 9884 ¶ 51 n.137. Because the Anchorage Transaction was nearly identical to the permitted Lincoln transaction, it was reasonable for Gray to conclude that the Anchorage Transaction was permissible.

The FCC's attempts to justify application of the Rule Against Swaps to the Anchorage Transaction fall short. *First*, the FCC asserted that Note 11 "does not contain the word swap or any similar limitation[,]" A9, but this ignores the FCC's instruction in Note 11 that parties should refer to the Second Order, 47 C.F.R. § 73.3555 n.11, and the Second Order's *30* repeated references to swaps.

*Second*, the FCC found a single stray reference to the word "sale" buried within the Second Order and claimed this constitutes fair notice. A9. Not so. It is abundantly clear from the Second Order that Note 11 prohibits affiliation swaps that result in ownership of two Top-Four stations in a DMA. The presence of one reference to "sale" submerged in a sea of "swaps" did not provide fair notice of a contrary intention behind the rule. *See McElroy Elecs. Corp. v. FCC*, 990 F.2d 1351, 1366 (D.C. Cir. 1993) (FCC "[can]not to bury what it believes to be the heart of its order in the last line of a footnote").

Because the Forfeiture Order penalizes Gray's reasonable interpretation of the

Rule Against Swaps, it should be vacated.

## IV.   THE FCC ERRONEOUSLY IMPOSED AN UNPRECEDENTED MAXIMUM FORFEITURE PENALTY.

The Court should set aside the Forfeiture Order because the FCC's penalty assessment was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"  5 U.S.C. § 706(2)(A).  An agency's penalty cannot stand "if [it] is unwarranted in law or is without justification." *Vidiksis*, 612 F.3d at 1154 (citation omitted).  Here, the FCC erroneously applied a base forfeiture for each day of the alleged violation in a stark departure from its precedent.  The FCC also manufactured new findings, failed to consider relevant factors, and relied on incompetent evidence.

### A.    The FCC's Application of a Daily Base Forfeiture to the Purported Note 11 Violation Was Contrary to Precedent and Practice.

It is well-settled that "'[a]n agency must either conform to its prior norms and decisions or explain the reason for its departure from such precedent.'" *McHenry*, 668 F.2d at 1190 (citation omitted); *see also SNR Wireless LicenseCo, LLC v. FCC*, 868 F.3d 1021, 1029 (D.C. Cir. 2017) (same); *Ramaprakash*, 346 F.3d at 1124–25. The FCC failed to heed this command when it arbitrarily departed from its precedent and practice.

Congress has authorized the FCC to impose a forfeiture "for each violation or each day of a continuing violation."  47 U.S.C. § 503(b)(2)(A).  The FCC had no

precedent for a Note 11 penalty, so it applied the "unauthorized substantial transfers of control" penalty and purportedly looked to "analogous cases for guidance." A79. In so doing, however, the agency departed from its cases concerning unauthorized transfers of control—none of which assessed a base forfeiture on a daily basis.

The *only* unauthorized transfer of control case on which the FCC relied was *In re Enserch Corporation*, 15 F.C.C.R. 13551 (2000), which does not support the FCC's base forfeiture penalty here.[17] In *Enserch*, which involved the unauthorized transfer of 170 stations, the FCC did not apply the daily base forfeiture penalty of $8,000 for each day of the alleged violations. Instead, noting the "substantial transfer of control for a significant number of licenses" that "continued for an extended period of time," the FCC reduced the proposed $510,000 penalty to $150,000 despite the party's failure to respond to the FCC's letter. *Id*. at 13555–556 ¶¶ 15–16. In *Enserch*, the FCC relied on *Central Illinois Public Service Company*, 15 F.C.C.R. 1750 (1999), where the FCC also declined to apply the base forfeiture of $8,000 by the number of stations because "[t]hat methodology would result in an excessive forfeiture amount in this case and would be inconsistent with prior enforcement actions." *Id*. at 1753 ¶ 7.

---

[17] The FCC also cited *In re Deerfield Media (Balt.) Licensee, LLC*, where the FCC calculated a base forfeiture of $8,000 for "eight instances" of violations of the FCC's good faith bargaining rules. 35 F.C.C.R. 13098, 13100–101 ¶¶ 6, 8 (2020). *Deerfield* was not an "analogous case" because it concerned a different violation, nor did *Deerfield* apply a base forfeiture on a daily basis.

Notwithstanding this precedent and numerous analogous cases Gray cited in which the FCC had not assessed a daily base forfeiture, A63–64, the FCC inexplicably applied the base forfeiture for *each day* of the alleged Note 11 violation. A12. Rather than distinguish its precedent, the FCC dismissed the cases because Gray purportedly did not address how they related to the "statutory considerations." A13. Not only was this incorrect, as shown below, but also it failed to satisfy the agency's obligation to explain its departure from precedent. *See Friedman v. Sebelius*, 686 F.3d 813, 828 (D.C. Cir. 2012) (penalty was arbitrary and capricious where the "agency d[id] not even acknowledge, much less explain" its departure from precedent).

## B.    The FCC Committed Multiple Errors in its Forfeiture Penalty Adjustment Analysis.

Congress has instructed that "in determining the amount of . . . a forfeiture penalty, the [FCC]. . . shall take into account the nature, circumstances, extent, and gravity of the violation and, with respect to the violator, the degree of culpability, any history of prior offenses, ability to pay, and such other matters as justice may require." 47 U.S.C. § 503(b)(2)(E). The FCC has specified several adjustment criteria. 47 C.F.R. § 1.80(b)(10), Table 3. The FCC erred in three ways.

### 1.    The FCC Arbitrarily and Capriciously Affirmed an Illusory "Egregiousness" Finding.

The FCC's purported affirmance in the Forfeiture Order of an

"egregiousness" finding, A12, was arbitrary and capricious because the FCC had not previously made such a finding. "[E]gregious misconduct" can be a factor under the FCC's regulations, 47 C.F.R. § 1.80(b)(10), Table 3, but the FCC made **no** such finding in the *NAL*. A80. The FCC's affirmance of a non-existent finding was error. *See Kansas City v. Dep't of Hous. & Urban Dev.*, 923 F.2d 188, 194 (D.C. Cir. 1991) (agency action "based on a factual premise that is flatly contradicted by the agency's own record . . . cannot survive review under the arbitrary and capriciousness standard").

Nor does the record support the FCC's "egregiousness" finding. *See Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983); *United States Sugar Corp. v. EPA*, 830 F.3d 579, 647 (D.C. Cir. 2016). Not all violations are egregious; the violation must be extremely or remarkably bad, or flagrant. *See, e.g.,* Black's Law Dictionary, *Egregious* (11th ed. 2019) ("egregious" means "[e]xtremely or remarkably bad; flagrant"). The record shows no such violation. Gray had no reason to believe it violated any rule, had no notice of the FCC's novel interpretations of Note 11, and took immediate steps to remedy the purported violation as soon as the FCC expressed concern. *See supra* Part III.B. The FCC's "egregiousness" finding is also based solely on its novel redefinitions of Note 11, which cannot justify the penalty. *See supra* Parts II.A, III.A.

### 2. The FCC Did Not Consider the Circumstances of the Purported Violation or Gray's Good Faith.

The circumstances of the violation and the broadcaster's good faith are relevant factors under the statute and regulation. *See* 47 U.S.C. § 503(b)(2)(E) ("the circumstances of the violation" is a relevant factor); 47 C.F.R. § 1.80(b)(10), Table 3 ("good faith" is a relevant factor). The FCC erroneously failed to consider these factors. *See Bidi Vapor LLC v. FDA*, 47 F.4th 1191, 1202 (11th Cir. 2022) (court may look to statutory language to determine whether the agency considered all the relevant factors).

The circumstances of the alleged violation, as well as Gray's good faith interpretation of Note 11 as the Rule Against Swaps and its immediate cooperation with the FCC—all bear on the penalty assessment. As discussed, *supra* Part III.B, Gray reasonably believed the transaction complied with Note 11. And Gray timely reconfigured its operations to remedy the purported violation once notified of the FCC's concerns. A35–36. Although it passingly acknowledged these points, the FCC did not account for these circumstances in its penalty analysis. A11–15.

The FCC stated in cursory language that it had "affirm[ed] that all possible grounds for a downward adjustment, including Gray's past compliance with this rule, are outweighed by" the upward adjustment factors on which the FCC relied. A13. This boilerplate language is insufficient to show that the FCC actually considered the relevant factors. *Dickson v. Sec'y of Defense*, 68 F.3d 1396, 1404–

50

05 (D.C. Cir. 1995) (agency acted arbitrarily and capriciously when "the boilerplate language used by the Board makes it impossible to discern the Board's 'path'").

### 3. The FCC's "Substantial Economic Gain" Finding Was Unsupported by Competent Evidence.

The FCC's "substantial economic gain" finding lacked adequate evidence. *See AT&T Corp. v. FCC*, 86 F.3d 242, 247 (D.C. Cir. 1996) ("[This Court] must set aside a Commission order if the record lacks substantial evidence to support its conclusion." (internal quotations omitted)).  The FCC based a statutory maximum fine on what appears to be the results of an Internet search without any concrete facts concerning "economic gain" Gray might have realized from the Anchorage Transaction.  This alone warrants vacatur.  *See id.* ("[S]ubstantial evidence is more than a mere scintilla . . . . It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.") (internal quotation marks and citation omitted); *RTC Transp., Inc. v. Interstate Com. Comm'n*, 708 F.2d 617, 619 (11th Cir. 1983) (same).

The FCC assumed in the *NAL* that the purported Note 11 violation "resulted in the substantial economic gain that comes from affiliation with a top-four network, particularly given that the timing of the acquisition"—three months before the November 3, 2020 elections—"enabled Gray to take advantage of the record-setting political advertising expenditures in the months leading up to the 2020 election." A80.  The so-called "evidence" on which the FCC relied was a transcript from an

October 2020 PBS News Hour clip generally describing spending on television political advertising (with no reference to Gray),[18] and one sentence in Gray's 2020 Form 10-K describing Gray's expectations for multiple transactions completed over a three-year period.[19]  *Id*.  The FCC again found in the Forfeiture Order that "Gray stood to achieve substantial economic gains."  A12–13.

The PBS Newshour clip does not support the FCC's finding because it was general information not connected to Gray or the Anchorage Transaction.  *See Finberg v. Dep't of Agric*., 6 F.4th 1332, 1337 (D.C. Cir. 2021) (substantial evidence did not support agency's decision where the agency "completely failed to make any factual findings connecting Finberg and the business's failure to pay its suppliers").  The clip made only a generic reference to political spending on television ads in the entire United States for the 2020 election cycle.[20]  The FCC did not explain how this generic reference related to Gray's purchase of the CBS network affiliation in the Anchorage DMA.

Nor did the FCC consider evidence that *undercut* its assumption that Gray "stood to achieve substantial economic gains."  A12.  The 2020 election cycle began

---

[18] *Unprecedented Spending for 2020 Political Ads*, PBS News Hour Weekend (Oct. 31, 2020)  https://www.pbs.org/newshour/sh.w/unprecedented-spending-for-2020-political-ads.

[19]  Gray Television, Inc., 2020 Annual Report on SEC Form 10-K, at 74, https://graytv.gcs-web.com/static-files/c78bebe1-c86a-452a-a885-695bc9d00662.

[20] *See supra* n.18.

in January 2019.[21]  Gray's evidence showed that the total estimated local television advertising revenue for the Anchorage DMA was $21.9 million in 2019—a *decline* in revenue from years earlier, A33.  Even the FCC cited articles stating that KTVA(TV) had unsustainable "operating losses" and the "ad revenue tied" to "KTVA's ratings . . . never really improved."[22]  The FCC's failure to consider this information was error.  *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight."); *AT&T Corp.*, 86 F.3d at 248 (FCC's decision was unsupported by substantial evidence where the record contained contrary undisputed evidence).

Gray's Form 10-K also provides no support for the FCC's finding.  Gray stated only that it "expected" multiple acquisitions completed between 2018 and 2020 to "increase our revenues and cash flows from operating activities."[23]  Gray did not opine on any "economic gain" from the Anchorage Transaction, nor did Gray's expectations regarding several acquisitions over a three-year period

---

[21] *See supra* n.18.

[22] A2 (citing Alex DeMarban, *One Company Will Own Anchorage's 2 Local TV News Stations after Deal with GCI*, Anchorage Daily News (July 31, 2020), https://www.adn.com/business-economy/2020/07/31/one-company-will-own-anchorages-2-local-tv-news-stationsafter-deal-with-gci/; Casey Grove, *Questions Remain after GCI Sells Television Assets to Competitor*, Alaska Public Media (Aug. 9, 2020), https://www.alaskapublic.org/2+020/08/09/questions-remain-after-gci-sells-television-assets-to-competitor).

[23] *See supra* n.19.

undermine the specific evidence Gray presented to the FCC showing declining ad revenue in the Anchorage DMA—evidence the FCC ignored.

## CONCLUSION

For the foregoing reasons, Gray respectfully requests that the Court grant the Petition and vacate the Forfeiture Order.

Dated:  May 24, 2023

Respectfully submitted,

*/s/ David E. Mills*
David E. Mills
Robert M. McDowell
Robby L.R. Saldaña
COOLEY LLP
1299   Pennsylvania   Avenue, NW, Suite 700
Washington, DC 20004-2400
dmills@cooley.com
rmcdowell@cooley.com
rsaldana@cooley.com

*Counsel for Petitioner*
*Gray Television, Inc.*

## CERTIFICATION OF COMPLIANCE WITH FRAP 32(g)(1)

Undersigned counsel certifies that this Brief complies with the applicable type volume limitations in Rule 32(a)(7). This brief contains 12,950 words, exclusive of the components that are excluded from the word count limitation in Rule 32(f). This certificate was prepared in reliance upon the word-count function of the word processing system (Microsoft Word) used to prepare this brief. This brief complies with the typeface and type style requirements of Rule 32(a)(5) because it has been prepared in a proportionally spaced typeface using font size 14 Times New Roman.

Dated: May 24, 2023

*/s/David E. Mills*

David E. Mills
COOLEY LLP
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400
dmills@cooley.com

*Counsel for Petitioner*
*Gray Television, Inc*

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 24, 2023, I served the foregoing document on all parties through the appellate CM/ECF system for the United States Court of Appeals for the Eleventh Circuit.

*/s/David E. Mills*
David E. Mills
COOLEY LLP
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400
dmills@cooley.com

*Counsel for Petitioner*
*Gray Television, Inc.*
