No. 22-14274

_____

UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

GRAY TELEVISION, INC.,

*Petitioner*,

v.

FEDERAL COMMUNICATIONS COMMISSION; and
UNITED STATES OF AMERICA,

*Respondents*.

_____

On petition for review of an agency order

_____

**BRIEF OF AMICUS CURIAE FREE STATE FOUNDATION
IN SUPPORT OF PETITIONERS**

_____

Randolph J. May
Seth L. Cooper
THE FREE STATE FOUNDATION
P.O. Box 60680
Potomac, MD 20859
(301) 984-8253
rmay@freestatefoundation.org
cooper@freestatefoundation.org

Jeffrey S. Beelaert
  *Counsel of Record*
STEIN MITCHELL BEATO & MISSNER LLP
2000 K Street NW, Suite 600
Washington, D.C. 20006
(202) 661-0923
jbeelaert@steinmitchell.com

_____

*Gray Television, Inc. v. FCC*, No. 22-14274

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 through 26.1-3, undersigned counsel provides this Certificate of Interested Persons and Corporate Disclosure Statement. To the best of counsel's knowledge, the following persons and entities may have an interest in the outcome of this case:

Parties and counsel

Atlanta Assembly, LLC – Subsidiary of Gray Media Group, Inc.

Citrin, Sarah E. – FCC

Cooley LLP – Counsel for Petitioner

Dynamic Captioning, LLC – Subsidiary of Gray Media Group, Inc.

Ellison, P. Michelle – FCC

Federal Communications Commission (FCC)

Feore, John R. – Cooley LLP

Folliard III, Robert J. – Gray Television, Inc.

Garland, Merrick B. – U.S. Department of Justice

Gray Media Group, Inc.

Gray Television, Inc.

Gray Television Licensee, LLC

Joslin, William P. – Gray Media Group, Inc.

Kreisman, Barbara A. – FCC

Latek, Kevin P. – Gray Television, Inc.

i

McDowell, Robert M. – Cooley LLP

Miller, Keith S. – Gray Television, Inc.

Mills, David E. – Cooley LLP

Nicholson, Robert B. – U.S. Department of Justice

PowerNation Studios, LLC

Rademacher, Jason E. – Counsel for Gray Television, Inc.

Raycom Sports Network, LLC

Saldaña, Robby L.R. – Cooley LLP

Scher, William J. – FCC

Stewart, Joan – Wiley Rein LLP

Storm, Brandon – U.S. Department of Justice

Tupelo Media Group, LLC

United States of America

Wendel, Henry H. – Cooley LLP

Wiley Rein LLP

Amicus

Beelaert, Jeffrey S. – Stein Mitchell Beato Missner LLP

Cooper, Seth L. – Free State Foundation

Free State Foundation

May, Randolph J. – Free State Foundation

Stein Mitchell Beato Missner LLP

To the best of undersigned counsel's knowledge, no other persons, associations of persons, firms, partnerships, or corporations have an interest in the outcome of this case or appeal.

*/s/ Jeffrey S. Beelaert*
Counsel for Amicus Curiae

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND
    CORPORATE DISCLOSURE STATEMENT ...................................i

TABLE OF CONTENTS ........................................................................iv

TABLE OF AUTHORITIES.................................................................vi

INTEREST OF AMICUS ....................................................................... 1

INTRODUCTION ................................................................................... 2

ARGUMENT ........................................................................................... 5

  I.  The FCC violated Gray's due process rights because the agency
     gave no fair notice of its novel interpretation of Note 11. ..............5

    A.    Fair notice is fundamental to the rule of law. ........................5

    B.    The forfeiture order failed to provide fair notice to
        Gray. .................................................................................... 8

    C.    The FCC's ad hoc interpretation of the top-four
        rule provided Gray no fair notice, especially in
        the context of a rapidly changing media market................. 14

  II. The FCC's application of Note 11 violated the First Amendment
     in these circumstances. .................................................................20

    A.    Broadcasters have free speech right to choose
        programming content............................................................20

    B.    The FCC impermissibly regulated programming
        content. ................................................................................ 21

    C.    The FCC's ad hoc interpretation of the top-four
        rule violated the First Amendment, especially in
        the context of a rapidly changing media market................. 23

CONCLUSION .......................................................................................28

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Agape Church, Inc. v. FCC,*
    738 F.3d 397 (D.C. Cir. 2013) ............................................................... 26

*AT&T Inc. v. FCC,*
    452 F.3d 830 (D.C. Cir. 2006) .............................................................. 19

*Beckles v. United States,*
    580 U.S. 256 (2017) ............................................................................... 8

*Christopher v. SmithKline Beecham Corp.,*
    567 U.S. 142 (2012) ......................................................... 12, 13, 14, 20

*Comcast Cable Comm., LLC v. FCC,*
    717 F.3d 982 (D.C. Cir. 2013) .............................................................. 26

*Comcast Corp. v. FCC,*
    579 F.3d 1 (D.C. Cir. 2009) .................................................................. 26

*FCC v. Fox Television Stations, Inc.,*
    567 U.S. 239 (2012) ........................................................................... 5, 7

*FCC v. National Citizens Comm. for Broad.,*
    436 U.S. 775 (1978) .............................................................................. 22

*FCC v. Prometheus Radio Project,*
    141 S. Ct. 1150 (2021) ......................................................................... 16

*Grayned v. City of Rockford,*
    408 U.S. 104 (1972) ............................................................................... 7

*Kisor v. Wilkie,*
    139 S. Ct. 2400 (2019) ...................................................................... 8, 11

*Lanzetta v. New Jersey,*
    306 U.S. 451 (1939) ............................................................................... 7

*Long Island Care at Home, Ltd. v. Coke,*
  551 U.S. 158 (2007) .................................................................... 12

*Marbury v. Madison,*
  5 U.S. 137 (1803) ......................................................................... 6

*Miami Herald Pub. Co. v. Tornillo,*
  218 U.S. 241  (1974) ................................................................... 27

*Motion Picture Ass'n of America, Inc. v. FCC,*
  309 F.3d 796 (D.C. Cir. 2002) ................................................... 20

*Mozilla v. FCC,*
  940 F.3d 1 (D.C. Cir. 2019) ....................................................... 18

*NLRB v. Bell Aerospace Co.,*
  416 U.S. 267 (1974) .................................................................... 12

*Papachristou v. Jacksonville,*
  405 U.S. 156 (1972) ...................................................................... 7

*Prometheus Radio Project v. FCC,*
  652 F.3d 431 (3d Cir. 2011) ....................................................... 22

*Reno v. ACLU,*
  521 U.S. 844 (1997) .................................................................... 27

*Satellite Broad. Co. v. FCC,*
  824 F. 2d 1 (D.C. Cir. 1987) ...................................................... 13

*Sinclair Broadcast Group, Inc. v. FCC,*
  284 F.3d 148 (D.C. Cir. 2002) ................................................... 22

*Sistersong Women of Color Reproductive Justice Collective v. Governor
  of Georgia,*
  40 F.4th 1320 (11th Cir. 2022) .................................................... 8

*Talk America, Inc. v. Michigan Bell Tel. Co.*,
   564 U.S. 50 (2011) ................................................................. 20

*Turner Broad. Sys., Inc. v. FCC*,
   512 U.S. 622 (1994) ............................................................... 21

*United States v. Williams*,
   553 U.S. 285 (2008) ................................................................. 6

*US Telecom Ass'n v. FCC*,
   825 F.3d 674 (D.C. Cir. 2016) ............................................. 19

**Statutes**

47 U.S.C. § 202..................................................................... 5, 13, 16

47 U.S.C. § 326..................................................................... 4, 21, 22

47 U.S.C § 533 ............................................................................ 27

**Rule and Regulations**

Federal Rule of Appellate Procedure 29 ..................................... 1

47 C.F.R. § 73.355(b)(1)(ii) ......................................................... 9

47 C.F.R. § 73.3555........................................................... passim

**Agency Actions**

*Communications Marketplace Report*,
   FCC Dkt. No. 220203, 2022 WL 1811053 (Dec. 30, 2022) ............ 23, 24

*Order on Reconsideration*,
   32 F.C.C.R. 9802 (Nov. 20, 2017) ................................... 15, 16

*Restoring Internet Freedom*,
   33 F.C.C.R. 311 (Jan. 4, 2018)........................................... 18

*Second Report and Order*,
   31 F.C.C.R. 9864 (Aug. 25, 2016) ................................. 3, 9, 18

*Space Station Licensing*,
    18 F.C.C.R. 10,760 (May 19, 2003) ...................................................... 18

*Wireless Messaging Order*,
    33 F.C.C.R. 12,075 (Dec. 13, 2018) ..................................................... 19

## Other Authorities

Anchorage TVGuide Schedule .................................................................. 16

Baker, Scott R., et al., *Measuring Economic Policy Uncertainty,*
    131 Quarterly Journal of Economics (2016) ........................................ 19

Cass, Rondald A., The Rule of Law in America (2001) ......................... 6, 7

May, Randolph J., *Charting a New Constitutional Jurisprudence
    for the Digital Age*, 3 Charleston L. Rev. 373 (2009) .................... 27, 28

Yoo, Christopher C., *The Convergence of Broadcasting and Telephony:
    Legal and Regulatory Implications*,
    Perpectives from FSF Scholars (2010) ................................................ 25

## INTEREST OF AMICUS[1]

The Free State Foundation (FSF) is a nonprofit, nonpartisan think tank founded in 2006.  Since its founding, it has proclaimed as its mission the promotion of free markets, free speech, limited government, and rule of law principles at the federal level and in Maryland, and to advocate laws and policies in furtherance of these principles.

Free State Foundation scholars have deep experience and broad expertise in communications law and policy, and FSF is widely acknowledged to be one of the nation's leading think tanks in this area. More specifically, and relevant to this case, FSF scholars have undertaken considerable scholarly work in administrative law and constitutional law, including First Amendment law, and they have recognized expertise in these areas.

Free State Foundation Founder and President Randolph J. May has served as Associate General Counsel at the Federal Communications Commission.  He has held numerous leadership positions in bar associations, including service as a past Chair of the American Bar Association's Section of Administrative Law and Regulatory Practice.  He is a Fellow of the National Academy of Public Administration.  Mr. May

---

[1] This brief is submitted under Federal Rule of Appellate Procedure 29(a) with the consent of all parties.  Undersigned counsel for amicus curiae certifies that this brief was not authored in whole or in part by counsel for any of the parties; no party or party's counsel contributed money for the brief; and no one other than amicus and its counsel have contributed to this brief.

also has served as a Public Member of the Administrative Conference of the United States and currently is a Senior Fellow at ACUS.

Seth L. Cooper is Director of Policy Studies and a Senior Fellow at The Free State Foundation. He is the author of numerous articles and essays on federal telecommunications and technology policy, regulatory reform, and intellectual property. Mr. Cooper's work has appeared in such publications as the *Washington Examiner*, *The Washington Times*, *The Tennessean*, and the San Jose *Mercury News*. Mr. Cooper was a 2009 Lincoln Fellow at the Claremont Institute.

## INTRODUCTION

This case raises important due process and First Amendment issues that extend beyond the immediate impact that this Court's ruling may have on Gray or on any one TV broadcaster.[2] Agencies must articulate rules with legally fixed standards, and agencies must follow those rules to avoid arbitrary enforcement. No agency may sanction a regulated party based on a freewheeling interpretation of its own rules, articulated for the first time in an administrative proceeding. The FCC's approach to dealing with Gray's alleged offenses in this case calls to mind a game of government "gotcha," full of surprises and lacking reasoned decision making.

---

[2] Gray presented compelling arguments explaining why the FCC's imposition of the forfeiture exceeds the agency's statutory authority. This brief focuses on due process and First Amendment violations.

Unless the Court vacates the FCC's forfeiture order, this case could serve as a roadmap for agencies to flout due process and to abridge free speech through the arbitrary use of authority. If the FCC's order stands, it likely will have negative consequences for other parties subject to the FCC's expansive interpretation of its regulatory jurisdiction and for all regulated parties.

The FCC's order violates Gray's due process and First Amendment rights. As for due process, Gray lacked fair notice that the transaction violated the so-called "top-four prohibition" found in the local television ownership rule at 47 C.F.R. § 73.3555(b). The FCC does not even claim that Gray violated the plain terms of this regulation. Gray did not. Instead, the agency claims that Gray violated an interpretive note to the rule, which itself depends on a flawed reading of the FCC's 2016 *Second Report and Order* (adopting Note 11).[3] That is agency decision making run amok.

And this is only the beginning of the layers of convoluted and confusing administrative interpretations adopted by the FCC, upon

---

[3] The Commission issued the *Second Report and Order* in connection with the agency's 2014 quadrennial review of its media ownership rules. In adopting Note 11, the FCC purported to "clarify" certain aspects of the agency's "application of the top-four prohibition" from 47 C.F.R. § 73.3555(b), including application of the prohibition to what the FCC described as "*affiliation swaps*" resulting "in a single entity obtaining control over two of the top-four-rated stations in a market." 31 F.C.C.R. 9864, 9871 (Aug. 25, 2016) (emphasis added). No affiliation swap occurred here.

which imposition of the forfeiture depended. If anything, to comport with due process requirements, the FCC's newfound interpretation of its authority to penalize Gray—based on an amalgamation of the Rule (47 C.F.R. § 73.3555) + Note 11 + the *Second Report and Order*—should have been applied only prospectively, not retroactively.

As for the First Amendment, the forfeiture order plainly applies to Gray's acquisition of a network program affiliation agreement, *not* the transfer of a broadcast license. The agency apparently recognized a limitation on its ability to regulate Gray's transaction in these circumstances because the FCC purported to rely on "ancillary authority" found nowhere in the relevant statutory text. In doing so, the Commission effectively seeks to regulate *broadcast content*. But it cannot do that: both the Communications Act, 47 U.S.C. § 326, and the First Amendment prohibit the FCC from regulating broadcast content. This Court should vacate the agency's forfeiture order for these reasons.

In fact, the media landscape has changed dramatically in the years since the FCC adopted its television ownership rules. Residents of Anchorage, Alaska, and almost all other consumers across the country, have access to a plethora of media outlets, including multiple sources of video news, information, and entertainment. It is arbitrary and capricious for the FCC to impose forfeiture in this case without accounting for the First Amendment. The FCC erred in broadly applying its ownership rules, whose constitutional rationale has been called into

serious question and are now more dubious than ever, in a way that regulates broadcast content. This is especially so when the agency steadfastly refuses to complete on a timely basis the periodic reviews that Congress has mandated specifically to determine "whether any of such rules are necessary in the public interest as the result of competition." 47 U.S.C. § 202(h).

## ARGUMENT

### I. The FCC violated Gray's due process rights because the agency gave no fair notice of its novel interpretation of Note 11.

Due process serves as a fundamental principle of fairness by giving notice of the law to those who must comply with it and by constraining the agencies who must enforce it. Due process prevents the FCC (as well as all other agencies) from engaging in discriminatory enforcement. No agency may take an enforcement action against a regulated party based on novel interpretations of its rules, especially when the agency never provided prior notice of that which it seeks to regulate.

#### A. Fair notice is fundamental to the rule of law.

A longstanding "principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). "[C]larity in regulation is essential to the protections provided by the Due Process Clause of the Fifth Amendment." *Id.* No court should allow an agency to regulate a party without fair notice of

prohibited activities, as that would allow the agency to engage in "seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008).

For centuries, the "government of the United States has been emphatically termed a government of laws, and not of men." *Marbury v. Madison,* 5 U.S. 137, 163 (1803). Philosophers, scholars, and jurists have offered various formulations of the rule of law over the years since *Marbury*. In general, the rule of law includes four elements: "(1) fidelity to rules (2) of principled predictability (3) embodied in valid authority (4) that is external to individual government decision makers." Ronald A. Cass, *The Rule of Law in America* 4 (2001). The rule of law essentially tells agencies "how, to what ends, and within what limits they may exercise power" through government regulation. *Id.*

Predictability and clarity are important. "The rule of law requires that legal rules instruct those affected by them in a way that allows a knowledgeable party to anticipate the manner in which a rule will be applied without knowing particulars about the individuals who will interpret and enforce the law." *Id.* at 8. This means that the legal rules must be "sufficiently clear to be understood." *Id.* A regulated party cannot follow regulations "unless their terms can be understood by those who must obey." *Id.* at 11. And, at the same time, the rules must provide "principled predictability" to guide agencies in their decision making. *Id.*

The principle of predictability confers legitimacy and encourages compliance. A clear, foreseeable rule enhances the rule of law because both regulators and regulated parties have certainty as to the relevant regulatory requirements and as to the scope of the agency's authority to enforce those requirements. Insofar as a rule is characterized by principled predictability, regulated parties must comply with it, and regulators are justified in taking enforcement actions for noncompliance. The rule of law "pulls society in the direction of knowable, predictable, rule-based decision making, toward the alignment of power with legitimacy." *Id.* at 19.

Conversely, when government agencies act to sanction regulated parties who are unable to discern exactly what a rule requires, the enforcement action constitutes an arbitrary use of governmental power. Regulatory arbitrariness (or agency overreach) violates fundamental rule of law principles embodied in due process. The same is true for selective enforcement or retroactive enforcement, which necessarily results in unfairness toward regulated parties and the erosion of an agencies' institutional legitimacy. Bureaucratic power must be constrained by "precision and guidance." *Fox*, 567 U.S. at 253 (citing *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972)).

Strict adherence to the rule of law means that regulated parties "are entitled to be informed as to what the State commands or forbids." *Papachristou v. Jacksonville,* 405 U.S. 156, 162 (1972) (quoting *Lanzetta*

*v. New Jersey*, 306 U.S. 451, 453 (1939)).  Agencies must articulate rules with "legally fixed standards," and agencies must follow those standards to avoid arbitrary enforcement.  *Sistersong Women of Color Reproductive Justice Collective v. Governor of Georgia*, 40 F.4th 1320, 1327 (11th Cir. 2022) (quoting *Beckles v. United States*, 580 U.S. 256, 266 (2017)).

An agency's interpretation of its rules is not entitled to "controlling weight" because a court still must conduct "an independent inquiry" as to the "character and context" of the agency's interpretation.  *Kisor v. Wilkie*, 139 S. Ct. 2400, 2416 (2019).  No court should credit an agency's ad hoc statements or post hoc rationalizations as it conducts its independent inquiry.  *Id.* at 2421.  Nor should the agency's interpretation of its rule create an "unfair surprise" or upset the "reliance interests" of the regulated party.  *Id.*  That is, however, exactly what the FCC has done here.

## B.    The forfeiture order failed to provide fair notice to Gray.

The FCC's imposition of a $518,283 forfeiture failed to provide Gray with fair notice in at least three significant respects.[4]

*First*, the FCC did not provide Gray with fair notice of the agency's interpretation of 47 C.F.R. § 73.3555 such that Note 11 required the agency to use the most recent TV ratings data available, as opposed to

---

[4] Amicus joins the additional reasons articulated by Gray for this Cout to vacate the agency's order.  *See* Opening Br. 20–32.

the most recent data showing the ranking at the relevant time. The FCC's interpretation confounded Gray's reasonable reading of 47 C.F.R. § 73.355(b)(1)(ii), which states that, for purposes of the top-four prohibition rule, the FCC considers the designated market area at the time of the relevant transaction "based on the most recent all-day (9 a.m.-midnight) audience share, as measured by Nielsen Media Research or by any comparable professional, accepted audience ratings service." At the time of the relevant transaction, Gray *already owned* two top-four stations, so it reasonably understood that this ratings provision did not apply. The *Second Report and Order* supports Gray's reading because it states that, for purposes of making the top-four station determination, the FCC must rely on the ranking "*at the time the agreement is executed.*" 31 F.C.C.R. at 9885 n.141 (emphasis added). Here, the transaction did not "result in" Gray owning two top-four stations at the time that it executed the agreement. Gray already owned two top-four stations.

*Second*, the FCC did not provide Gray with fair notice of its ad hoc interpretation that Note 11 prohibits transactions that result in what the agency referred to as a *new* "top-four combination" of local TV stations in the market. *See* A4 (¶9), A5 (¶11). The plain text of Note 11 prohibits "the execution of any agreement" that itself "would *result in* the licensee of the new affiliate" directly or indirectly "owning, operating, or controlling two of the top-four rated" TV stations in the area "*at the time of the agreement.*" 47 C.F.R. §73.3555 (Note 11) (emphasis added).

9

Nothing in the text of Note 11 or the *Second Report and Order* prohibits transactions by pre-existing owners already in control of two of the top-four stations. Nor is there anything to suggest that the FCC somehow must consider a transaction that creates a *new* top-four combination.

As Commissioner Simington explained in his dissent, this particular transaction did not *result in* Gray becoming the owner of two of the top-four stations in Anchorage because Gray *already owned* two of the stations allegedly violating the top-four prohibition rule before it completed the transaction. *See* A17–18. "If Gray previously *had* a duopoly in Anchorage, its behavior was not prohibited under a plain reading of the Rule." A18. The FCC thus found a regulatory violation where none exists. And in doing so, the agency—for the first time—adopted a strained reading of Note 11 prohibiting transactions that result in "a *new* top-four combination" of stations. A5 (¶11) (emphasis added). That is not what Note 11 says.

*Third*, the FCC did not provide Gray with fair notice that its ad hoc interpretation of Note 11 applied to transactions other than those involving traditional affiliation swaps. The plain text of Note 11 merely prohibits agreements in which a station "acquires the *network affiliation* of another station . . . if the change in the *network affiliations* would result in the licensee of the new affiliate" controlling two of the top-four rated stations. 47 C.F.R. § 73.3555 (Note 11). Here, the FCC arbitrarily expanded the scope of the rule. The agency found that, "regardless of

10

whether an entity obtains a second Top 4 station from a *license transfer* or by *acquiring the affiliation* of another station in the market," the FCC still has authority to act because it considers either transaction to be "functionally the same" for purposes of the top-four prohibition rule. A8 (¶17) (emphasis added). But Note 11 "means what it means," and this Court must give effect to the *plain language* of the rule without the FCC's policy-laden gloss. *Kisor*, 139 S. Ct. at 2415.

The FCC never provided notice (or any meaningful explanation) as to how a license transfer agreement could be considered "functionally the same" as an affiliation swap for purposes of the top-four prohibition rule when the rule itself mentions no such equivalency test. It may be "that the *intent* of the Rule is to prevent the acquisition of market share through a swap in network affiliation," but that is not what occurred here. A17 (Commissioner Nathan Simington, dissenting) (explaining how the FCC's order "misapplies the plain language of Section 73.3555, Note 11.") (emphasis added). Gray did not execute an affiliation swap.

Each of these fair notice violations depended on layers of convoluted and confusing administrative interpretations—essentially, one agency misinterpretation piled upon another to reach the FCC's desired policy goal of enforcement. Gray, of course, had no way of knowing any of this as a regulated party.

Gray had no way of knowing what to expect from the FCC because the agency had never previously articulated how Note 11, despite its own

11

limited text, could apply here. Neither Gray nor any other party could have anticipated the agency's novel interpretations. Before Gray executed the transaction, it had no way of knowing that the FCC would apply Note 11—(1) even though Gray already owned two stations in the top four based on ratings data; (2) to prohibit transactions that result in what the agency found were *new* top-four combinations of local TV stations; and (3) to transactions involving anything other than affiliation swaps deemed by the agency to be "functionally the same" as the license transfer that actually occurred here.

In an adjudicative proceeding, no agency may impose "new liability" on a regulated party "for past actions taken in good-faith reliance" on earlier agency pronouncements. *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 295 (1974). All agencies, including the FCC, instead must provide fair warning to regulated parties of the conduct prohibited by regulation. *Christopher v. SmithKline Beecham Corporation*, 567 U.S. 142, 156 (2012). The FCC failed to do that here, as it never engaged in notice-and-comment rulemaking to articulate its view of the applicable ownership rules before taking regulatory action against Gray. *Id.* (citing *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 170–71 (2007)). Nor has the agency ever suggested that the Communications Act or any FCC regulations "provide clear notice" of the positions that it articulated here. *Id.* at 157. No prior agency guidance supports the FCC's actions. *Id.* Indeed, it is unclear whether the FCC ever has "initiated any

12

enforcement actions" based on the same (incorrect) interpretation of the ownership rules. *Id.*

This Court should not defer to the FCC's reading, especially because Congress has required the agency periodically to review and to update its rules to account for increased competition. *See* 47 U.S.C. § 202(h). Given the FCC's purported expertise in evaluating media markets, this Court should require the agency to articulate interpretations of its rules with sufficient clarity for regulated parties to understand them. The responsibility does not fall on private parties to guess what the agency might deem to pass muster under yet-to-be-determined extensions of existing regulatory policy.

"Traditional concepts of due process incorporated into administrative law preclude an agency from penalizing a private party for violating a rule without first providing adequate notice of the substance of the rule." *Satellite Broad. Co. v. FCC*, 824 F. 2d 1, 3 (D.C. Cir. 1987). Absent "full notice" of the agency's interpretation, the FCC "through its regulatory power cannot, in effect, punish a member of the regulated class for reasonably interpreting Commission rules." *Id.* at 4. This Court should not condone that.

Undoubtedly, the Court's decision will have implications in future agency actions taken by the FCC in regulating local broadcast stations and other providers. This Court should take the opportunity to reinforce well-established principles of administrative law. "It is one thing to

13

expect regulated parties to conform their conduct to an agency's interpretations once the agency announces them; it is quite another to require regulated parties to divine the agency's interpretations in advance or else be held liable when the agency announces its interpretations for the first time in an enforcement proceeding." *SmithKline*, 567 U.S. at 158–59.

The Court should not accept the FCC's actions as it could embolden other agencies to take shortcuts in the future. A decision in favor of the FCC here "creates a risk that agencies will promulgate vague and open-ended regulations that they can later interpret as they see fit, thereby frustrating the notice and predictability purposes of rulemaking." *Id.* at 158 (cleaned up). Even assuming simply for the sake of argument that the Commission's enforcement action, based on new interpretations of the conjoined Rule + Note + *Second Report and Order*, was reasonable and not arbitrary or capricious, due process still requires the agency to apply those interpretations prospectively, not retroactively. The forfeiture order cannot stand.

**C.    The FCC's ad hoc interpretation of the top-four rule provided Gray no fair notice, especially in the context of a rapidly changing media market.**

Predictability in the law is critically important in the modern communications marketplace. Local broadcast TV stations, like other media providers, operate in a marketplace undergoing dynamic change from technological innovation, cross-platform competition, changing

14

consumer media consumption habits, and shifts in advertising models and revenue flows. In many respects, new media sources, including YouTube, Facebook, and Twitter, as well as other outlets accessible on the internet, have overtaken the information marketplace in which traditional newspapers, broadcast TV, and radio stations previously thrived. On top of that, local broadcast TV stations continue to face competition from other video channels offered by cable and satellite networks.

To account for increased competition, the FCC must periodically review and update its rules. *See* 47 U.S.C. § 202(h). Congress required the FCC to review its ownership rules to determine whether the rules remain "necessary in the public interest as a result of competition" and to "repeal or modify any regulation [that the Commission] determines is no longer in the public interest." *Id.*

In fact, the Commission's 2017 *Order on Reconsideration* relaxed the top–four prohibition rule at issue here. The FCC recognized "the dynamic nature of the media marketplace" and took "concrete steps to update its broadcast ownership rules to reflect reality." 32 F.C.C.R. 9802, 9803 (Nov. 20, 2017). The agency acknowledged that the "*Second Report and Order* issued in August 2016"—the order relied on by the FCC in this case—"manifestly failed to adopt any meaningful changes to these [ownership] rules" based on dynamic changes in the marketplace. *Id.* at ¶ 1. In issuing this order, the Commission "refuse[d] to ignore the

changed landscape" by instead adopting "broadcast ownership rules that reflect the present, not the past." *Id.*

As the Supreme Court later explained, the FCC reasonably concluded that its then-existing ownership rules no longer "serve[d] the public interest." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1160 (2021). "The FCC reasoned that the historical justifications for those ownership rules no longer apply in today's media market, and that permitting efficient combinations among . . . television stations . . . would benefit consumers." *Id.*

Competitive changes have occurred in Anchorage market. Current TVGuide listings for Anchorage include the following choices:

| 2.1 | KTUU | NBC |
|------|------|--------|
| 4.1 | KTBY | Fox |
| 5.1 | KYES | CBS |
| 7.1 | KAKM | PBS |
| 11.1 | KYUR | ABC |
| 15.1 | KYUK | PBS |
| 33.1 | KDKM | Ion |
| 35.1 | KCFT | Cowboy |
| 41.1 | KLDY | TBN |

*Anchorage, AK – TV Schedule.*[5]   There also are more than thirty multicast channels available in the Anchorage market, some of which are redundant or are repeaters intended to provide better reception for

---

[5] https://www.tvguide.com/listings/zip/99524-anchorage-ak/

viewers in specific local geographical areas, but most of which offer programming other than that available on the primary channels.

Throughout much of the Anchorage market, several providers also offer home internet service. *See* Broadband Now, *Internet Providers in Anchorage, Alaska*.[6] Cable operators also offer access to video services via cable broadband internet. And nearly all residents in Anchorage have access to at least two competing satellite broadband providers. Many consumers have additional video options through Alaska Communications' DSL and fiber networks, as well as through Borealis broadband's fixed wireless access network.

Anchorage has a dynamic media market that offers consumers a multitude of choices. To compete, providers need to make capital-intensive investments. And providers need stability as to the meaning and application of relevant regulations so that they can plan investments and deploy their resources effectively. Gray had reasonable private capital investment-backed expectations based on the plain language of the FCC's ownership regulations and governing laws. And Gray depended on the accuracy of publicly available information to plan, to negotiate, and to execute its acquisition of programming content, as well as assets and personnel, and to make subsequent investment decisions to upgrade its operations.

---

[6] https://broadbandnow.com/Alaska/Anchorage

Many local broadcast TV stations also depend on the same information, as well as the FCC's actions, when deciding to acquire programming content and to invest resources. Accurate information, regulatory predictability, and legal clarity are all required to ensure viability in the digital media marketplace.

But in today's tumultuous media market, the financial risks of investing in new programming content necessarily are increased when the rules are unclear and unknown. Arbitrary regulatory interpretations, such as those advanced by the FCC for the first time in this case, undermine private investment.

None of this should come as a surprise. "The Commission has noted on several occasions that regulatory uncertainty can discourage investment, and so unnecessary regulatory uncertainty should be avoided." *Space Station Licensing*, 18 F.C.C.R. 10,760, 10,781 n.115 (May 19, 2003) (listing several examples). In a 2018 order classifying broadband internet service, the FCC stated that it "has long recognized that regulatory burdens and uncertainty . . . can deter investment by regulated entities." *Restoring Internet Freedom*, 33 F.C.C.R. 311, 364 (Jan. 4, 2018) (¶88). To be sure, "regulatory uncertainty serves as a major barrier to investment and innovation." *Id.* at 454 (¶ 249); *see also Mozilla v. FCC*, 940 F.3d 1, 49–55 (D.C. Cir. 2019) (discussing the agency's analysis of investment and innovation).

And in a separate 2018 order addressing wireless messaging, the FCC recognized that even the "*threat* of regulation can have significant deleterious effects on investment." *Wireless Messaging Order*, 33 F.C.C.R. 12,075, 12,101 (Dec. 13, 2018) (¶ 49) (emphasis added). In dynamic technological markets that constantly undergo major developments, the FCC recognized the value of "*regulatory certainty*"— i.e., minimal regulatory actions promote investment and innovation in a competitive market. *Id.* (emphasis added).

Parties frequently seek judicial review of agency rules that purport to eliminate regulatory uncertainty. *See, e.g.*, *AT&T Inc. v. FCC*, 452 F.3d 830, 836 (D.C. Cir. 2006). They do so for good reason: not all agency rules have a positive effect on investment. "Besides imposing the usual costs of regulatory compliance," many FCC orders actually "increase uncertainty in policy, which both reason and the most recent rigorous econometric evidence suggest reduce investment." *US Telecom Assoc. v. FCC*, 825 F.3d 674, 754–55 (D.C. Cir. 2016) (Williams, J., concurring in part and dissenting in part) (citing Scott R. Baker, Nicholas Bloom & Steven J. Davis, *Measuring Economic Policy Uncertainty*, 131 Quarterly Journal of Economics 1593–1636 (2016)).

So, regulated parties often find themselves in a lose-lose position. Not only must regulated parties "divine the agency's interpretations in advance or else be held liable when the agency announces its interpretations for the first time in an enforcement proceeding,"

19

*SmithKline*, 567 U.S. at 158, but they also must suffer the consequences that regulatory uncertainty inflicts upon investment.  Courts should not condone such "arbitrary government."  *Talk America, Inc. v. Michigan Bell Tel. Co.*, 564 U.S. 50, 69 (2011) (Scalia, J., concurring).  Nor should courts defer to an "agency's interpretation of its own rule" when deference simply would encourage "the agency to enact vague rules which give it the power, in future adjudications, to do what it pleases."  *Id.*

Due process requires more from agencies.  To comply with well-established due process principles, agencies must articulate rules with legally fixed standards, and agencies must follow those rules to avoid arbitrary enforcement.  The FCC could exercise its authority to conduct notice-and-comment rulemaking or to issue declaratory orders *prospectively* so that regulated parties can understand agency interpretations before being subject to penalties.  Rules should be clear and known.  This Court should reject novel agency interpretations applied retroactively to penalize parties like Gray.

## II.  The FCC's application of Note 11 violated the First Amendment in these circumstances.

### A.  Broadcasters have free speech right to choose programming content.

Whenever the FCC seeks to regulate programming content, the "regulations invariably raise First Amendment issues."  *Motion Picture Association of America, Inc. v. FCC*, 309 F.3d 796, 805 (D.C. Cir. 2002).  Congress gave the agency clear guidance:  "no regulation or condition

shall be promulgated or fixed by the Commission which shall interfere with the right of free speech by means of radio communication." 47 U.S.C. § 326. That statutory provision codifies the First Amendment right of broadcasters to select the programming content. "Government regulation over the content of broadcast programming must be *narrow*, and that broadcast licensees must retain abundant discretion over programming choices." *Turner Broad. Sys., Inc. v. FCC,* 512 U.S. 622, 651 (1994) (emphasis added).

## B. The FCC impermissibly regulated programming content.

The FCC claims its novel interpretation of Note 11 does not violate the First Amendment and Section 326. The agency claims that its enforcement action against Gray "does not consider content but rather market concentration" and that the agency has a rational basis in "advancing the goals of competition and diversity." A11 (¶¶ 24–25). The FCC states that "in no way does the rule intrude into programming content decisions." *Id.* at ¶ 24. But that is not right. The Commission's application of Note 11, in effect, regulates Gray's programming because the agency penalized Gray for acquiring KTVA's CBS network affiliation to gain access to new content and to upgrade existing programming.

Even if the Court were to credit the FCC's claim that its regulatory interpretation imposed a content-neutral restriction on broadcast programming in this case, the agency defeats its own argument. The

Commission insists that it had "a rational basis" for its action. *Id.* at ¶ 25; *see also Turner,* 512 U.S. at 637–41 (discussing First Amendment scrutiny). Courts routinely "apply a rational basis standard of review" in considering local ownership orders. *Sinclair Broad. Group, Inc. v. FCC*, 284 F.3d 148, 167 (D.C. Cir. 2002); *accord Prometheus Radio Project v. FCC*, 652 F.3d 431, 464–65 (3d Cir. 2011). Any restriction on local TV station ownership must be "rationally" related to the Commission's interest in promoting the "diversification of ownership" and "achieving greater diversity of viewpoints." *FCC v. Nat'l Citizens Comm. for Broad.,* 436 U.S. 775, 796 (1978).

Yet the FCC failed that test. By imposing a substantial penalty on Gray for its acquisition of additional programming content, the agency has not promoted competition or diversity in Anchorage. A TV broadcast station's acquisition of additional programming content generates operational efficiencies that *expand* programming choices for consumers. This case illustrates that. Gray's purchase of programming content, and other assets from KTVA, expanded programming content on KYES. Gray also has maintained the same network affiliations. The Commission never explained in any meaningful way how the acquisition impacted competition in the already tumultuous local market.

Gray did not acquire KTVA's broadcast *license*. Thus, the transaction did not reduce opportunities for other broadcasters to compete in the Anchorage market. Consumers have many available

alternate media outlets in Anchorage, including broadcast stations, satellite TV, radio, cable TV, and countless internet services.

### C.    The FCC's ad hoc interpretation of the top-four rule violated the First Amendment, especially in the context of a rapidly changing media market.

The FCC claimed that its interpretation of Note 11 "is rationally related to the substantial government interests in promoting competition and diversity." A11 (¶ 24). But this Court should reject that claim, as context matters. The FCC glosses over the realities of the Anchorage market. Technological advances already have created several alternative media distribution outlets for Anchorage consumers to enjoy video programming. Even the FCC has recognized that "many television broadcast stations use digital transmission technologies to offer multiple programming streams (digital multicast channels) to viewers." *Communications Marketplace Report*, Dkt. No. 22-203, 2022 WL 18110553, at ¶ 264 (Dec. 30, 2022). As a matter of consumer choice, these technological developments have expanded opportunities for competition and for diverse programming.

Broadcast TV stations offer linear video programming channels to over-the-air households connected to an antenna, and they are only one video viewing option among many. Today, broadcast TV stations compete in a dynamic competitive marketplace with other video technology platforms, including cable multi-channel video distributor networks, direct broadcast satellite networks, and internet-based alternatives.

23

The FCC has observed that "most households have access to at least one cable provider" as well as two satellite providers. *Id.* at ¶ 282. That is certainly true in Anchorage, where viewers also have a wide variety of opportunities for internet access. According to the FCC, more than 69 million consumers in 2021 subscribed to video programming content provided by multichannel distributors. *Id.* at ¶ 287. That same year (2021), consumer "spending on rental, streaming, and downloading video" *more than doubled*, with the average household spending more than $110 each year. *Id.* at ¶ 288.

Online video distributors had high year-end subscriber numbers in 2021, including Amazon Prime Video (108 million), Netflix (68 million), Hulu (about 45 million), and Disney+ (about 39 million). *Id.* at ¶ 285. "At the end of 2021," the Commission explained that "15% of U.S. TV households watched over-the-air television, and 80% of these over-the-air households also subscribed to an [online video distributor]." *Id.* at ¶ 283. That is not all. "In 2021, about 80% of U.S. households" also consumed advertising-based video on demand provided by websites such as YouTube and Rumble, exclusive of increasingly popular video offerings on social media sites such as Twitter. *Id.* at ¶ 254.

These facts confirm cross-platform video competition, which rapidly continues to develop across the country. It is not a new phenomenon. At least since Congress enacted the Telecommunications Act of 1996, the communications marketplace environment has been characterized by

24

increasing competition among a variety of media and service providers and also by a convergence of the services offered by media companies and telecommunications providers." Randolph J. May, *Charting a New Constitutional Jurisprudence for the Digital Age*, 3 Charleston L. Rev. 373, 374 (2009).

"Convergence should also have a significant impact on U.S. jurisprudence on free speech," especially because the internet can "convey all major forms of communications effectively," with the potential to render "incoherent any regime that attempts to base the level of First Amendment scrutiny on the technological means of transmission." Christopher C. Yoo, *The Convergence of Broadcasting and Telephony: Legal and Regulatory Implications*, Perspectives from FSF Scholars (Jan. 4, 2010).[7] Jurists also have acknowledged changes in the marketplace:

- Justice Thomas observed more than ten years ago that "traditional broadcast television and radio are no longer the 'uniquely pervasive' media forms they once were." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 533 (2009) (Thomas, J., concurring). "For most consumers," he observed that "traditional broadcast media programming" has been "bundled with cable or satellite services." *Id.* at 533–34. And even in 2009, consumers already had "freely

---

[7] https://freestatefoundation.org//wp-content/uploads/2019/08/Convergence_of_Broadcasting_and_Telephony-010410.pdf.

available" access to the internet using "portable computer, cell phones, and other wireless devices" to watch video programming. *Id.* at 534 (citing May, 3 Charleston L. Rev. at 375).

- In another case, the FCC "failed to demonstrate that allowing a cable operator to serve more than 30% of all cable subscribers would threaten to reduce either competition or diversity in programming." *Comcast Corp. v. FCC*, 579 F.3d 1, 8 (D.C. Cir. 2009). That is because the record was "replete with evidence of ever increasing competition among video providers." *Id.* Given "the entry of new competitors at both the programming and the distribution levels," the D.C. Circuit held that "it was arbitrary and capricious for the Commission to conclude that a cable operator serving more than 30% of the market poses a threat either to competition or to diversity in programming." *Id.*

- Then-Judge Kavanaugh has recognized that the "video programming distribution market has changed dramatically, especially with the rapid growth of satellite and Internet providers." *Comcast Cable Comm., LLC v. FCC*, 717 F.3d 982, 993 (D.C. Cir. 2013) (Kavanaugh, J., concurring). It has been a "massive transformation." *Id.* "In the two decades since Congress enacted the Cable Act of 1992, the video programming marketplace [was] radically transformed." *Agape Church, Inc. v. FCC*, 738 F.3d 397, 413 (D.C. Cir. 2013) (Kavanaugh J, concurring). "Cable

operators today face intense competition from a burgeoning number of satellite, fiber optic, and Internet television providers." *Id.* at 414 (citing, among other sources, May, 3 Charleston L. Rev. at 393–94).

Given these changes in the media landscape, the FCC errs in brushing aside the First Amendment implications of its enforcement action against Gray. "The extant facts that drove" the Supreme Court "to subject broadcasters to unique disfavor under the First Amendment simply do not exist today." *Fox Television*, 556 U.S. at 534 (Thomas, J., concurring). And it may be that "these dramatic changes in factual circumstances" support the Supreme Court's eventual "departure from precedent under the prevailing approach to *stare decisis*." *Id.*; *accord* May, 3 Charleston L. Rev. at 385 (explaining why "the Court should articulate a jurisprudence that generally affords the various forms of electronic media the same strict First Amendment protection that newspapers receive under [*Miami Herald Publishing Co. v. Tornillo*, 218 U.S. 241 (1974)], and that the Internet receives under [*Reno v. ACLU*, 521 U.S. 844 (1997)].")

A lot has changed since the 1970's and 1980's, when courts characterized the competitive state of media markets in cases involving the First Amendment. Heightened scrutiny now may be warranted as agencies issue decisions that restrict the programming choices from broadcast TV stations, as the FCC did here.

27

Either way, even in the absence of a formal change to the Supreme Court's jurisprudence, this Court must consider the Anchorage market and the extent to which the FCC "rationally" promoted competition and diversity. A11 (¶ 25). A careful review of this record demonstrates that the agency did no such thing. Applying its ad hoc interpretation of Note 11 to Gray, the FCC did not promote competition and diverse programming. The agency likely harmed those interests. Gray acquired programming content to realize efficiencies and to attract viewers. There is no evince that the transaction stifled competition. The forfeiture order, as applied to Gray in these circumstances, contravenes the First Amendment.

## CONCLUSION

This Court should grant the petition for review and set aside as unlawful the forfeiture order issued by the FCC against Gray.

Respectfully submitted,

*/s/ Jeffrey S. Beelaert*

Randolph J. May
Seth L. Cooper
THE FREE STATE FOUNDATION
P.O. Box 60680
Potomac, MD 20859
(301) 984-8253
rmay@freestatefoundation.org
cooper@freestatefoundation.org

Jeffrey S. Beelaert
  *Counsel of Record*
STEIN MITCHELL BEATO & MISSNER LLP
2000 K Street, NW, Suite 600
Washington, DC 20006
(202) 661-0923
jbeelaert@steinmitchell.com

May 31, 2023

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 6,333 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

*/s/ Jeffrey S. Beelaert*
Jeffrey S. Beelaert
Counsel for Amicus Curiae

## CERTIFICATE OF SERVICE

I certify that, on May 31, 2023, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system. I further certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Jeffrey S. Beelaert*
Jeffrey S. Beelaert
Counsel for Amicus Curiae