ORAL ARGUMENT NOT YET SCHEDULED

No. 22-14274

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

GRAY TELEVISION, INC.,

*Petitioner*,

v.

FEDERAL COMMUNICATIONS COMMISSION
and UNITED STATES OF AMERICA,

*Respondents*.

On Petition for Review of an Order of
the Federal Communications Commission

## BRIEF FOR RESPONDENTS

Jonathan S. Kanter
  *Assistant Attorney General*

Robert B. Nicholson
Brandon Storm
  *Attorneys*

U.S. DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
950 Pennsylvania Ave. NW
Washington, DC 20530

P. Michele Ellison
  *General Counsel*

Sarah E. Citrin
  *Deputy Associate General Counsel*

William J. Scher
  *Counsel*

FEDERAL COMMUNICATIONS COMMISSION
45 L Street NE
Washington, DC 20554
(202) 418-1740
fcclitigation@fcc.gov

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rule 26.1-2(b), Respondents certify that to the best of their knowledge the Certificate of Interested Persons and Corporate Disclosure Statement contained in Petitioner's brief is correct and complete.

/s/  William J. Scher
William J. Scher
Federal Communications Commission
Washington, DC 20554
(202) 418-1740

Counsel for Respondent Federal
Communications Commission

## STATEMENT REGARDING ORAL ARGUMENT

Respondents respectfully request oral argument because Petitioner challenges the validity of a regulation that the Federal Communications Commission has adopted to promote competition in local television markets.

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................... iii

JURISDICTION .................................................................................. 1

STATEMENT OF THE ISSUES ....................................................... 2

STATUTES AND REGULATIONS .................................................. 3

COUNTERSTATEMENT .................................................................. 3

I.    STATUTORY AND REGULATORY BACKGROUND ................................. 3

    A.    The Local Television Ownership Rule ................................. 4

    B.    Note 11 ..................................................................................... 5

    C.    The FCC's Forfeiture Authority ......................................... 6

II.   FACTUAL BACKGROUND AND PROCEEDINGS BELOW ......................... 7

    A.    Gray's Affiliation Purchase ................................................. 7

    B.    The Notice of Apparent Liability ........................................ 8

    C.    The Forfeiture Order ............................................................ 9

SUMMARY OF ARGUMENT .......................................................... 11

STANDARD OF REVIEW ............................................................... 14

ARGUMENT ..................................................................................... 15

I.    THE FCC REASONABLY CONCLUDED THAT GRAY VIOLATED NOTE 11 ............ 15

    A.    Gray Failed to Establish That It Previously Owned a Top-Four Combination, and Note 11 Does Not Exempt the Owners of Existing Top-Four Combinations In Any Case. ................................. 18

    B.    Gray's "Functional Equivalent" Argument Is Barred by Section 405 of the Communications Act, and Its "Bare License" Argument Misreads the *Order* ............................................................ 25

    C.    By Its Terms, Note 11 Applies to Network Affiliation Purchases ........ 28

II.   GRAY HAD FAIR NOTICE THAT ITS NETWORK AFFILIATION PURCHASE WOULD VIOLATE NOTE 11. .......................................................... 31

III.  GRAY'S STATUTORY AND CONSTITUTIONAL ARGUMENTS FAIL ...................... 33

     A.    The Court Lacks Jurisdiction to Consider Gray's Unfounded Claim That Note 11 Exceeds the Agency's Statutory Authority. ......... 33

     B.    The Rule Does Not Violate Gray's Speech Rights.............................38

IV.    THE FORFEITURE AMOUNT IS APPROPRIATE. ....................................................43

CONCLUSION ......................................................................................................48

CERTIFICATE OF COMPLIANCE.......................................................................49

# TABLE OF AUTHORITIES

## Cases

*Am. Family Ass'n, Inc. v. FCC*, 365 F.3d 1156 (D.C. Cir. 2004)............................39

*Am. Library Ass'n v. FCC*, 406 F.3d 689 (D.C. Cir. 2005).....................................36

*Autauga Cnty. Emergency Mgmt. Commc'n Dist. v. FCC*, 17 F.4th 88 (11th Cir. 2021) ................................................................................................................14

*Cablevision Sys. Corp. v. FCC*, 649 F.3d 695 (D.C. Cir. 2011) ..................... 38, 40

*Carter Mountain Transmission Corp. v. FCC*, 321 F.2d 359 (D.C. Cir. 1963).......43

*Cellco P'ship v. FCC*, 700 F.3d 534  (D.C. Cir. 2012) ...........................................37

*Chevron USA, Inc. v. Nat'l Res. Def. Council*, 467 U.S. 837 (1984) ......................15

*City of Arlington v. FCC*, 569 U.S. 290 (2013) ......................................................15

*Comcast Corp. v. FCC*, 600 F.3d 642 (D.C. Cir. 2010)..................................... 36, 37

*FCC v. Nat'l Citizens Comm. for Broad.*, 436 U.S. 775 (1978) .. 3, 4, 34, 35, 36, 39, 41

*FCC v. Prometheus Radio Project*, 141 S. Ct. 1150 (2021) ......................... 3, 14, 34

*FCC v. WNCN Listeners Guild*, 450 U.S. 582 (1981) ...............................................3

*Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027 (D.C. Cir. 2002) .................42

*Gates & Fox Co. v. OSHRC*, 790 F.2d 154 (D.C. Cir. 1986)..................................31

*Graham v. R.J. Reynolds Tobacco Co.*, 857 F.3d 1169 (11th Cir. 2017) (en banc)................................................................................................................15

*Grid Radio v. FCC*, 278 F.3d 1314 (D.C. Cir. 2002)..............................................15

*Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421 (5th Cir. 2021) ..............................38

*Jones Total Health Care Pharmacy, LLC v. DEA*, 881 F.3d 823 (11th Cir. 2018) ................................................................................................................47

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Jones v. Waffle House, Inc.*, 866 F.3d 1257 (11th Cir. 2017)....................................28

*Kisor v. Wilkie*, 139 S. Ct. 2400 (2019) ....................................................... 14, 15, 21

*Koons Buick Pontiac GMC, Inc. v. Nigh*, 543 U.S. 50 (2004) .................................23

*Motion Picture Ass'n of Am. v. FCC*, 309 F.3d 796 (D.C. Cir. 2002)......................37

*NBC v. U.S.*, 319 U.S. 190 (1943) .............................................................. 34, 36, 42

*NetChoice, LLC v. Att'y Gen., Fla.*, 34 F.4th 1196 (11th Cir. 2022) ......................39

*NetworkIP, LLC v. FCC*, 548 F.3d 116 (D.C. Cir. 2008) .........................................31

*Oceanair of Fla., Inc. v. U.S. Dept. of Transp.*, 876 F.2d 1560 (11th Cir. 1989) ..................................................................................................................38

*Prometheus Radio Project v. FCC*, 373 F.3d 372 (3d Cir. 2004) ..................... 16, 39

*Prometheus Radio Project v. FCC*, 652 F.3d 431 (3d Cir. 2011) .......... 4, 39, 40, 41

*Ramirez v. Sec'y, U.S. Dep't of Transp.*, 686 F.3d 1239 (11th Cir. 2012)..............26

*Ruggiero v. FCC*, 317 F.3d 239 (D.C. Cir. 2003) (en banc) ....................... 39, 41, 43

*Satellite Broad. Co. v. FCC*, 824 F.2d 1 (D.C. Cir. 1987) ......................................31

*SBC Comm'cns, Inc. v. FCC,* 373 F.3d 140 (D.C. Cir. 2004)..................................44

*Sinclair Broad. Grp., Inc. v. FCC*, 284 F.3d 148 (D.C. Cir. 2002)............. 39, 40, 41

*SNR Wireless LicenseCo, LLC v. FCC*, 868 F.3d 1021 (D.C. Cir. 2017) ..............33

*Trinity Broad. of Fla., Inc. v. FCC*, 211 F.3d 618 (D.C. Cir. 2000)........................31

*Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622 (1994) ...........................................39

*U.S. v. Lachman*, 387 F.3d 42 (1st Cir. 2004) .........................................................33

*U.S. v. Storer Broad. Co.*, 351 U.S. 192 (1956)........................................................3

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

*United States ex rel. Hunt v. Cochise Consultancy, Inc.*, 887 F.3d 1081 (11th
    Cir. 2018) ..............................................................................................23

*United States v. Gonzales*, 520 U.S. 1 (1997).........................................28

*Worldcall Interconnect, Inc. v. FCC*, 907 F.3d 810 (5th Cir. 2018) ......26

**Statutes**

5 U.S.C. § 706(2)(A).................................................................................14

28 U.S.C. § 2342(1) ...................................................................................1

47 U.S.C. § 154(i) .....................................................................................35

47 U.S.C. § 301 .........................................................................................34

47 U.S.C. § 303(r) .....................................................................................34

47 U.S.C. § 307(a) .....................................................................................34

47 U.S.C. § 307(d) .....................................................................................34

47 U.S.C. § 308(a) .....................................................................................34

47 U.S.C. § 309(a) .....................................................................................34

47 U.S.C. § 309(d) .....................................................................................34

47 U.S.C. § 310 .........................................................................................34

47 U.S.C. § 310(d) .....................................................................................16

47 U.S.C. § 312 .........................................................................................34

47 U.S.C. § 326 .........................................................................................38

47 U.S.C. § 402(a) .....................................................................................1

47 U.S.C. § 405(a) .............................................. 12, 13, 26, 33, 34, 45

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

47 U.S.C. § 503(b) ........................................................................1

47 U.S.C. § 503(b)(1)(B) ..............................................................6

47 U.S.C. § 503(b)(2)(A) ........................................................ 7, 43

47 U.S.C. § 503(b)(4) ....................................................................6

**Regulations**

47 C.F.R. § 1.80(a) ........................................................................6

47 C.F.R. § 1.80(b)(1) ...................................................................7

47 C.F.R. § 1.80(b)(10) ...............................................................45

47 C.F.R. § 1.80(b)(10) Table 1 ............................................ 6, 8, 43

47 C.F.R. § 1.80(b)(10) Table 3 ...............................................7, 8

47 C.F.R. § 1.80(g) ........................................................................6

47 C.F.R. § 73.3555(b) ................................................................15

47 C.F.R. § 73.3555(b)(1) ...........................................................16

47 C.F.R. § 73.3555(b)(1)(i) ........................................................10

47 C.F.R. § 73.3555(b)(1)(ii) .................................................. 4, 20

47 C.F.R. § 73.3555(b)(2) ....................................................... 5, 41

47 C.F.R. § 73.3555(b)(2)(i) ........................................................10

47 C.F.R. § 73.3555 Note 4 .................................................. 4, 23, 24

47 C.F.R. § 73.3555 Note 5 ..........................................................32

47 C.F.R. § 73.3555 Note 11 ...................... 6, 17, 18, 19, 21, 22, 27, 28, 30

47 C.F.R. § 74.732(b) ..................................................................42

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

## Administrative Materials

*2010 Quad. Regul. Rev.*, 26 FCC Rcd 17489 (2011)................................................29

*2014 Quad. Regul. Rev.*, 29 FCC Rcd 4371 (2014)........................................... 5, 29

*2014 Quad. Regul. Rev.*, 31 FCC Rcd 9864 (2016)4, 5, 6, 13, 16, 17, 18, 19, 20, 23, 25, 28, 29, 33, 35, 36, 39, 40, 41, 47

*2014 Quad. Regul. Rev.*, 32 FCC Rcd 9802 (2017)....................................... 4, 5, 16

*2018 Quad. Regul. Rev.*, 33 FCC Rcd 12111 (2018)................................................42

65 Applications for Authority to Construct and Operate Multipoint Distribution Service Stations at Three Transmitter Sites, 10 FCC Rcd 11162 (1995)................................................................................32

*Amendment of Section 1.80(b) of the Commission's Rules, Adjustment of Civil Monetary Penalties to Reflect Inflation*, 36 FCC Rcd 18129 (Enf. Bur. rel. Dec. 22, 2021)..........................................................................44

*Application of Franklin Commc'ns Part., L.P.*, 8 FCC Rcd 4909 (1993)..............20

*Application of William B. Neal*, 11 FCC Rcd 3448 (1996) ....................................21

*Complaints Involving the Political Files of WCNC-TV, Inc.*, 34 FCC Rcd 10048 (2019)....................................................................................46

*Fireweed Commc'ns, LLC*, 31 FCC Rcd 6997 (Media Bur. 2016) ........................30

*Forfeiture Policy Statement*, 12 FCC Rcd 17087 (1997) .........................................8

*Hoak Media, LLC*, 29 FCC Rcd 3640 (Media Bur. 2014)......................................32

*In re Enserch Corp.*, 15 FCC Rcd 13551 (2000)....................................................43

*Liability of Benito Rish*, 7 FCC Rcd 6036 (1992) ..................................................45

*Revision of Radio Rules*, 7 FCC Rcd 6387 (1992) .................................................20

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

**Other Materials**

Black's Law Dictionary (10th ed. 2014)...................................................22

Black's Law Dictionary (11th ed. 2019) ...............................................28

Comments of Gray Tel. Licensee, LLC in MB Docket No. 20-299 at 2, 6
(Jan. 9, 2023), https://www.fcc.gov/ecfs/document/10109250120396/1 .............7

Gray 2020 Annual Report, https://graytv.gcs-web.com/static-files/0a61d85c-
5ec4-4425-83f6-a798c7bff630 ...........................................................47

No. 22-14274

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

GRAY TELEVISION, INC.,

*Petitioner*,

v.

FEDERAL COMMUNICATIONS COMMISSION
and UNITED STATES OF AMERICA,

*Respondents*.

On Petition for Review of an Order of
the Federal Communications Commission

## BRIEF FOR RESPONDENTS

## JURISDICTION

This case involves a monetary forfeiture penalty imposed pursuant to

Section 503(b) of the Communications Act of 1934, as amended. 47 U.S.C.

§ 503(b). The Federal Communications Commission ("FCC" or the

"Commission") released the order imposing the forfeiture on November 1, 2022.

Gray Television, Inc. ("Gray") paid the forfeiture on November 22, 2022. On

December 28, 2022, Gray filed a timely petition for review of the order. This Court

has jurisdiction under 47 U.S.C. § 402(a) and 28 U.S.C. § 2342(1).

## STATEMENT OF THE ISSUES

The FCC's broadcast ownership rules generally prohibit ownership of two television stations in the same market that are rated among the top four stations in terms of audience share. In 2016, the FCC extended this "top-four prohibition" from station license applications to transactions in which one station acquires the network affiliation (*e.g.*, ABC or CBS) of another station. The agency adopted this regulation – known as Note 11 of the ownership rules – to protect the integrity of the top-four prohibition, as network affiliation acquisitions have the competitive impact of license transactions but unlike them are not subject to prior FCC review or approval.

Gray has owned two television stations in Anchorage, Alaska since 2016. One of those stations is an NBC affiliate and has the largest audience share in the market. Gray's other Anchorage station had no major network affiliation until, in 2020, Gray acquired the local CBS network affiliation of Anchorage's second-rated station from a competitor. As a result of that transaction, Gray's station, which based on contemporaneously available data was not previously ranked among the top four stations in Anchorage, took over second place, making Gray the owner of the market's top two stations. Because Gray's affiliation acquisition violated Note 11, the FCC imposed a forfeiture penalty of $518,283. This case presents the following issues:

1. Did the FCC reasonably conclude that Gray violated Note 11?

2. Did Gray have fair notice that its conduct violated the regulation?

3. Does Note 11, as applied, exceed the FCC's statutory licensing authority or violate the First Amendment?

4. Did the FCC abuse its discretion in determining the forfeiture amount?

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are reprinted in an addendum bound with this brief.

## COUNTERSTATEMENT

### I.    STATUTORY AND REGULATORY BACKGROUND

Congress has vested the FCC with broad authority to regulate broadcast stations in the public interest. *FCC v. WNCN Listeners Guild*, 450 U.S. 582, 593-94 (1981). The FCC has exercised that authority by limiting the number of media outlets that a single entity may own, operate, or control. *See FCC v. Nat'l Citizens Comm. for Broad.*, 436 U.S. 775, 780 (1978) ("*NCCB*") (limiting cross-ownership of a newspaper and broadcast station in the same local market); *U.S. v. Storer Broad. Co.*, 351 U.S. 192, 202-05 (1956) (limiting the number of broadcast stations that one entity may own nationwide). "The FCC has long explained that [its] ownership rules seek to promote competition, localism, and viewpoint diversity by ensuring that a small number of entities do not dominate a particular media market." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1155 (2021). Courts repeatedly have upheld the ownership rules as consistent with the First

Amendment. *See, e.g.*, *Prometheus Radio Project v. FCC*, 652 F.3d 431, 465 (3d Cir. 2011) (rejecting "First Amendment claims that the media ownership rules are impermissible attempts by the FCC to manipulate content"); *NCCB*, 436 U.S. at 799 ("we see nothing in the First Amendment to prevent the Commission from allocating licenses so as to promote the 'public interest' in diversification of the mass communications media"); *id.* at 799-802.

### A.    The Local Television Ownership Rule

The FCC's local television ownership rule prohibits new combinations among the four highest-rated stations in a market based on audience share. 47 C.F.R. § 73.3555(b)(1)(ii). Top-four stations are usually affiliated with the four largest national networks (ABC, CBS, Fox, and NBC), which "have a distinctive ability to attract larger primetime audiences on a regular basis." *2014 Quad. Regul. Rev.*, 31 FCC Rcd 9864, 9952 ¶ 216 (2016) ("*Second Report and Order*"). Top-four station combinations "generally result" in the combined firm having a "significantly larger market share," which may lead to "reduced incentives for commonly owned local stations to compete for programming, advertising, and audience shares." *2014 Quad. Regul. Rev.*, 32 FCC Rcd 9802, 9837 ¶ 79 n.230 (2017).

The top-four prohibition applies when "the application to acquire or construct the station(s) is filed" with the FCC. 47 C.F.R. § 73.3555(b)(1)(ii). *See id.* Note 4 (ownership rules "apply to all applications for new stations" and "all other

applications for assignment or transfer" of licenses). A combination owner need not divest "where a station organically becomes a top-four station through station improvement." *Second Report and Order*, 31 FCC Rcd at 9883 ¶ 48.

The FCC, upon the applicant's request, may exclude a proposed combination from the top-four prohibition to "help mitigate the potential drawbacks associated with strict application" of the local television ownership rule. *2014 Quad. Regul. Rev.*, 32 FCC Rcd at 9838 ¶ 81. *See* 47 C.F.R. § 73.3555(b)(2). In such a case, proponents of a combination must show that applying the prohibition "is not in the public interest because the reduction in competition is minimal and is outweighed by public interest benefits." *2014 Quad. Regul. Rev.*, 32 FCC Rcd at 9838 ¶ 82 .

## B.    Note 11

In 2014, the FCC proposed to extend the top-four prohibition to "a transaction or series of transactions, sometimes referred to as 'affiliation swaps,'" that enable a station licensee "to obtain control over two of the top-four stations in a market" without agency approval. *2014 Quad. Regul. Rev.*, 29 FCC Rcd 4371, 4390 ¶ 45 (2014). The FCC tentatively found that such transactions "can be used to evade the top-four prohibition." *Id.* at 4392 ¶ 49. To "close this loophole," it proposed to require "that such transactions must comply with the top-four prohibition at the time the agreement is executed." *Id.*

The FCC adopted its proposal in 2016, finding that "transactions involving the sale or swap of network affiliations between in-market stations that result in an

entity holding an attributable interest in two top-four stations" "undermine the purpose of the top-four prohibition." *Second Report and Order,* 31 FCC Rcd at 9883 ¶ 48. To protect the integrity of the local television ownership rule, the FCC adopted Note 11, which provides:

> An entity will not be permitted to … own, operate, or control two television stations in the same [market] through the execution of any agreement … involving stations in the same [market], … in which a station (the 'new affiliate') acquires the network affiliation of another station (the 'previous affiliate'), if the change in network affiliations would result in the licensee of the new affiliate … owning, operating, or controlling two of the top-four rated television stations in the [market] at the time of the agreement. Parties should also refer to the *Second Report and Order*.

47 C.F.R. § 73.3555 Note 11.

### C.    The FCC's Forfeiture Authority

The Communications Act provides that any person who the agency determines has willfully or repeatedly failed to comply with any rule, regulation, or order issued by the agency is liable for a monetary forfeiture penalty. 47 U.S.C. § 503(b)(1)(B); 47 C.F.R. § 1.80(a). To impose such a forfeiture, the FCC must first issue a notice of apparent liability, which provides the recipient an opportunity to show why the agency should not impose the forfeiture. 47 U.S.C. § 503(b)(4); 47 C.F.R. § 1.80(g).

The FCC's rules set forth base forfeiture amounts for specified types of rule violations, *see* 47 C.F.R. § 1.80(b)(10) Table 1, as well as factors that may warrant upward or downward departures from those base amounts. *See id.* § 1.80(b)(10)

Table 3. The Act and the FCC's rules also cap the forfeiture for a given violation. *See* 47 U.S.C. § 503(b)(2)(A); 47 C.F.R. § 1.80(b)(1).

## II.  FACTUAL BACKGROUND AND PROCEEDINGS BELOW

Gray is "the nation's second largest television broadcaster," with stations in 113 markets nationwide. Comments of Gray Tel. Licensee, LLC in MB Docket No. 20-299 at 2, 6 (Jan. 9, 2023), https://www.fcc.gov/ecfs/document/10109250120396/1. Gray owns two stations in the Anchorage, Alaska television market: KTUU-TV and KYES-TV. *Gray Tel., Inc.*, 2022 WL 16647929 ¶ 1 (2022) ("*Order*") (A1). *See id.* ¶ 3 n.7 (A2). KTUU is the local NBC network affiliate and the highest-rated station in the market. *Id.* ¶ 3 (A2); Req. for Cancellation of Notice of Apparent Liability (Aug. 6, 2021), Exh. 1 (A68). Gray acquired the KYES license in 2016, at which time KYES did not have an affiliation with any of the four largest national networks. *Order* ¶ 9 n.25 (A4).

### A.  Gray's Affiliation Purchase

On July 24, 2020, Gray executed an agreement with Denali Media Holdings ("Denali") to acquire, for Gray's KYES, the local CBS network affiliation of KTVA(TV), Anchorage, along with other station assets; Denali retained "only the license and KTVA(TV) transmission facilities." *Order* ¶¶ 3, 19 (A2, A8). At the time of the purchase, KTVA's audience share ranked second in the market behind only Gray's KTUU. *Id.* ¶ 3 (A2); A68. Immediately afterward, KYES "began

broadcasting the same program schedule … that had previously appeared on" KTVA. *Id.* ¶ 3 (A2).[1]

### B.    The Notice of Apparent Liability

After Gray and Denali responded to letters of inquiry, the FCC issued a Notice of Apparent Liability for Forfeiture against Gray for violating Note 11 of the local television ownership rule. *Gray Tel., Inc.*, 36 FCC Rcd 10856, 10858 ¶ 7 (2021) ("*Notice*") (A76). The FCC found that Gray's purchase of the local CBS affiliation from KTVA apparently violated Note 11 because it gave Gray ownership of the two highest-rated stations in the Anchorage market. *Id.* ¶¶ 6-7 (A76). The *Notice* proposed a forfeiture of $518,283, which was then the statutory maximum for a single violation by a broadcast station licensee. *See id.* ¶ 6 (A76).

In determining the appropriate forfeiture penalty, the FCC started with the base forfeiture of $8,000 for an "unauthorized substantial transfer of control," "the most analogous type of violation" for which the agency's rules identify a base forfeiture amount. *Id.* ¶ 12 & n.28 (A79-80) (citing 47 C.F.R. § 1.80(b)(10) Table 1).[2] Recognizing that various factors, including the deliberate nature of the

---

[1] KTVA went silent on September 4, 2020, and did not resume operation until September 2, 2021, after obtaining a new program source. *Order* ¶ 3 n.8 (A2).

[2] The FCC has adopted base forfeitures as guidelines "to provide a measure of predictability to the forfeiture process." *Notice* ¶ 11 & n.25 (A79) (quoting *Forfeiture Policy Statement*, 12 FCC Rcd 17087, 17098-99 ¶ 22 (1997)); 47 C.F.R. § 1.80(b)(10) Table 3. The FCC has not specified a base forfeiture for violation of Note 11. *See id.*

violation and its timing, would have justified an upward adjustment, the FCC nonetheless did not propose such an adjustment because assessing the base forfeiture for each day of Gray's months-long continuing violation would exceed the statutory maximum forfeiture. *See id.* ¶ 13 (A80). The Commission considered "all possible grounds" to reduce the forfeiture, but found none "sufficiently compelling." *Id.*

In response to the *Notice*, Gray raised a number of arguments. Among other things, it contended that Note 11 did not apply because the "purchase of assets from KTVA(TV) did not involve any swap of affiliations and was not the 'functional equivalent' of a license transfer." A20. In making this argument, Gray did not challenge the FCC's "authority to prohibit transactions that are the 'functional equivalent' of … license transfers or assignments"; Gray's reply to the *Notice* "assume[d]" that the FCC has such authority. A58. Gray also argued that Note 11 did not apply because, at the time of the Anchorage transaction, KYES "was already a Top 4 station," A20 (emphasis removed), according to ratings data compiled by the Comscore research service at the end of July 2020. A37; A68.

## C.    The Forfeiture Order

In the *Order* on review, the FCC first rejected Gray's argument that its affiliation purchase did not "result" in a prohibited station combination because, at the time of the transaction, KYES was already a top-four station. *See Order* ¶¶ 9-13 (A4-A6). The FCC found that Gray failed to show that KYES was a top-four

station on the relevant date – July 24, 2020 – because the data on which Gray

relied to support the claimed ranking were not yet compiled on that date and thus

were not the "'most recent' ratings available at the [relevant] time." *Id.* ¶ 11 (A5)

(quoting 47 C.F.R. § 73.3555(b)(2)(i)).[3] The FCC additionally found that,

"regardless of whether Gray already legally possessed a top-four combination

through organic growth at the time of the transaction," purchasing the CBS

affiliation still violated Note 11, because it "resulted in a combination of the

market's first- and second-ranked stations" that "did not arise from any organic

growth." *Id.* ¶ 12 (A6). Gray's contrary reading of the rule, the FCC explained,

would leave "no barriers" to a company's "eventually acquiring all of the top-four

network affiliations from other in-market stations through a similar combination of

agreements." *Id.* ¶ 13 (A6).

The FCC also rejected Gray's arguments that the prohibition in Note 11

encompasses only two-way "swaps" of network affiliations, and only when a

transaction is "indistinguishable from a license transfer" because it involves the

conveyance of "nearly all non-license assets." *Id.* ¶¶ 17-18 (A7-8). *See id.* ¶¶ 20-21

(A9-10). The plain language of the rule, the FCC explained, encompasses "any

agreement," without referencing "swap[s] or any similar limitation." *Id.* ¶ 20 (A9).

---

[3] Consistent with the *Order*, we attribute this requirement to Section 73.3555(b)(1)(i), recognizing that, "pursuant to … [a] subsequent renumbering of Commission rules, [it] is now memorialized at Section 73.355(b)(1)(ii)." *Order* ¶ 11 n.30 (A5).

And the *Second Report and Order* made clear that affiliation purchases are comparable to license transfers due to their "impact" on competition – not because they involve any non-license assets other than affiliation. *Id.* ¶ 17 (A8). In any event, the FCC found, the Anchorage transaction was the "functional equivalent" of a license transfer, in that Gray, by its own admission, acquired all of the non-license assets from Denali's KTVA that it could legally acquire. *Id.* ¶ 19 (A8).

The FCC further explained why Gray had fair notice that Note 11 would apply beyond two-way affiliation "swaps," *id.* ¶¶ 20-21 (A9-10), and why Note 11 does not violate statutory and constitutional protections for free speech. *Id.* ¶¶ 24-25 (A11). The FCC also rejected Gray's attempt to analogize its situation to prior cases in which the agency had imposed a lesser forfeiture, characterizing those cases as "dramatic[ally] differen[t] … with regard to ability to pay" and other relevant factors. *Id.* ¶ 31 (A14). After considering the application of all possible adjustment factors, the FCC affirmed its tentative determination in the *Notice* to adopt the statutory maximum of $518,283 without adjustment. *Id.* ¶¶ 1, 26-33 (A1, 11-15).

## SUMMARY OF ARGUMENT

**I.A**. The FCC reasonably concluded that Gray's network affiliation purchase, which substantially increased the concentration of television market power in Anchorage, violated Note 11 of the local television ownership rule by making Gray the owner of the top two stations in the market. Gray argues that Note

11 exempts the owners of existing top-four combinations, but the FCC reasonably determined that Gray did not establish that KYES was a top-four station before changing affiliation. Alternatively, the Commission reasonably found that Note 11 applies regardless of KYES's previous station ranking because the consequence of Gray's purchase of KTVA's CBS affiliation is that KYES became the second-ranked station in the Anchorage market. Note 11's context and purpose – to help guard against top-four combinations in local television markets – strongly support the FCC's interpretation, while Gray's reading would permit end-runs around the top-four prohibition.

**B**. Gray seems to have abandoned the argument it raised before the agency that the Anchorage transaction did not violate Note 11 because it was not sufficiently similar to a license transfer. Instead, Gray now argues that Note 11 does not reach transactions that are "functional[ly] equivalent" to license transfers because only the *Second Report and Order*, not the text of the rule itself, uses that phrase. Because Gray gave the FCC "no opportunity to pass" on this argument, the Court lacks jurisdiction to reach it, 47 U.S.C. § 405(a), and anyway it is meritless. Gray's related claim that the FCC improperly found that the Anchorage transaction left Denali's KTVA with a "bare license" misconstrues what the FCC in fact found – that Denali "sold off to Gray all the assets that it could, *short of* impermissibly leaving itself with a bare license." *See Order* ¶ 19 (A8) (emphasis added).

**C**. By its terms, Note 11 applies to an affiliation acquisition regardless of the consideration exchanged. And the *Second Report and Order* indicates that the rule is intended to reach "transactions involving the sale or swap of network affiliations." 31 FCC Rcd at 9883 ¶ 48.

**II**. Gray also did not lack fair notice of the FCC's interpretation of its rule. The text of Note 11 provided Gray, a sophisticated broadcaster with numerous stations nationwide, fair warning that its affiliation purchase would violate the top-four prohibition.

**III.A**. Gray's challenge to the FCC's statutory authority is barred, *see* 47 U.S.C. § 405(a), because Gray did not raise it before the agency, and instead "assum[ed]" for the sake of argument that the FCC had the authority Gray now contends, for the first time, that it lacks. A58. In all events, Note 11 falls within the FCC's well-established authority to restrict common ownership of broadcast properties in the interest of competition. Gray's contention that Note 11 is "untethered" from that authority ignores a long line of Supreme Court precedent upholding the agency's broadcast ownership rules.

**B**. Note 11 is subject to the same constitutional analysis as the local television ownership rule, which courts repeatedly have affirmed is rationally related to the important governmental interest in promoting competition in local television markets. The regulation targets network affiliation acquisitions only because they may be used to evade the top-four prohibition. Any indirect effect on

speech that attends Note 11's enforcement does not violate the First Amendment or the parallel protections in Section 326 of the Act.

**IV**. The FCC did not abuse its discretion by imposing the statutory maximum forfeiture of $518,283. The precedents that Gray points to involved very different facts. Gray quibbles with the FCC's analysis of the regulatory adjustment criteria, but fails to demonstrate any error, or to acknowledge that the FCC directly considered – but rejected – Gray's protestations of good faith.

## STANDARD OF REVIEW

Under the Administrative Procedure Act, agency orders must be affirmed unless "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This "deferential" standard of review "requires that agency action be reasonable and reasonably explained." *Prometheus Radio Project*, 141 S. Ct. at 1158.

When reviewing an agency's interpretation of its own regulations, a court must "carefully consider the text, structure, history, and purpose of a regulation," as "it would if it had no agency to fall back on." *Autauga Cnty. Emergency Mgmt. Commc'n Dist. v. FCC*, 17 F.4th 88, 98 (11th Cir. 2021) (quoting *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019)). If there is no "uncertainty" as to a regulation's meaning, it just "means what it means." *Kisor*, 139 S. Ct. at 2415. But if the regulation is ambiguous, the agency has "significant leeway to say what its own rules mean," *id.* at 2418, and courts should defer to the agency's view so long as it is "the agency's

'authoritative' or 'official position,'" *id.* at 2416, reflects the agency's "fair and considered judgment," *id.* at 2417, and "in some way implicate[s]" the agency's "substantive expertise." *Id.*

An agency's interpretation of its statutory authority is reviewed under *Chevron USA, Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984). *City of Arlington v. FCC*, 569 U.S. 290, 307 (2013). If "Congress has directly spoken to the precise question at issue," courts "must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-43. But "if the statute is silent or ambiguous with respect to the specific issue, the question" is whether the agency has adopted "a permissible construction of the statute." *Id.* at 843.

Judicial review of a First Amendment challenge is de novo. *Graham v. R.J. Reynolds Tobacco Co.*, 857 F.3d 1169, 1181 (11th Cir. 2017) (en banc).

Review of an agency's determination of the amount of a monetary forfeiture is under the deferential arbitrary-and-capricious standard. *Grid Radio v. FCC*, 278 F.3d 1314, 1322 (D.C. Cir. 2002).

## ARGUMENT

## I.    THE FCC REASONABLY CONCLUDED THAT GRAY VIOLATED NOTE 11.

The local television ownership rule generally prohibits common ownership of two top-four stations in the same market. 47 C.F.R. § 73.3555(b). This prohibition "promote[s] competition and … viewpoint diversity by helping to

ensure the presence of independently owned broadcast television stations in local markets." *Second Report and Order*, 31 FCC Rcd at 9871 ¶ 17. To guard against the risk that more concentrated market power will "reduce[] incentives for … stations to compete for programming, advertising, and audience shares," *2014 Quad. Regul. Rev.*, 32 FCC Rcd at 9837 ¶ 79 n.230, any entity seeking a station license must first demonstrate to the FCC that the proposed transaction comports with the local television ownership rule. 47 C.F.R. § 73.3555(b)(1). *See Prometheus Radio Project v. FCC*, 373 F.3d 372, 417 (3d Cir. 2004).

The FCC adopted Note 11 to prevent evasion of the local television ownership rule. *Second Report and Order*, 31 FCC Rcd at 9882-84 ¶¶ 47-52. Network affiliation acquisitions "implicate the specific harms to [the] public interest that led the Commission to adopt the top-four prohibition" but are not subject to prior FCC review or approval because they do not involve the transfer or assignment of a station license. *Id.* at 9883 ¶ 47. *See* 47 U.S.C. § 310(d). Note 11 "clos[es]" this "loophole" by requiring that station owners comply with the top-four prohibition when they sell or trade network affiliations. *Second Report and Order*, 31 FCC Rcd at 9882 ¶¶ 47-48.

Note 11 provides that an entity may not own two television stations in the same market:

> through the execution of any agreement … in which a station (the 'new affiliate') acquires the network affiliation of another station ('the previous affiliate') … if the change in network affiliations would

> result in the licensee of the new affiliate … owning … two of the top-four rated television stations in the [market] at the time of the agreement.

47 C.F.R. § 73.3555 Note 11. To make this determination, "the new affiliate's post-consummation ranking" is "the ranking of the previous affiliate at the time the agreement is executed." *Second Report and Order*, 31 FCC Rcd at 9884 ¶ 52 n.141.

The FCC reasonably found that Gray's purchase violated Note 11. There is no dispute that on June 24, 2020, Gray executed an agreement to acquire the local network affiliation of Denali's KTVA (the "previous affiliate") for Gray's own KYES (the "new affiliate"). *Order* ¶ 11 (A5). There is also no dispute that, "at the time [this] agreement [was] executed," *Second Report and Order*, 31 FCC Rcd at 9884 ¶ 52 n.141, a different Gray station, KTUU, was the top-ranked station in the market, and Denali's KTVA was the second-ranked station *See Order* ¶ 12 (A6); A68. To determine whether the "change in network affiliations" from Denali's KTVA to Gray's KYES "[resulted] in" Gray owning "two of the top-four rated television stations in the [market] at the time of the agreement," the FCC correctly applied the contemporaneous rating of KTVA (the "previous affiliate") to KYES (the "new affiliate"). *Order* ¶ 12 (A6). *See Second Report and Order*, 31 FCC Rcd at 9885 ¶ 52 n.141. By this straightforward application of the text of Note 11 and the *Second Report and Order*, the Anchorage transaction unlawfully resulted in Gray's owning "two of the top-four rated television stations in the [market] at the time of the agreement" – KTUU, ranking first, and KYES, now ranking second. 47 C.F.R.

§ 73.3555 Note 11; *Second Report and Order*, 31 FCC Rcd at 9885  ¶ 52 n.141. *See Order* ¶¶ 9, 12 (A4, A6).

Gray nevertheless argues that the FCC erred in applying Note 11 because: (A) before acquiring the second-place ranking of Denali's station, KYES was the fourth-ranked station in the Anchorage market, meaning that Gray's KTUU and KYES were already a top-four combination and Gray's purchase did not "result" in a prohibited combination under the rule; (B) the terms of Note 11 do not cover a transaction merely because it is the "functional equivalent" of a license transfer; and (C) Note 11 is limited to two-way "swaps" and Gray's KYES did not exchange affiliations with Denali's KTVA. Gray's arguments are unavailing.

### A.    Gray Failed to Establish That It Previously Owned a Top-Four Combination, and Note 11 Does Not Exempt the Owners of Existing Top-Four Combinations In Any Case.

**1**. Gray argues that the FCC unlawfully rejected evidence that Gray's KYES was already a top-four station in Anchorage before Gray purchased, from Denali, KTVA's station affiliation and other assets. Br. at 33-34, 37. The FCC considered that evidence but concluded it was "not relevant" because it was not compiled until the end of July 2020 and so was not available to Gray and Denali when, on July 24, 2020, they executed the purchase agreement. *Order* ¶ 11 (A5).[4]

---

[4] Gray submitted composite data for July 2020 from Comscore. A68. Gray did not submit such data for June 2020. According to June 2020 Nielsen data, "the 'most

The premise of Gray's challenge is that, because "the word 'available' …
appears nowhere in" Note 11 or the *Second Report and Order*, the FCC's
determination "create[d] de facto a new regulation through the guise of
interpretation." Br. 37  (internal quotation marks omitted). That is incorrect.
To begin with, neither Note 11 nor the *Second Report and Order* expressly
addresses how to determine KYES's station ranking – as opposed to KTVA's – at
the time of the transaction. This is because it is only the "new affiliate" ranking,
not the "previous affiliate" ranking, that is relevant to the application of Note 11. 47
C.F.R. § 73.3555 Note 11. Note 11 applies when, "at the time of [an] agreement" to
"change … network affiliations," the transaction "would result in the licensee of
the new affiliate … owning … two of the top-four rated television stations in the
[market]." *Id.* "[F]or purposes of making this determination," the *Second Report
and Order* directs that "the new affiliate's post-consummation ranking will be the
ranking of the previous affiliate at the time the agreement is executed." 31 FCC
Rcd at 9885 ¶ 52 n.141. But this language concerning how to determine the "post-
consummation ranking" of KYES, using the pre-consummation ranking of KTVA,
does not dictate how to determine the pre-consummation ranking of KYES.

---

recent' ratings data available when the agreement was 'executed,'" Gray's KYES
was the fifth-rated station in the market as of the purchase date. *Order* ¶ 11 (A5).

The FCC's refusal to credit Gray's after-the-fact data concerning the pre-consummation ranking of KYES reflects a faithful understanding of "both the language and purpose" of the ownership rules. *Order* ¶ 11 (A5). The FCC uses audience-share data "as a screening mechanism to identify potential problems with concentration" in reviewing applications under the rules. *Revision of Radio Rules*, 7 FCC Rcd 6387, 6398 ¶ 52 (1992). Such data needs to be available at the time of application filing so that applicants may ascertain and demonstrate that they are in compliance with the ownership rules. *See Application of Franklin Commc'ns Part., L.P.*, 8 FCC Rcd 4909, 4911 ¶ 11 (1993) (declining to evaluate applications based on more recent data that became available "after the application [was] filed" because doing so "would subject the parties to the transaction to significant uncertainty" and unduly burden agency resources). Thus, the local television ownership rule permits common ownership of stations in the same market if, "*[a]t the time the application to acquire or construct the station(s) is filed*, at least one of the stations is not ranked among the top four stations in the [market], based on the most recent … audience share." 47 C.F.R. § 73.3555(b)(1)(ii) (emphasis added).

Note 11 extends this rule to affiliation exchanges, which do not require applications to the FCC because they do not involve license transfers. *Second Report and Order*, 31 FCC Rcd 9884 ¶ 49 (Note 11 is an "extension of the top-four prohibition"). *See* pg.16 *supra*. Accordingly, Note 11 provides for determination of

the relevant station ratings "at the time of the agreement" rather than at the time of application filing. 47 C.F.R. § 73.3555 Note 11.

In this context, the FCC reasonably declined to consider data compiled after the purchase date to prove that Gray's KYES was the fourth-rated station in Anchorage before changing affiliation. Considering after-the-fact data would be inconsistent with Note 11's function as an extension of the local television ownership rule, and would "interject an unreasonable factor of uncertainty" for licensees who negotiate an affiliation exchange in reliance on contemporaneously available data. *See Application of William B. Neal*, 11 FCC Rcd 3448, 3449 ¶ 4 (1996) (declining to require applicants to use more recent data from a different rating service). As Gray could not have relied on the data that it submitted to determine in advance whether its transaction complied with Note 11, the FCC reasonably declined to consider the data in reviewing compliance after the fact. *Order* ¶ 11 (A5). And the FCC's "considered judgment" on this issue, in an "official" order that implicates the agency's expertise concerning the broadcast television industry, is deserving of deference. *See Kisor*, 139 S. Ct. at 2416-18.

**2**. The agency reasonably explained, in the alternative, that Note 11 does not exempt the owners of existing top-four combinations when they form new combinations that are the result of network affiliation purchases. According to Gray, the word "result" in Note 11 exempts its situation because Gray's ownership

of a top-four combination in Anchorage was not a "'consequence'" of the affiliation change. Br. at 35 (quoting "Result," Black's Law Dictionary (10th ed. 2014) as "[t]o be a physical, logical, or legal consequence; to proceed as an outcome or conclusion.") (alteration in original). But Gray's ownership of the two highest-ranked stations in Anchorage *was* a "'consequence'" of the Anchorage transaction – regardless whether Gray owned a different top-four combination before combining ownership of the market's top two stations through a network affiliation purchase. *Id.*; *Order* ¶ 12 (A6). In addition, Gray ignores the text of Note 11 as a whole, as well as the rule's context and purpose, all of which strongly support the FCC's interpretation.

**a**. Read as a whole, the text of Note 11 focuses ultimately on the state of affairs *after* a change in network affiliation, not before. Note 11 asks "if *the* change in network affiliations" – that is, execution of the agreement specified in the first clause of the rule – "*would result in* the licensee of the new affiliate" owning two top-four stations. 47 C.F.R. § 73.3555 Note 11 (emphasis added). The definite article "the" and the future conditional tense signify that Note 11 is concerned with the new combination of station ratings that proceeds from the transaction specified in the preceding clause. In contrast, there is no language in Note 11 exempting the owners of existing top-four combinations, or inquiring whether "the licensee of the new affiliate" owned two top-four stations *before* the transaction. *Contra* Br. at 36.

The FCC's reading is buttressed by the agency's instruction that, in making the determination that Note 11 requires, the relevant station rating is that of the "previous affiliate," *i.e.*, the station involved in the transaction that the new combination owner does *not* own. *Second Report and Order*, 31 FCC Rcd at 9885 ¶ 52 n.141 ("the new affiliate's post-consummation ranking will be the ranking of the previous affiliate at the time the agreement is executed"). Pursuant to that instruction, the rating of the "new affiliate" – in this case Gray's KYES – before the transaction is irrelevant. *See* § I.A.1 *supra*.

**b**. Note 11's meaning is further "clarified by the remainder of the [regulatory] scheme." *United States ex rel. Hunt v. Cochise Consultancy, Inc.*, 887 F.3d 1081, 1088 (11th Cir. 2018) (quoting *Koons Buick Pontiac GMC, Inc. v. Nigh*, 543 U.S. 50, 60 (2004)). Note 11 is a provision of the FCC's ownership rules, which generally require that a station combination comply with the ownership limits upon transfer or assignment of the license of any station in the combination. 47 C.F.R. § 73.3555 Note 4. Thus, had Gray agreed to purchase KTVA's license, the purchase would have been subject to the top-four prohibition and would have required FCC authorization. *Order* ¶ 14 (A6) (the local television ownership rule "would not have permitted Gray to acquire KTVA(TV) without Commission approval"). The FCC adopted Note 11 based on its finding that affiliation acquisitions, although they do not involve license transfers, pose the same threat to local competition. *Second Report and Order*, 31 FCC Rcd at 9883 ¶ 47. The FCC's interpretation of Note 11 is

consonant with the general requirement that a station combination comply with the ownership limits upon transfer or assignment of the license of any station in the combination, 47 C.F.R. § 73.3555 Note 4, and with Note 11's competitive purpose. Gray's interpretation is not.

Instead, Gray's rule interpretation would allow the owner of an existing top-four combination "to vastly improve the rankings of its two stations" through the acquisition of a competitor's affiliation (and not through organic growth) while preventing the owners of non-top-four combinations from doing the same, thereby "turning the [local television ownership rule] on [its] head." *Order* ¶ 14 (A6). "Under Gray's strained reading, once a broadcaster with two stations in a market grows the lower-ranked station to the fourth position in market ratings, it would have no barriers to maneuvering its stations through affiliation agreements into the first and second spots in the market." *Id.* ¶ 13 (A6). Even assuming that Gray's KYES was a top-four station before becoming the number-two station in the market, the acquisition formed an even-more-dominant top-four combination, substantially increasing the concentration of market power in Anchorage. *Id.* ¶ 9 (A4). *See* A68.[5]

---

[5] According to the data that Gray submitted to the FCC, the combined audience share of Gray's KTUU (16.1507) and Denali's KTVA (4.4466) was 20.5973 before the change in affiliations. A68. KYES's audience share before the transaction was 1.7777. *Id.* The combined audience share of the other full-power television stations in the market (not counting Gray's KYES) was 6.0537. *Id.*

The FCC's interpretation of Note 11 is more faithful than Gray's to the rule's text, context, purpose, and place within the ownership rules. If the FCC intended to create an exemption from the rule for the owners of existing top-four combinations, then it would have done so expressly in adopting the rule, just as it made clear that Note 11 does not apply to top-four combinations achieved through "organic growth," *Second Report and Order*, 31 FCC Rcd at 9883 ¶ 48, or where the new affiliation is acquired "through negotiating with a national network" directly rather than from an in-market competitor. *Id.* at 9884 ¶ 51 n.138 .

### B.    Gray's "Functional Equivalent" Argument Is Barred by Section 405 of the Communications Act, and Its "Bare License" Argument Misreads the *Order*.

In addition to arguing that the Anchorage transaction was exempt from Note 11 because Gray already owned a top-four combination, Gray argued before the agency that there was no violation because Note 11 only prohibits transactions that are the "functional equivalent" of a "license transfer," meaning that "two stations … trade[] nearly all non-license assets, including [network affiliations]." A59. The FCC rejected that claim, explaining that "[n]either the text of Note 11 nor [the] *Second Report and Order* … require evidence beyond the acquisition of an affiliation of a top-four rated station from another station in the market" to show a violation of Note 11. *Order* ¶ 17 (A8). In the alternative, the FCC found that Gray's purchase was "the functional equivalent of a station license transfer" because Gray purchased most of KTVA's non-license assets. *Id.* ¶ 19 (A8).

Rather than challenge these determinations, Gray now changes course. For the first time, Gray argues that "plainly" "Note 11 does not prohibit transactions that are the 'functional equivalent' of a license transfer." Br. at 38. Gray also argues that the FCC made a "'bare license' finding," which "was arbitrary and capricious because it departed without explanation from the FCC's precedent on what constitutes a 'bare license.'" *Id.* at 39. The FCC had no fair opportunity to address the first argument, so the Court lacks jurisdiction over it. *See* 47 U.S.C. § 405(a). And it is unavailing in any event. Gray's second argument misconstrues what the FCC in fact found – that Denali's parent company "sold off to Gray all the assets that it could, *short of* impermissibly leaving itself with a bare license." *See Order* ¶ 19 (A8) (emphasis added).

**1**. Under Section 405(a) of the Act, "the filing of a petition for reconsideration is a condition precedent to judicial review where the party seeking review 'relies on questions of fact or law upon which the Commission … has been afforded no opportunity to pass.'" *Worldcall Interconnect, Inc. v. FCC*, 907 F.3d 810, 820 (5th Cir. 2018) (quoting 47 U.S.C. § 405(a)). *See Ramirez v. Sec'y, U.S. Dep't of Transp.*, 686 F.3d 1239, 1249 (11th Cir. 2012) ("It is well-settled that we will generally refuse to consider arguments raised for the first time on appeal.").

Gray's argument that "Note 11 does not prohibit transactions that are the 'functional equivalent' of a license transfer" (Br. at 38) is not properly before the Court because it is raised for the first time on appeal. Indeed, the applicability of

Section 405(a) is particularly strong here, because Gray's current argument is at odds with what Gray argued before the agency: namely, that Note 11 only prohibits transactions that are the "functional equivalent" of a license transfer. A59. In any event, Gray has no basis for complaining that Note 11 omits reference to "functional equivalence" when the rule expressly provides that "[p]arties should also refer to the [*Second Report and Order*]," 47 C.F.R. § 73.3555 Note 11, and when – as Gray itself argued before the Commission (*e.g.,* A21, A45) – the *Second Report and Order* does address that concept.

**2**. Gray's argument (Br. at 39) that "the FCC's 'bare license' finding was arbitrary and capricious because it departed without explanation from the FCC's precedent on what constitutes a 'bare license'" misconstrues what the FCC found. The agency did not find that Gray's purchase left KTVA with a "bare license"; it found that "[Denali] sold off to Gray all the assets that it could, *short of* impermissibly leaving itself with a bare license." *Order* ¶ 19 (A8) (emphasis added).[6] Nor did the FCC find that Gray "independently violated" Note 11 by doing so, Br. at 19; those words appear nowhere in the *Order*. Gray's discussion of FCC precedent on what constitutes a "bare license" thus has no bearing on this case.

---

[6] Gray did not refute the Commission's tentative finding, in the *Notice*, that Gray had acquired for KYES all of the "intellectual property, local news, sales, creative, and engineering assets used by KTVA(TV)." *Order* ¶ 19 (A8).

### C.    By Its Terms, Note 11 Applies to Network Affiliation Purchases.

Gray further maintains that Note 11 is limited to two-way affiliation "swaps" and the FCC erred by applying it to Gray's "one-way sales transaction." Br. at 32 n.13; *id.* at 42-45. Gray points out that the rule refers to the *Second Report and Order*, which repeatedly uses the term "affiliation swap," and which states in a footnote that "the record demonstrates only a single instance of an affiliation swap that would be subject to the rule" – a transaction in which two Hawaii stations exchanged affiliations. Br. at 43-44 & n.16 (quoting *Second Report and Order*, 31 FCC Rcd at 9884 ¶ 51 n.137). But, as the FCC explained, Gray's understanding of Note 11 as a rule against "swaps" is inconsistent with the text of the rule itself. *See Order* ¶¶ 20-21 (A9-10). Note 11 covers "*any* agreement … involving stations in the same [market] … in which a station … *acquires* the network affiliation of another station." 47 C.F.R. § 73.3555 Note 11 (emphasis added). On its face, this language does not restrict what "a station" must exchange for "the network affiliation of another station." *Id.*; *Order* ¶ 20 (A9). *See Jones v. Waffle House, Inc.*, 866 F.3d 1257, 1267 (11th Cir. 2017) ("Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'") (quoting *United States v. Gonzales*, 520 U.S. 1, 5 (1997)); "Acquire," Black's Law Dictionary (11th ed. 2019) ("To gain possession or control of; to get or obtain.").

Moreover, the *Second Report and Order* "repeats the language of the rule and states clearly that [Note 11] is intended to prohibit sales of affiliations in

addition to swaps." *Order* ¶ 21 (A9). Indeed, the *Second Report and Order* refers specifically to "transactions involving the *sale* or swap *of network affiliations*." 31 FCC Rcd at 9883 ¶ 48 (emphasis added). In context, the order's single mention of the Hawaii transaction, in a passage rejecting the argument that Note 11 would unduly interfere with the network affiliation marketplace, simply supports the conclusion that stations typically obtain affiliations from networks rather than from other stations. *Order* ¶ 21 n.57 (A9-10). *See Second Report and Order*, 31 FCC Rcd at 9884 ¶ 51.

Note 11's history further undercuts Gray's reading of the *Second Report and Order*. The FCC did not use the term "affiliation swap" when it first sought comment on affiliation acquisitions in 2010, and it gave the example of a transaction in which a combination owner "*purchases* the network affiliation of another top-four-ranked market station." *2010 Quad. Regul. Rev.*, 26 FCC Rcd 17489, 17505 ¶ 45 (2011) (emphasis added). In 2014, the FCC observed that affiliation acquisitions are "sometimes referred to as 'affiliation swaps,'" and tentatively found "that transactions involving the *sale or swap* of network affiliations … can be used to evade the top-four prohibition." *2014 Quad. Regul. Rev.*, 29 FCC Rcd at 4390, 4392 ¶¶ 45, 49 (emphasis added).[7] That tentative

---

[7] The FCC quoted this same language in conditioning approval of Gray's 2016 acquisition of KYES. *Fireweed Commc'ns, LLC*, 31 FCC Rcd 6997, 7002-03

finding was followed immediately by the proposed language that the FCC later codified in Note 11, reinforcing that the rule covers any agreement in which a station "acquires the network affiliation of another station." 47 C.F.R. § 73.3555 Note 11. Gray identifies no intervening public statements suggesting that the agency changed its mind between its tentative finding in 2014 and its adoption of Note 11 in 2016.

Further, Gray does not explain why the consideration received in exchange for a network affiliation has any relevance to Note 11's prohibition on the formation of top-four combinations through affiliation acquisitions. *See Notice* ¶ 8 (A77) ("The disposition of [KYES]'s prior affiliation is of no consequence to the application of Note 11."). Before the FCC, Gray's theory was that the FCC intended to prohibit only transactions like the Hawaii case, in which the stations traded affiliations and other non-license assets. *See* A59 ("The *Second Report and Order* defines the 'functional equivalent' standard in the context of the Hawaii case."). Gray has now largely abandoned that theory, which is at odds with its current contention that Note 11 does not cover "functional[ly] equivalent" transactions. *See* § I.B.1 *supra*. But without the argument that Note 11 was a "special-purpose rule designed to protect against recurrence" of the circumstances in the Hawaii case,

---

(Media Bur. 2016) ("transactions involving the sale or swap of network affiliations … can be used to evade the top-four prohibition").

A45, Gray's contention that Note 11 covers trades and not other kinds of purchases makes little sense.

## II. GRAY HAD FAIR NOTICE THAT ITS NETWORK AFFILIATION PURCHASE WOULD VIOLATE NOTE 11.

The fair notice doctrine requires an agency "to give fair warning of the conduct it prohibits or requires." *Gates & Fox Co. v. OSHRC*, 790 F.2d 154, 156 (D.C. Cir. 1986). That requirement is met where "the agency's interpretation is the most natural one." *NetworkIP, LLC v. FCC*, 548 F.3d 116, 123 (D.C. Cir. 2008). Here, the FCC's interpretation is the most natural one, as it neatly fits both the text and the purpose of Note 11. Gray's fair notice argument (Br. at 40-46) is almost entirely a repackaging of arguments already made and answered. *See* § I *supra*.[8]

Gray's argument that it reasonably relied on data reflecting KYES's ranking at the time of the transaction at issue (Br. at 41) is unpersuasive. There is no dispute that the data was not available until after the July 24, 2020 purchase date. *See*

---

[8] Gray cites *Trinity Broadcasting of Florida, Inc. v. FCC*, 211 F.3d 618 (D.C. Cir. 2000), and *Satellite Broadcasting Co. v. FCC*, 824 F.2d 1 (D.C. Cir. 1987), only for the general proposition that an agency must give fair notice, and not to claim that the factual situations in those cases were similar to the one here. In *Trinity*, the agency did not give fair notice where it acknowledged that Trinity's alternative reading of the rule was "perhaps literally accurate," and the agency's only clear public statements supported Trinity's interpretation. 211 F.3d at 629-32 (internal quotation marks omitted). In *Satellite*, the rule described the filing location in a "baffling and inconsistent" way. 824 F.2d at 2-4. In contrast, the text of Note 11 provided Gray, a sophisticated broadcaster with numerous stations nationwide, "sufficient and specific notice" of the FCC's interpretation. *Order* ¶ 20 (A9).

§ I.A.1 *supra*. Accordingly, Gray could not have relied on the data in executing its purchase. The fact that the FCC later declined to consider the data to justify Gray's purchase retroactively hardly deprived Gray of "*advance* notice" that its conduct violated Note 11. Br. at 42 (emphasis in original).

Gray further argues that the FCC's 2014 approval of a "virtually identical" transaction that the company consummated in the Lincoln, Nebraska market led it to believe that Note 11 did not cover its Anchorage affiliation purchase. Br. at 44-45. The agency reasonably rejected this argument. The staff decision approving Gray's Lincoln transaction "does not reference any affiliation changes." *Order* ¶ 22 (A10).[9] Thus, to the extent that affiliation changes were relevant to the Nebraska transaction, they would have been discussed only in the non-public "negotiations" with FCC staff that Gray alleges occurred. Br. at 44. *See 65 Applications for Authority to Construct and Operate Multipoint Distribution Service Stations at Three Transmitter Sites*, 10 FCC Rcd 11162, 11175 ¶ 41 (1995) (refusing to consider an "analysis of the facts surrounding the grants" of two applications because "[t]he staff did not purport to rely in any way on the facts which … [the] petitioners … assert[ed] were the basis for those grants"). But even if those

---

[9] Indeed, the decision does not even mention the local television ownership rule. *Hoak Media, LLC*, 29 FCC Rcd 3640 (Media Bur. 2014) (granting applications for license transfers and requests for continuation of satellite waivers). *See* 47 C.F.R. § 73.3555 Note 5 (providing that the local television ownership rule "will not be applied to cases involving television stations that are 'satellite operations.'").

negotiations did in fact occur, courts have rejected the contention that such non-public statements can "create the kind of confusion that supports a finding of a due process violation." *U.S. v. Lachman*, 387 F.3d 42, 58 (1st Cir. 2004). *See SNR Wireless LicenseCo, LLC v. FCC*, 868 F.3d 1021, 1037 (D.C. Cir. 2017) ("unexplained, case-specific Bureau actions" do not establish the position of the Commission). And when the FCC referred to the Hawaii case as "the 'single instance' of an affiliation swap," Br. at 45 (quoting *Second Report and Order*, 31 FCC Rcd at 9884 ¶ 51 n.137), "it was referring to published cases" expressly addressing an affiliation acquisition, "not unverified recountings of such transactions not reflected in a Commission decision." *Order* ¶ 22 (A10).

## III.   GRAY'S STATUTORY AND CONSTITUTIONAL ARGUMENTS FAIL.

### A.    The Court Lacks Jurisdiction to Consider Gray's Unfounded Claim That Note 11 Exceeds the Agency's Statutory Authority.

Although Gray argues extensively that Note 11 exceeds the FCC's authority over license transfers under Section 310(d) of the Act (Br. at 21-28), it never made this argument before the FCC and thus may not raise it now. *See* 47 U.S.C. § 405(a). In all events, the FCC's authority to adopt broadcast ownership rules pursuant to the licensing provisions of the Act is well-established. Because Note 11 is a reasonable measure to protect the integrity of the local television ownership rule, it falls squarely within that settled authority.

**1**. As set forth above, Section 405 of the Act bars judicial review of issues that were not presented to the agency first. 47 U.S.C. § 405(a); *see* § I.B.1 *supra*. Section 405 squarely applies to Gray's argument that the FCC lacks authority under Section 310(d) (Br. at 25), because before the agency Gray simply brushed aside the question of the FCC's statutory authority. *See* A58.

**2**. In any case, the FCC's ownership rules are a well-established and valid exercise of its licensing authority. "[N]o television or radio broadcast station may operate without a license granted by the [] Commission. Licensees who wish to continue broadcasting must apply for renewal of their licenses …, and the Commission may grant an initial license or a renewal only if it finds that the public interest, convenience, and necessity will be served thereby." *NCCB*, 436 U.S. at 780 (citing 47 U.S.C. §§ 301, 307(a), 308(a), 309(a), (d)); *NBC v. U.S.*, 319 U.S. 190, 215 (1943) (citing 47 U.S.C. §§ 307(a), (d), 309(a), 310, 312). *See also Prometheus Radio Project*, 141 S. Ct. at 1155 (the FCC "possesses broad statutory authority to regulate broadcast media 'as public convenience, interest, or necessity requires'" (quoting 47 U.S.C. § 303(r)). Section 303(r), which authorizes the FCC to "[m]ake such rules and regulations and prescribe such restrictions and conditions, not inconsistent with law, as may be necessary to carry out the provisions of [the Act]," 47 U.S.C. § 303(r), "supplies a statutory basis for the

Commission to issue regulations codifying its view of the public-interest licensing standard." *NCCB*, 436 U.S. at 793 (also citing 47 U.S.C. § 154(i)).

The FCC relied for Note 11 on "the same" licensing authority "that supports all of [the] broadcast ownership rules," citing the Supreme Court's *NCCB*, *Storer*, and *NBC* decisions. *Order* ¶ 23 (A10-11); *Second Report and Order*, 31 FCC Rcd at 9882 ¶ 47 n.122. The FCC reasoned that Note 11 is necessary to the effective performance of its statutory licensing responsibilities because Note 11 "clos[es] a potential loophole and prevent[s] circumvention of" the top-four prohibition. *Id.* at 9882 ¶ 47. Affiliation acquisitions from in-market competitors that create top-four combinations "undermine the purpose of the top-four prohibition and the [local television ownership rule] as a whole. Application of the top-four prohibition to [such transactions] is necessary to prevent circumvention of the [rule]." *Id.* at 9883 ¶ 48.[10]

**a**. Although Gray seeks to distinguish Note 11 from the regulations approved in *NCCB*, *Storer*, and *NBC*, those cases are analogous. Gray contends that the regulations at issue in those cases were "tethered to the FCC's statutory licensing authority," whereas Note 11 regulates "the purchase of a programming affiliation."

---

[10] This discussion in the *Second Report and Order*, which the FCC cited in the order on review, *Order* ¶ 23 (A10-11), refutes Gray's argument that the agency failed "to explain the statutory basis" of its authority. Br. at 25.

Br. at 26; *id.* at 25-28. But Note 11 *is* tethered to the agency's licensing authority, which encompasses transactions that directly implicate the local television ownership rule. *See Second Report and Order*, 31 FCC Rcd at 9883 ¶ 47 (affiliation purchases that create top-four combinations "implicate the specific harms to public interest that led the Commission to adopt the top-four prohibition").[11]

Gray further argues that, if the FCC has authority "over the purchase of a programming affiliation," "there would be no principled limit to the FCC's power over broadcast licensees." Br. at 28. But the Supreme Court has specifically upheld the FCC's licensing authority in the context of regulations that – like the local television ownership rule and Note 11 – are based on the agency's policy of fostering competition in the broadcasting industry. *NCCB*, 436 U.S. at 794 (discussing *Storer* and *NBC*); *id.* at 795-96. *See Order* ¶ 13 (A6) ("the broader goal of the Note 11 restriction is to prevent transactions between licensees in the same [market] that … diminish competition").

Gray misplaces reliance on *Comcast Corp. v. FCC*, 600 F.3d 642, 661 (D.C. Cir. 2010), *Am. Library Ass'n v. FCC*, 406 F.3d 689, 692 (D.C. Cir. 2005), and *Motion Picture Ass'n of Am. v. FCC*, 309 F.3d 796, 806 (D.C. Cir. 2002)

---

[11] Like Note 11, moreover, the rules affirmed in *NBC* addressed network affiliations, generally providing "that no licenses shall be granted to stations or applicants having specified relationships with networks." *NBC*, 319 U.S. at 196. *See id.* at 196-209.

("*MPAA*"), for its argument that the FCC lacks "ancillary authority" for Note 11 under Sections 303(r) and 154(i). Br. at 26-28; Nat'l Ass'n of Broad. Amicus Br. at 12-15. None of those cases involved "the Commission's exercise of its express licensing power over broadcasting stations under section 303." *Comcast*, 600 F.3d at 658 (distinguishing *NBC*). And unlike the video description rules in *MPAA*, which directly regulated program content, 309 F.3d at 803, Note 11 "only incidentally and minimally affects program content" by prohibiting the grant or renewal of licenses to the owners of top-four combinations created through affiliation acquisitions. *Id*. Note 11 affects network programming rights only to the extent necessary to carry out the FCC's licensing responsibilities by protecting the integrity of the local television ownership rule's protections against competitive harm. *See Cellco P'ship v. FCC*, 700 F.3d 534, 544  (D.C. Cir. 2012) (rule requiring mobile data providers to offer roaming agreements to other providers on "commercially reasonable" terms did not exceed the FCC's Title III authority by intruding impermissibly into carriers' business affairs).

Finally, there is no reason to believe that when Congress gave the FCC broad power to ensure that broadcast license transfers are in the public interest, it nonetheless excluded transactions that are the "functional equivalent" of license transfers. Such an exclusion would be especially improbable where (as here) it would leave the agency powerless to address the abuse to which Note 11 is directed.

"Under *Storer*, … courts generally should not infer that Congress intended to restrict an agency's broad power to establish rules that the agency has concluded are necessary to perform its statutorily-mandated regulatory responsibilities unless Congress has explicitly so provided." *Oceanair of Fla., Inc. v. U.S. Dept. of Transp.*, 876 F.2d 1560, 1565 (11th Cir. 1989). *See Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 437 (5th Cir. 2021) (use of the "open-textured term" "'public interest'" in the Act's licensing provisions "suggests 'an express delegation of authority to the agency to elucidate'" those provisions). *See also Cablevision Sys. Corp. v. FCC*, 649 F.3d 695, 706-07 (D.C. Cir. 2011) (the FCC had authority to regulate access to terrestrially delivered cable programming despite statute's reference to withholding of satellite programming).

For these reasons, although the Court should not reach the question, Note 11 was a valid exercise of statutory authority that the Supreme Court has repeatedly recognized to justify broadcast ownership restrictions.

### B. The Rule Does Not Violate Gray's Speech Rights.

Gray next asserts (Br. at 28-32) that the *Order* violates the First Amendment and Section 326 of the Act, 47 U.S.C. § 326, by penalizing Gray for its programming choices.[12] Courts repeatedly have rejected similar challenges to the

---

[12] Section 326 provides, in pertinent part, that "no regulation or condition shall be promulgated or fixed by the Commission which shall interfere with the right of free speech by means of radio communications." 47 U.S.C. § 326.

FCC's ownership rules, and Gray offers no convincing reason why those cases should not control here.

**1**. It is well established that the ownership rules are content-neutral "structural" regulations that are "generally subject only to rational basis scrutiny." *Am. Family Ass'n, Inc. v. FCC*, 365 F.3d 1156, 1168 (D.C. Cir. 2004) (quoting *Ruggiero v. FCC*, 317 F.3d 239, 243 (D.C. Cir. 2003) (en banc)). *See Prometheus Radio Project*, 373 F.3d at 401-02; *NCCB*, 436 U.S. at 801. Broadcasting's "unique physical limitations" – "chiefly, the scarcity of broadcast frequencies" – justify this deferential standard. *NetChoice, LLC v. Att'y Gen., Fla.*, 34 F.4th 1196, 1220 (11th Cir. 2022) (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 637-39 (1994)). Accordingly, so long as the ownership "regulations are a reasonable means of promoting the public interest" under the Act, "they do not violate the First Amendment rights of those who will be denied broadcast licenses pursuant to them." *NCCB*, 436 U.S. at 802.

Applying rational basis review, courts repeatedly have rejected First Amendment challenges to the local television ownership rule, affirming that it "is rationally related to the substantial government interests in promoting competition and diversity." *Second Report and Order*, 31 FCC Rcd at 9884 ¶ 50. *E.g. Sinclair Broad. Grp., Inc. v. FCC*, 284 F.3d 148, 167-68 (D.C. Cir. 2002); *Prometheus Radio Project*, 652 F.3d at 465.

Note 11, which is an "extension" of the local television ownership rule, is "subject to the same constitutional analysis." *Second Report and Order*, 31 FCC Rcd at 9884 ¶ 50. *Accord Order* ¶ 25 (A11). Note 11 furthers the FCC's longstanding public interest goal of promoting competition in local television markets by extending the top-four prohibition to transactions that have the same harmful competitive impact as certain license transactions. *Second Report and Order*, 31 FCC Rcd at 9882 ¶ 47 ("we are merely closing a potential loophole and preventing circumvention of the Commission's rules"). The rule thus easily satisfies rational basis review. *Cf. Cablevision*, 649 F.3d at 699, 711-13 (applying intermediate scrutiny, holding that extension of cable program access rules "to close the so-called terrestrial loophole" furthered the FCC's interest in promoting competition). Because "there is no unabridgeable First Amendment right" to hold a broadcast license "comparable to the right of every individual to speak, write, or publish," Gray "does not have a First Amendment right to hold a broadcast license where it would not," under Note 11, "satisfy the public interest." *Sinclair*, 284 F.3d at 168.

**2**. Gray argues that Note 11 is content-based because it is directed at Gray's "programming choices." Br. at 29. Not so. Note 11 applies to transactions that form top-four combinations, "regardless of the content of programming." *Prometheus Radio Project*, 652 F.3d at 465. The provision targets transactions involving network affiliations only because they may be used to evade the local television

ownership rule. *Second Report and Order*, 31 FCC Rcd at 9882 ¶ 47. *See Prometheus Radio Project*, 652 F.3d at 465 (rejecting argument "that the local television ownership rule violates the First Amendment because it singles out television stations" (internal quotation marks omitted; citing *Sinclair*, 284 F.3d at 168)). And it constrains only a broadcaster's choice of the community in which to affiliate with a network. *See NCCB*, 436 U.S. at 800 ("a newspaper owner need not forfeit anything in order to acquire a license for a station located in another community"); *Ruggiero*, 317 F.3d at 245 (distinguishing prohibition on licensing former pirate broadcasters from "structural" ownership restrictions based on the "would-be speaker's inability to broadcast at all").

Gray also argues that the *Order* violates the First Amendment because the FCC failed to demonstrate how enforcing Note 11 furthers competition in the Anchorage market. Br. at 30-32. But the local television ownership rule codifies the FCC's view that top-four combinations unduly threaten competition in local markets. And having provided flexibility for licensees to show that the top-four prohibition should not apply due to "specific circumstances in a local market or with respect to a specific transaction," 47 C.F.R. § 73.3555(b)(2), the agency was not obliged to analyze the particulars of competition in the Anchorage television market before applying the rule in this case. *See NCCB*, 436 U.S. at 793 ("If a license applicant does not qualify under standards set forth in such regulations, and does not proffer sufficient grounds for waiver or change of those standards, the

Commission may deny the application without further inquiry."). In short, Gray could have asked for a finding that its acquisition would serve the public interest, and submitted a showing regarding local competition. Instead, Gray chose to ignore the rule. *See Order* ¶ 33 (A14-15). Even so, the record clearly reflects that Gray's purchase threatened competition in Anchorage by substantially increasing the concentration of market power. *See* § I.A.2 *supra*.

Gray further argues (Br. at 31-32) that enforcing the rule here does not serve competition because all Gray did to cure the violation was shift the CBS network programming from KYES to a low-power television station not covered by the local television ownership rule, *see* 47 C.F.R. § 74.732(b), whose transmissions Gray then retransmitted over a multicast channel of Gray's KTUU. *Order* ¶ 4 (A3). *Accord* A30. Although the FCC's rules do not currently "impose restrictions on local television station ownership based on the ability to multicast" (a capability arising from the transition to digital television), the FCC has sought comment on whether to do so. *See 2018 Quad. Regul. Rev.*, 33 FCC Rcd 12111, 12137 ¶¶ 66-67 (2018). Meanwhile, the agency's adherence to the bounds of its existing rules does not undermine the determination that Note 11 promotes competition.

In sum, the FCC enforced Note 11 against Gray to address "practices deemed contrary to the public interest and not" because of Gray's "political, economic or social views, or [] any other capricious basis." *Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1046 (D.C. Cir. 2002) (quoting *NBC*, 319 U.S. at 226-27). *See*

*Order* ¶ 12 (A6). Any "indirect effect upon speech that may attend" such enforcement did not violate Gray's free speech rights. *Ruggiero*, 317 F.3d at 244. *See also Carter Mountain Transmission Corp. v. FCC*, 321 F.2d 359, 364 (D.C. Cir. 1963) ("The protection of the public interest does not amount to 'censorship' within the meaning of Section 326.").

## IV.   THE FORFEITURE AMOUNT IS APPROPRIATE.

Gray also contests the FCC's determination of the amount of the forfeiture that the FCC imposed.  These arguments, too, lack merit.

**A**. Gray first argues that the FCC departed from precedent in imposing a forfeiture penalty for each day of a continuing unauthorized transfer of control – the rule violation most analogous to Gray's violation of Note 11. Br. at 46-48. *See* n.2 and accompanying text *supra*. This argument is mistaken.

The relevant base forfeiture amount set forth in the FCC's regulation is $8,000. 47 C.F.R. § 1.80(b)(10) Table 1. Gray does not dispute this. This amount is then multiplied by the number of days of a continuing violation (subject to the statutory cap of $518,283). 47 U.S.C. § 503(b)(2)(A). Gray does not contest that, under agency precedent, "an unauthorized transfer of control of a broadcast license is a continuing violation . . . that does not end until the Commission grants a transfer of control application." *Order* ¶ 32 (A14) (discussing *In re Enserch Corp.*, 15 FCC Rcd 13551, 13554 ¶ 10 (2000)). *See SBC Comm'cns, Inc. v. FCC,* 373 F.3d

140, 151-52 (D.C. Cir. 2004) (upholding the FCC's imposition of the statutory

maximum fine for each individual continuing violation of an agency order).

The FCC has discretion to adjust the forfeiture downward from the statutory

cap, and Gray asked it to do so, citing cases involving smaller forfeitures. The

FCC, however, declined, finding that there were "dramatic differences" between

those cases and Gray's.[13] Among other things, none of those cases involved a

"brazen attempt by the owner of the top-rated broadcast station in a market to

acquire the affiliation of the second-ranked station" – especially "during the

months prior to a record-setting political advertising spend." *Order* ¶¶ 31-32

(A14). Gray now substantially repeats the arguments it made before the FCC, but

they remain unpersuasive.

**B**. Although the imposition of a penalty higher than the statutory cap is

barred, the FCC noted that, if not for the cap, there would have been grounds for

upward adjustment in this case, including "the egregiousness of the misconduct,

Gray's ability to pay, and the substantial economic gain Gray stood to achieve."

*Order* ¶ 29 (A12); *id.* ¶ 32 (A14); *Notice* ¶ 13 (A80). The FCC also "reviewed all

---

[13] The FCC did exercise its discretion to impose the statutory maximum fine set
forth in the *Notice* rather than the higher inflation-adjusted cap at the time of the
*Order*, which was $550,531. *Order* ¶ 8 n.24 (A4); *Amendment of Section 1.80(b) of
the Commission's Rules, Adjustment of Civil Monetary Penalties to Reflect
Inflation*, 36 FCC Rcd 18129 (Enf. Bur. rel. Dec. 22, 2021).

possible grounds for a downward adjustment," but it did not find them "sufficiently compelling" to warrant one here. *Id.*; *Order* ¶ 30 (A13).

Gray next argues that the FCC erred in applying the forfeiture adjustment factors in three respects. Br. at 48-54. These arguments are likewise unpersuasive.

**1**. Gray first argues that the FCC erred by affirming a finding of egregious misconduct that "the FCC had not previously made" in the *Notice*. Br. at 49. Once again, this is a new argument that Gray did not give the FCC an opportunity to address, and which the Court lacks jurisdiction to consider. 47 U.S.C. § 405(a). *See* § I.B.1 *supra*. In any case, there is no error. The FCC in the *Notice* made clear the conscious and deliberate nature of the violation, which continued for over seven months, *Notice* ¶ 10 (A78); 47 C.F.R. § 1.80(b)(10), and was analogous to an unauthorized transfer of control. *Notice* ¶ 12 & n.28 (A79-80). *See Liability of Benito Rish*, 7 FCC Rcd 6036, 6037 ¶ 9 n.5 (1992) (noting "the Commission's longstanding view that unauthorized transfers of control are extremely serious violations"). These determinations belie Gray's suggestion that the FCC's finding of egregious misconduct was "flatly contradicted" by the *Notice*. Br. at 49 (internal quotation marks omitted).

Gray also argues that the record does not support the finding because "Gray had no reason to believe that it violated any rule, had no notice of the FCC's novel interpretation[] of Note 11, and took immediate steps to remedy the purported violation as soon as the FCC expressed concern." Br. at 49. But the FCC

- 45 -

reasonably rejected Gray's portrayal, concluding that Gray in fact had "brazen[ly] attempt[ed]" to evade the rule, *Order* ¶ 32 (A14), of which it had "sufficient and specific notice." *Id.* ¶ 20 (A9). *See id.* ¶ 33 (A15) (the purpose of Note 11 "is to prohibit precisely the type of acquisition made here"). Gray's remedial measures after learning that the agency staff had discovered its misconduct do not mitigate its culpability. *Complaints Involving the Political Files of WCNC-TV, Inc.*, 34 FCC Rcd 10048, 10068 ¶ 48 (2019) ("remedial measures do not constitute a basis for mitigating or eliminating a sanction") (citing cases).

**2**. Gray next argues that the FCC ignored mitigating factors, in particular Gray's "good faith." Br. at 50. On the contrary, the FCC explained that it "did identify factors that would support … downward adjustments," but that such factors were "heavily counterbalanced by the upward adjustment factors and by the size of the [base] forfeiture," which substantially exceeded the statutory cap. *Order* ¶¶ 29, 30 (A13). *See Notice* ¶ 13 (A80) (affirming that the FCC considered "all possible grounds for a downward adjustment, including . . . Gray's past compliance with this rule"). That explanation is hardly "boilerplate." Br. at 50.

**3**. Finally, Gray challenges the evidence on which the FCC found that the violation produced substantial economic gain. Br. at 50-54. Again, this argument is barred under Section 405. *See* § I.B.1 *supra*. Rather than dispute this finding before the agency, Gray argued that its economic gain was not a valid basis for upward adjustment because it immediately began investing in its new service. A65-66. As a

result, the FCC did not have an opportunity to respond to Gray's current argument that "concrete" proof was required of the gain that Gray realized from its rule violation. Br. at 51.

In all events, the FCC's finding was supported by substantial evidence. Substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Jones Total Health Care Pharmacy, LLC v. DEA*, 881 F.3d 823, 829 (11th Cir. 2018). In finding that Gray "stood to achieve substantial economic gains," *Order* ¶ 29 (A12-13), the FCC relied on the facts that (1) affiliation with a top-four network such as CBS generally has economic benefits, *Notice* ¶ 13 (A80); *see Second Report and Order*, 31 FCC Rcd at 9952 ¶ 216 (top-four networks "have a distinctive ability to attract larger primetime audiences on a regular basis."); (2) the timing of KYES's change in affiliations "enabled Gray to take advantage of the record-setting political advertising expenditures in the months leading up to the 2020 election," *Notice* ¶ 13 (A80); and (3) Gray had stated in its 2020 annual report that it expected its 2020 acquisitions, including the transaction at issue, to "increase [its] revenues and cash flows from operating activities." *Id.* n.33 (quoting Gray 2020 Annual Report at 75, https://graytv.gcs-web.com/static-files/0a61d85c-5ec4-4425-83f6-a798c7bff630). Even taking into account news articles reporting that KTVA was unprofitable in 2019 (Br. at 52-53), a reasonable person would accept this evidence as adequate to support the FCC's finding.

## CONCLUSION

For all of these reasons, the Court should deny the petition.

Dated:  July 24, 2023

Respectfully submitted,

/s/  William J. Scher

P. Michele Ellison
   *General Counsel*

Jonathan S. Kanter
   *Assistant Attorney General*

Sarah E. Citrin
   *Deputy Associate General Counsel*

Robert B. Nicholson
Brandon Storm
   *Attorneys*

William J. Scher
   *Counsel*

U.S. DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
950 Pennsylvania Ave. NW
Washington, DC 20530

FEDERAL COMMUNICATIONS COMMISSION
45 L Street NE
Washington, DC 20554
(202) 418-1740
fcclitigation@fcc.gov

*Counsel for Respondent*
   *United States of America*

*Counsel for Respondent Federal*
   *Communications Commission*

# CERTIFICATE OF COMPLIANCE

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1.  This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

    ☒    this document contains 11,683 words, *or*

    ☐    this document uses a monospaced typeface and contains _ lines of text.

2.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    ☒    this document has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman, *or*

    ☐    this document has been prepared in a monospaced spaced typeface using _____ with _____.


*/s/  William J. Scher* _____
William J. Scher
*Counsel for Respondents*

- 49 -

**CERTIFICATE OF SERVICE**

I, William J. Scher, hereby certify that on July 24, 2023, I filed the foregoing

Brief for Respondents with the Clerk of the Court for the United States Court of

Appeals for the Eleventh Circuit using the electronic CM/ECF system.  Participants

in the case who are registered CM/ECF users will be served by the CM/ECF system.

*/s/ William J. Scher*

William J. Scher
Counsel

Federal Communications Commission
Washington, D.C.  20554
(202) 418-1740

**STATUTORY ADDENDUM**

# STATUTORY ADDENDUM CONTENTS

**Page**

5 U.S.C. § 706……………………………………….…………………Add. 2

28 U.S.C. § 2342…………………………………………………….Add. 2

47 U.S.C. § 154……………………………………………………Add. 2

47 U.S.C. § 301………………………………………………….Add. 3

47 U.S.C. § 303………………………………………………….Add. 3

47 U.S.C. § 307………………………………………………….Add. 4

47 U.S.C. § 308………………………………………………….Add. 4

47 U.S.C. § 309…………………………………………….......Add. 5

47 U.S.C. § 310………………………………………………….Add. 6

47 U.S.C. § 312………………………………………………….Add. 8

47 U.S.C. § 326………………………………………………...Add. 10

47 U.S.C. § 402………………………………………………...Add. 11

47 U.S.C. § 405…………………………………………………Add. 11

47 U.S.C. § 503…………………………………………………Add. 12

47 C.F.R. § 1.80………………………………………………...Add. 17

47 C.F.R. § 73.3555…………………………………………….Add. 22

47 C.F.R. § 74.732……………………………………………...Add. 24

## 5 U.S.C. § 706

### § 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--

* * *

**(2)** hold unlawful and set aside agency action, findings, and conclusions found to be—

    **(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

## 28 U.S.C. § 2342

### § 2342. Jurisdiction of court of appeals

The court of appeals (other than the United States Court of Appeals for the Federal Circuit) has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of--

**(1)** all final orders of the Federal Communications Commission made reviewable by section 402(a) of title 47;

## 47 U.S.C. § 154

### § 154. Federal Communications Commission

* * *

**(i) Duties and powers**
The Commission may perform any and all acts, make such rules and regulations, and issue such orders, not inconsistent with this chapter, as may be necessary in the execution of its functions.

Add. 2

## 47 U.S.C. § 301

### § 301. License for radio communication or transmission of energy

It is the purpose of this chapter, among other things, to maintain the control of the United States over all the channels of radio transmission; and to provide for the use of such channels, but not the ownership thereof, by persons for limited periods of time, under licenses granted by Federal authority, and no such license shall be construed to create any right, beyond the terms, conditions, and periods of the license. No person shall use or operate any apparatus for the transmission of energy or communications or signals by radio (a) from one place in any State, Territory, or possession of the United States or in the District of Columbia to another place in the same State, Territory, possession, or District; or (b) from any State, Territory, or possession of the United States, or from the District of Columbia to any other State, Territory, or possession of the United States; or (c) from any place in any State, Territory, or possession of the United States, or in the District of Columbia, to any place in any foreign country or to any vessel; or (d) within any State when the effects of such use extend beyond the borders of said State, or when interference is caused by such use or operation with the transmission of such energy, communications, or signals from within said State to any place beyond its borders, or from any place beyond its borders to any place within said State, or with the transmission or reception of such energy, communications, or signals from and/or to places beyond the borders of said State; or (e) upon any vessel or aircraft of the United States (except as provided in section 303(t) of this title); or (f) upon any other mobile stations within the jurisdiction of the United States, except under and in accordance with this chapter and with a license in that behalf granted under the provisions of this chapter.

## 47 U.S.C. § 303

### § 303. Powers and duties of Commission

* * *

**(r)** Make such rules and regulations and prescribe such restrictions and conditions, not inconsistent with law, as may be necessary to carry out the provisions of this chapter, or any international radio or wire communications treaty or convention, or regulations annexed thereto, including any treaty or convention insofar as it relates to the use of radio, to which the United States is or may hereafter become a party.

**47 U.S.C. § 307**

§ 307. Licenses

**(a) Grant**

The Commission, if public convenience, interest, or necessity will be served thereby, subject to the limitations of this chapter, shall grant to any applicant therefor a station license provided for by this chapter.

\* \* \*

**(d) Renewals**

No renewal of an existing station license in the broadcast or the common carrier services shall be granted more than thirty days prior to the expiration of the original license.

**47 U.S.C. § 308**

§ 308. Requirements for license

**(a) Writing; exceptions**

The Commission may grant construction permits and station licenses, or modifications or renewals thereof, only upon written application therefor received by it: *Provided*, That (1) in cases of emergency found by the Commission involving danger to life or property or due to damage to equipment, or (2) during a national emergency proclaimed by the President or declared by the Congress and during the continuance of any war in which the United States is engaged and when such action is necessary for the national defense or security or otherwise in furtherance of the war effort, or (3) in cases of emergency where the Commission finds, in the nonbroadcast services, that it would not be feasible to secure renewal applications from existing licensees or otherwise to follow normal licensing procedure, the Commission may grant construction permits and station licenses, or modifications or renewals thereof, during the emergency so found by the Commission or during the continuance of any such national emergency or war, in such manner and upon such terms and conditions as the Commission shall by regulation prescribe, and without the filing of a formal application, but no authorization so granted shall continue in effect beyond the period of the emergency or war requiring it: *Provided further*, That the Commission may issue by cable, telegraph, or radio a permit for the operation of a station on a vessel of the United States at sea, effective in lieu of a license until said vessel shall return to a port of the continental United States.

Add. 4

**47 U.S.C. § 309**

§ 309. Application for license

**(a) Considerations in granting application**
Subject to the provisions of this section, the Commission shall determine, in the case of each application filed with it to which section 308 of this title applies, whether the public interest, convenience, and necessity will be served by the granting of such application, and, if the Commission, upon examination of such application and upon consideration of such other matters as the Commission may officially notice, shall find that public interest, convenience, and necessity would be served by the granting thereof, it shall grant such application.

\* \* \*

**(d) Petition to deny application; time; contents; reply; findings**
**(1)** Any party in interest may file with the Commission a petition to deny any application (whether as originally filed or as amended) to which subsection (b) of this section applies at any time prior to the day of Commission grant thereof without hearing or the day of formal designation thereof for hearing; except that with respect to any classification of applications, the Commission from time to time by rule may specify a shorter period (no less than thirty days following the issuance of public notice by the Commission of the acceptance for filing of such application or of any substantial amendment thereof), which shorter period shall be reasonably related to the time when the applications would normally be reached for processing. The petitioner shall serve a copy of such petition on the applicant. The petition shall contain specific allegations of fact sufficient to show that the petitioner is a party in interest and that a grant of the application would be prima facie inconsistent with subsection (a) (or subsection (k) in the case of renewal of any broadcast station license). Such allegations of fact shall, except for those of which official notice may be taken, be supported by affidavit of a person or persons with personal knowledge thereof. The applicant shall be given the opportunity to file a reply in which allegations of fact or denials thereof shall similarly be supported by affidavit.
**(2)** If the Commission finds on the basis of the application, the pleadings filed, or other matters which it may officially notice that there are no substantial and material questions of fact and that a grant of the application would be consistent with subsection (a) (or subsection (k) in the case of renewal of any broadcast station license), it shall make the grant, deny the petition, and issue a concise

statement of the reasons for denying the petition, which statement shall dispose of all substantial issues raised by the petition. If a substantial and material question of fact is presented or if the Commission for any reason is unable to find that grant of the application would be consistent with subsection (a) (or subsection (k) in the case of renewal of any broadcast station license), it shall proceed as provided in subsection (e).

## 47 U.S.C. § 310

### § 310. License ownership restrictions

**(a) Grant to or holding by foreign government or representative**
The station license required under this chapter shall not be granted to or held by any foreign government or the representative thereof.

**(b) Grant to or holding by alien or representative, foreign corporation, etc.**
No broadcast or common carrier or aeronautical en route or aeronautical fixed radio station license shall be granted to or held by—

**(1)** any alien or the representative of any alien;

**(2)** any corporation organized under the laws of any foreign government;

**(3)** any corporation of which more than one-fifth of the capital stock is owned of record or voted by aliens or their representatives or by a foreign government or representative thereof or by any corporation organized under the laws of a foreign country;

**(4)** any corporation directly or indirectly controlled by any other corporation of which more than one-fourth of the capital stock is owned of record or voted by aliens, their representatives, or by a foreign government or representative thereof, or by any corporation organized under the laws of a foreign country, if the Commission finds that the public interest will be served by the refusal or revocation of such license.

**(c) Authorization for aliens licensed by foreign governments; multilateral or bilateral agreement to which United States and foreign country are parties as prerequisite**

In addition to amateur station licenses which the Commission may issue to aliens pursuant to this chapter, the Commission may issue authorizations, under such conditions and terms as it may prescribe, to permit an alien licensed by his government as an amateur radio operator to operate his amateur radio station licensed by his government in the United States, its possessions, and the Commonwealth of Puerto Rico provided there is in effect a multilateral or bilateral agreement, to which the United States and the alien's government are parties, for such operation on a reciprocal basis by United States amateur radio operators. Other provisions of this chapter and of subchapter II of chapter 5, and chapter 7, of Title 5 shall not be applicable to any request or application for or modification, suspension, or cancellation of any such authorization.

**(d) Assignment and transfer of construction permit or station license**

No construction permit or station license, or any rights thereunder, shall be transferred, assigned, or disposed of in any manner, voluntarily or involuntarily, directly or indirectly, or by transfer of control of any corporation holding such permit or license, to any person except upon application to the Commission and upon finding by the Commission that the public interest, convenience, and necessity will be served thereby. Any such application shall be disposed of as if the proposed transferee or assignee were making application under section 308 of this title for the permit or license in question; but in acting thereon the Commission may not consider whether the public interest, convenience, and necessity might be served by the transfer, assignment, or disposal of the permit or license to a person other than the proposed transferee or assignee.

**(e) Administration of regional concentration rules for broadcast stations**

    **(1)** In the case of any broadcast station, and any ownership interest therein, which is excluded from the regional concentration rules by reason of the savings provision for existing facilities provided by the First Report and Order adopted March 9, 1977 (docket No. 20548; 42 Fed. Reg. 16145), the exclusion shall not terminate solely by reason of changes made in the technical facilities of the station to improve its service.

**(2)** For purposes of this subsection, the term "regional concentration rules" means the provisions of sections 73.35, 73.240, and 73.636 of title 47, Code of Federal Regulations (as in effect June 1, 1983), which prohibit any party from directly or indirectly owning, operating, or controlling three broadcast stations in one or several services where any two of such stations are within 100 miles of the third (measured city-to-city), and where there is a primary service contour overlap of any of the stations.

**47 U.S.C. § 312**

§ 312. Administrative sanctions

**(a) Revocation of station license or construction permit**

The Commission may revoke any station license or construction permit--

**(1)** for false statements knowingly made either in the application or in any statement of fact which may be required pursuant to section 308 of this title;

**(2)** because of conditions coming to the attention of the Commission which would warrant it in refusing to grant a license or permit on an original application;

**(3)** for willful or repeated failure to operate substantially as set forth in the license;

**(4)** for willful or repeated violation of, or willful or repeated failure to observe any provision of this chapter or any rule or regulation of the Commission authorized by this chapter or by a treaty ratified by the United States;

**(5)** for violation of or failure to observe any final cease and desist order issued by the Commission under this section;

**(6)** for violation of section 1304, 1343, or 1464 of Title 18; or

**(7)** for willful or repeated failure to allow reasonable access to or to permit purchase of reasonable amounts of time for the use of a broadcasting station, other than a non-commercial educational broadcast station, by a legally qualified candidate for Federal elective office on behalf of his candidacy.

**(b) Cease and desist orders**

Where any person (1) has failed to operate substantially as set forth in a license, (2) has violated or failed to observe any of the provisions of this chapter, or section 1304, 1343, or 1464 of Title 18, or (3) has violated or failed to observe any rule or regulation of the Commission authorized by this chapter or by a treaty ratified by the United States, the Commission may order such person to cease and desist from such action.

**(c) Order to show cause**

Before revoking a license or permit pursuant to subsection (a), or issuing a cease and desist order pursuant to subsection (b), the Commission shall serve upon the licensee, permittee, or person involved an order to show cause why an order of revocation or a cease and desist order should not be issued. Any such order to show cause shall contain a statement of the matters with respect to which the Commission is inquiring and shall call upon said licensee, permittee, or person to appear before the Commission at a time and place stated in the order, but in no event less than thirty days after the receipt of such order, and give evidence upon the matter specified therein; except that where safety of life or property is involved, the Commission may provide in the order for a shorter period. If after hearing, or a waiver thereof, the Commission determines that an order of revocation or a cease and desist order should issue, it shall issue such order, which shall include a statement of the findings of the Commission and the grounds and reasons therefor and specify the effective date of the order, and shall cause the same to be served on said licensee, permittee, or person.

**(d) Burden of proof**

In any case where a hearing is conducted pursuant to the provisions of this section, both the burden of proceeding with the introduction of evidence and the burden of proof shall be upon the Commission.

**(e) Procedure for issuance of cease and desist order**

The provisions of section 558(c) of Title 5 which apply with respect to the institution of any proceeding for the revocation of a license or permit shall apply also with respect to the institution, under this section, of any proceeding for the issuance of a cease and desist order.

(f) "Willful" and "repeated" defined

For purposes of this section:

> **(1)** The term "willful", when used with reference to the commission or omission of any act, means the conscious and deliberate commission or omission of such act, irrespective of any intent to violate any provision of this chapter or any rule or regulation of the Commission authorized by this chapter or by a treaty ratified by the United States.

> **(2)** The term "repeated", when used with reference to the commission or omission of any act, means the commission or omission of such act more than once or, if such commission or omission is continuous, for more than one day.

## (g) Limitation on silent station authorizations

If a broadcasting station fails to transmit broadcast signals for any consecutive 12-month period, then the station license granted for the operation of that broadcast station expires at the end of that period, notwithstanding any provision, term, or condition of the license to the contrary, except that the Commission may extend or reinstate such station license if the holder of the station license prevails in an administrative or judicial appeal, the applicable law changes, or for any other reason to promote equity and fairness. Any broadcast license revoked or terminated in Alaska in a proceeding related to broadcasting via translator, microwave, or other alternative signal delivery is reinstated.

### 47 U.S.C. § 326

### § 326. Censorship

Nothing in this chapter shall be understood or construed to give the Commission the power of censorship over the radio communications or signals transmitted by any radio station, and no regulation or condition shall be promulgated or fixed by the Commission which shall interfere with the right of free speech by means of radio communication.

## 47 U.S.C. § 402

§ 402. Judicial review of Commission's orders and decisions

**(a) Procedure**

Any proceeding to enjoin, set aside, annul, or suspend any order of the Commission under this chapter (except those appealable under subsection (b) of this section) shall be brought as provided by and in the manner prescribed in chapter 158 of Title 28.

## 47 U.S.C. § 405

§ 405. Petition for reconsideration; procedure; disposition; time of filing; additional evidence; time for disposition of petition for reconsideration of order concluding hearing or investigation; appeal of order

**(a)** After an order, decision, report, or action has been made or taken in any proceeding by the Commission, or by any designated authority within the Commission pursuant to a delegation under section 155(c)(1) of this title, any party thereto, or any other person aggrieved or whose interests are adversely affected thereby, may petition for reconsideration only to the authority making or taking the order, decision, report, or action; and it shall be lawful for such authority, whether it be the Commission or other authority designated under section 155(c)(1) of this title, in its discretion, to grant such a reconsideration if sufficient reason therefor be made to appear. A petition for reconsideration must be filed within thirty days from the date upon which public notice is given of the order, decision, report, or action complained of. No such application shall excuse any person from complying with or obeying any order, decision, report, or action of the Commission, or operate in any manner to stay or postpone the enforcement thereof, without the special order of the Commission. The filing of a petition for reconsideration shall not be a condition precedent to judicial review of any such order, decision, report, or action, except where the party seeking such review (1) was not a party to the proceedings resulting in such order, decision, report, or action, or (2) relies on questions of fact or law upon which the Commission, or designated authority within the Commission, has been afforded no opportunity to pass. The Commission, or designated authority within the Commission, shall enter an order, with a concise statement of the reasons therefor, denying a petition for reconsideration or granting such petition, in whole or in part, and ordering such further proceedings as may be appropriate: *Provided,* That in any case where such petition relates to an instrument of authorization granted without a hearing, the Commission, or designated

Add. 11

authority within the Commission, shall take such action within ninety days of the filing of such petition. Reconsiderations shall be governed by such general rules as the Commission may establish, except that no evidence other than newly discovered evidence, evidence which has become available only since the original taking of evidence, or evidence which the Commission or designated authority within the Commission believes should have been taken in the original proceeding shall be taken on any reconsideration. The time within which a petition for review must be filed in a proceeding to which section 402(a) of this title applies, or within which an appeal must be taken under section 402(b) of this title in any case, shall be computed from the date upon which the Commission gives public notice of the order, decision, report, or action complained of.

### 47 U.S.C. § 503

### § 503. Forfeitures

\* \* \*

**(b) Activities constituting violations authorizing imposition of forfeiture penalty; amount of penalty; procedures applicable; persons subject to penalty; liability exemption period**

> **(1)** Any person who is determined by the Commission, in accordance with paragraph (3) or (4) of this subsection, to have--

>> **(A)** willfully or repeatedly failed to comply substantially with the terms and conditions of any license, permit, certificate, or other instrument or authorization issued by the Commission;

>> **(B)** willfully or repeatedly failed to comply with any of the provisions of this chapter or of any rule, regulation, or order issued by the Commission under this chapter or under any treaty, convention, or other agreement to which the United States is a party and which is binding upon the United States;

>> **(C)** violated any provision of section 317(c) or 509(a) of this title; or

>> **(D)** violated any provision of section 1304, 1343, 1464, or 2252 of Title 18;

Add. 12

shall be liable to the United States for a forfeiture penalty. A forfeiture penalty under this subsection shall be in addition to any other penalty provided for by this chapter; except that this subsection shall not apply to any conduct which is subject to forfeiture under subchapter II of this chapter, part II or III of subchapter III of this chapter, or section 507 of this title.

**(2)(A)** If the violator is (i) a broadcast station licensee or permittee, (ii) a cable television operator, or (iii) an applicant for any broadcast or cable television operator license, permit, certificate, or other instrument or authorization issued by the Commission, the amount of any forfeiture penalty determined under this section shall not exceed $25,000 for each violation or each day of a continuing violation, except that the amount assessed for any continuing violation shall not exceed a total of $250,000 for any single act or failure to act described in paragraph (l) of this subsection.

> **(B)** If the violator is a common carrier subject to the provisions of this chapter or an applicant for any common carrier license, permit, certificate, or other instrument of authorization issued by the Commission, the amount of any forfeiture penalty determined under this subsection shall not exceed $100,000 for each violation or each day of a continuing violation, except that the amount assessed for any continuing violation shall not exceed a total of $1,000,000 for any single act or failure to act described in paragraph (l) of this subsection.

> **(C)** Notwithstanding subparagraph (A), if the violator is--

>> **(i)(I)** a broadcast station licensee or permittee; or

>> **(II)** an applicant for any broadcast license, permit, certificate, or other instrument or authorization issued by the Commission; and

>> **(ii)** determined by the Commission under paragraph (1) to have broadcast obscene, indecent, or profane language,[1] the amount of any forfeiture penalty determined under this subsection shall not exceed $325,000 for each violation or each day of a continuing violation, except that the amount assessed for any continuing violation shall not exceed a total of $3,000,000 for any single act or failure to act.

Add. 13

**(D)** In any case not covered in subparagraph (A), (B), or (C), the amount of any forfeiture penalty determined under this subsection shall not exceed $10,000 for each violation or each day of a continuing violation, except that the amount assessed for any continuing violation shall not exceed a total of $75,000 for any single act or failure to act described in paragraph (1) of this subsection.

**(E)** The amount of such forfeiture penalty shall be assessed by the Commission, or its designee, by written notice. In determining the amount of such a forfeiture penalty, the Commission or its designee shall take into account the nature, circumstances, extent, and gravity of the violation and, with respect to the violator, the degree of culpability, any history of prior offenses, ability to pay, and such other matters as justice may require.

**(F)** Subject to paragraph (5) of this section, if the violator is a manufacturer or service provider subject to the requirements of section 255, 617, or 619 of this title, and is determined by the Commission to have violated any such requirement, the manufacturer or provider shall be liable to the United States for a forfeiture penalty of not more than $100,000 for each violation or each day of a continuing violation, except that the amount assessed for any continuing violation shall not exceed a total of $1,000,000 for any single act or failure to act.

**(3)(A)** At the discretion of the Commission, a forfeiture penalty may be determined against a person under this subsection after notice and an opportunity for a hearing before the Commission or an administrative law judge thereof in accordance with section 554 of Title 5. Any person against whom a forfeiture penalty is determined under this paragraph may obtain review thereof pursuant to section 402(a) of this title.

**(B)** If any person fails to pay an assessment of a forfeiture penalty determined under subparagraph (A) of this paragraph, after it has become a final and unappealable order or after the appropriate court has entered final judgment in favor of the Commission, the Commission shall refer the matter to the Attorney General of the United States, who shall recover the amount assessed in any appropriate district court of the United States. In such action, the

validity and appropriateness of the final order imposing the forfeiture penalty shall not be subject to review.

**(4)** Except as provided in paragraph (3) of this subsection, no forfeiture penalty shall be imposed under this subsection against any person unless and until--

> **(A)** the Commission issues a notice of apparent liability, in writing, with respect to such person;
>
> **(B)** such notice has been received by such person, or until the Commission has sent such notice to the last known address of such person, by registered or certified mail; and
>
> **(C)** such person is granted an opportunity to show, in writing, within such reasonable period of time as the Commission prescribes by rule or regulation, why no such forfeiture penalty should be imposed.

Such a notice shall (i) identify each specific provision, term, and condition of any Act, rule, regulation, order, treaty, convention, or other agreement, license, permit, certificate, instrument, or authorization which such person apparently violated or with which such person apparently failed to comply; (ii) set forth the nature of the act or omission charged against such person and the facts upon which such charge is based; and (iii) state the date on which such conduct occurred. Any forfeiture penalty determined under this paragraph shall be recoverable pursuant to section 504(a) of this title.

**(5)** No forfeiture liability shall be determined under this subsection against any person, if such person does not hold a license, permit, certificate, or other authorization issued by the Commission, and if such person is not an applicant for a license, permit, certificate, or other authorization issued by the Commission, unless, prior to the notice required by paragraph (3) of this subsection or the notice of apparent liability required by paragraph (4) of this subsection, such person (A) is sent a citation of the violation charged; (B) is given a reasonable opportunity for a personal interview with an official of the Commission, at the field office of the Commission which is nearest to such person's place of residence; and (C) subsequently engages in conduct of the type described in such citation. The provisions of this paragraph shall not apply, however, if the person involved is engaging in activities for which a license, permit, certificate, or other authorization is

Add. 15

required, or is a cable television system operator, if the person involved is transmitting on frequencies assigned for use in a service in which individual station operation is authorized by rule pursuant to section 307(e) of this title, or in the case of violations of section 303(q) of this title, if the person involved is a nonlicensee tower owner who has previously received notice of the obligations imposed by section 303(q) of this title from the Commission or the permittee or licensee who uses that tower. Whenever the requirements of this paragraph are satisfied with respect to a particular person, such person shall not be entitled to receive any additional citation of the violation charged, with respect to any conduct of the type described in the citation sent under this paragraph.

**(6)** No forfeiture penalty shall be determined or imposed against any person under this subsection if--

    **(A)** such person holds a broadcast station license issued under subchapter III of this chapter and if the violation charged occurred--

        **(i)** more than 1 year prior to the date of issuance of the required notice or notice of apparent liability; or

        **(ii)** prior to the date of commencement of the current term of such license,

        whichever is earlier; or

    **(B)** such person does not hold a broadcast station license issued under subchapter III of this chapter and if the violation charged occurred more than 1 year prior to the date of issuance of the required notice or notice of apparent liability.

For purposes of this paragraph, "date of commencement of the current term of such license" means the date of commencement of the last term of license for which the licensee has been granted a license by the Commission. A separate license term shall not be deemed to have commenced as a result of continuing a license in effect under section 307(c) of this title pending decision on an application for renewal of the license.

**47 C.F.R. § 1.80**

§ 1.80 Forfeiture proceedings.

(a) Persons against whom and violations for which a forfeiture may be assessed. A forfeiture penalty may be assessed against any person found to have:

(1) Willfully or repeatedly failed to comply substantially with the terms and conditions of any license, permit, certificate, or other instrument of authorization issued by the Commission;

(2) Willfully or repeatedly failed to comply with any of the provisions of the Communications Act of 1934, as amended; or of any rule, regulation or order issued by the Commission under that Act or under any treaty, convention, or other agreement to which the United States is a party and which is binding on the United States;

(3) Violated any provision of section 317(c) or 508(a) of the Communications Act;

(4) Violated any provision of sections 227(b) or (e) of the Communications Act or of §§ 64.1200(a)(1) through (5) and 64.1604 of this title;

(5) Violated any provision of section 511(a) or (b) of the Communications Act or of paragraph (b)(6) of this section;

(6) Violated any provision of section 1304, 1343, or 1464 of Title 18, United States Code; or

(7) Violated any provision of section 6507 of the Middle Class Tax Relief and Job Creation Act of 2012 or any rule, regulation, or order issued by the Commission under that statute.

Note 1 to paragraph (a): A forfeiture penalty assessed under this section is in addition to any other penalty provided for by the Communications Act, except that the penalties provided for in paragraphs (b)(1) through (4) of this section shall not apply to conduct which is subject to a forfeiture penalty or fine under sections 202(c), 203(e), 205(b), 214(d), 219(b), 220(d), 223(b), 364(a), 364(b), 386(a), 386(b), 506, and 634 of the Communications Act. The remaining provisions of this section are applicable to such conduct.

Add. 17

(b) Limits on the amount of forfeiture assessed.

(1) Forfeiture penalty for a broadcast station licensee, permittee, cable television operator, or applicant. If the violator is a broadcast station licensee or permittee, a cable television operator, or an applicant for any broadcast or cable television operator license, permit, certificate, or other instrument of authorization issued by the Commission, except as otherwise noted in this paragraph (b)(1), the forfeiture penalty under this section shall not exceed $59,316 for each violation or each day of a continuing violation, except that the amount assessed for any continuing violation shall not exceed a total of $593,170 for any single act or failure to act described in paragraph (a) of this section. There is no limit on forfeiture assessments for EEO violations by cable operators that occur after notification by the Commission of a potential violation. See section 634(f)(2) of the Communications Act (47 U.S.C. 554). Notwithstanding the foregoing in this section, if the violator is a broadcast station licensee or permittee or an applicant for any broadcast license, permit, certificate, or other instrument of authorization issued by the Commission, and if the violator is determined by the Commission to have broadcast obscene, indecent, or profane material, the forfeiture penalty under this section shall not exceed $479,945 for each violation or each day of a continuing violation, except that the amount assessed for any continuing violation shall not exceed a total of $4,430,255 for any single act or failure to act described in paragraph (a) of this section.

* * *

(10) Factors considered in determining the amount of the forfeiture penalty. In determining the amount of the forfeiture penalty, the Commission or its designee will take into account the nature, circumstances, extent and gravity of the violations and, with respect to the violator, the degree of culpability, any history of prior offenses, ability to pay, and such other matters as justice may require.

**Table 1 to Paragraph (b)(10)—Base Amounts for Section 503 Forfeitures**

| Forfeitures | Violation amount |
| --- | --- |
| Misrepresentation/lack of candor | (1) |
| Failure to file required DODC required forms, and/or filing materially inaccurate or incomplete DODC information | $15,000 |
| Construction and/or operation without an instrument of authorization for the service | 10,000 |
| Failure to comply with prescribed lighting and/or marking | 10,000 |
| Violation of public file rules | 10,000 |
| Violation of political rules: Reasonable access, lowest unit charge, equal opportunity, and discrimination | 9,000 |
| Unauthorized substantial transfer of control | 8,000 |
| Violation of children's television commercialization or programming requirements | 8,000 |
| Violations of rules relating to distress and safety frequencies | 8,000 |
| False distress communications | 8,000 |
| EAS equipment not installed or operational | 8,000 |
| Alien ownership violation | 8,000 |
| Failure to permit inspection | 7,000 |
| Transmission of indecent/obscene materials | 7,000 |
| Interference | 7,000 |

| | |
|---|---|
| Importation or marketing of unauthorized equipment | 7,000 |
| Exceeding of authorized antenna height | 5,000 |
| Fraud by wire, radio or television | 5,000 |
| Unauthorized discontinuance of service | 5,000 |
| Use of unauthorized equipment | 5,000 |
| Exceeding power limits | 4,000 |
| Failure to respond to Commission communications | 4,000 |
| Violation of sponsorship ID requirements | 4,000 |
| Unauthorized emissions | 4,000 |
| Using unauthorized frequency | 4,000 |
| Failure to engage in required frequency coordination | 4,000 |
| Construction or operation at unauthorized location | 4,000 |
| Violation of requirements pertaining to broadcasting of lotteries or contests | 4,000 |
| Violation of transmitter control and metering requirements | 3,000 |
| Failure to file required forms or information | 3,000 |
| Failure to make required measurements or conduct required monitoring | 2,000 |
| Failure to provide station ID | 1,000 |

| | |
|---|---|
| Unauthorized pro forma transfer of control | 1,000 |
| Failure to maintain required records | 1,000 |

* * *

**Table 3 to Paragraph (b)(10)—Adjustment Criteria for Section 503 Forfeitures**

Upward Adjustment Criteria:

 (1) Egregious misconduct.

 (2) Ability to pay/relative disincentive.

 (3) Intentional violation.

 (4) Substantial harm.

 (5) Prior violations of any FCC requirements.

 (6) Substantial economic gain.

 (7) Repeated or continuous violation.

Downward Adjustment Criteria:

 (1) Minor violation.

 (2) Good faith or voluntary disclosure.

 (3) History of overall compliance.

 (4) Inability to pay.

* * *

(g) Notice of apparent liability. Before imposing a forfeiture penalty under the provisions of this paragraph, the Commission or its designee will issue a written notice of apparent liability.

    (1) Content of notice. The notice of apparent liability will:

        (i) Identify each specific provision, term, or condition of any act, rule, regulation, order, treaty, convention, or other agreement, license, permit, certificate, or instrument of authorization which the respondent has apparently violated or with which he has failed to comply,

Add. 21

(ii) Set forth the nature of the act or omission charged against the respondent and the facts upon which such charge is based,

(iii) State the date(s) on which such conduct occurred, and

(iv) Specify the amount of the apparent forfeiture penalty.

(2) Delivery. The notice of apparent liability will be sent to the respondent, by certified mail, at his last known address (see § 1.5).

(3) Response. The respondent will be afforded a reasonable period of time (usually 30 days from the date of the notice) to show, in writing, why a forfeiture penalty should not be imposed or should be reduced, or to pay the forfeiture. Any showing as to why the forfeiture should not be imposed or should be reduced shall include a detailed factual statement and such documentation and affidavits as may be pertinent.

(4) Forfeiture order. If the proposed forfeiture penalty is not paid in full in response to the notice of apparent liability, the Commission, upon considering all relevant information available to it, will issue an order canceling or reducing the proposed forfeiture or requiring that it be paid in full and stating the date by which the forfeiture must be paid.

(5) Judicial enforcement of forfeiture order. If the forfeiture is not paid, the case will be referred to the Department of Justice for collection under section 504(a) of the Communications Act.

**47 C.F.R. § 73.3555**

§ 73.3555 Multiple ownership.

\* \* \*

(b) Local television multiple ownership rule.

(1) An entity may directly or indirectly own, operate, or control two television stations licensed in the same Designated Market Area (DMA) (as determined by Nielsen Media Research or any successor entity) if:

(i) The digital noise limited service contours of the stations (computed in accordance with § 73.622(e)) do not overlap; or

(ii) At the time the application to acquire or construct the station(s) is filed, at least one of the stations is not ranked among the top four stations in the DMA, based on the most recent all-day (9 a.m.-midnight) audience share, as measured by Nielsen Media Research or by any comparable professional, accepted audience ratings service.

(2) Paragraph (b)(1)(ii) (Top–Four Prohibition) of this section shall not apply in cases where, at the request of the applicant, the Commission makes a finding that permitting an entity to directly or indirectly own, operate, or control two television stations licensed in the same DMA would serve the public interest, convenience, and necessity. The Commission will consider showings that the Top–Four Prohibition should not apply due to specific circumstances in a local market or with respect to a specific transaction on a case-by-case basis.

* * *

Note 4 to § 73.3555: Paragraphs (a) and (b) of this section will not be applied so as to require divestiture, by any licensee, of existing facilities, and will not apply to applications for assignment of license or transfer of control filed in accordance with § 73.3540(f) or § 73.3541(b), or to applications for assignment of license or transfer of control to heirs or legatees by will or intestacy, or to FM or AM broadcast minor modification applications for intra-market community of license changes, if no new or increased concentration of ownership would be created among commonly owned, operated or controlled broadcast stations. Paragraphs (a) and (b) of this section will apply to all applications for new stations, to all other applications for assignment or transfer, to all applications for major changes to existing stations, and to all other applications for minor changes to existing stations that seek a change in an FM or AM radio station's community of license or create new or increased concentration of ownership among commonly owned, operated or controlled broadcast stations. Commonly owned, operated or controlled broadcast stations that do not comply with paragraphs (a) and (b) of this section may not be assigned or transferred to a single person, group or entity, except as provided in this Note, the Report and Order in Docket No. 02–277, released July 2, 2003 (FCC 02–127), or the Second Report and Order in MB Docket No. 14–50, FCC 16–107 (released August 25, 2016).

* * *

Add. 23

Note 5 to § 73.3555: Paragraphs (b) and (e) of this section will not be applied to cases involving television stations that are "satellite" operations. Such cases will be considered in accordance with the analysis set forth in the Report and Order in MM Docket No. 87–8, FCC 91–182 (released July 8, 1991), as further explained by the Report and Order in MB Docket No. 18–63, FCC 19–17, (released March 12, 2019), in order to determine whether common ownership, operation, or control of the stations in question would be in the public interest. An authorized and operating "satellite" television station, the digital noise limited service contour of which overlaps that of a commonly owned, operated, or controlled "non-satellite" parent television broadcast station may subsequently become a "non-satellite" station under the circumstances described in the aforementioned Report and Order in MM Docket No. 87–8. However, such commonly owned, operated, or controlled "non-satellite" television stations may not be transferred or assigned to a single person, group, or entity except as provided in Note 4 of this section.

* * *

Note 11 to § 73.3555: An entity will not be permitted to directly or indirectly own, operate, or control two television stations in the same DMA through the execution of any agreement (or series of agreements) involving stations in the same DMA, or any individual or entity with a cognizable interest in such stations, in which a station (the "new affiliate") acquires the network affiliation of another station (the "previous affiliate"), if the change in network affiliations would result in the licensee of the new affiliate, or any individual or entity with a cognizable interest in the new affiliate, directly or indirectly owning, operating, or controlling two of the top-four rated television stations in the DMA at the time of the agreement. Parties should also refer to the Second Report and Order in MB Docket No. 14–50, FCC 16–107 (released August 25, 2016).

### 47 C.F.R. § 74.732

§ 74.732 Eligibility and licensing requirements.

* * *

(b) More than one low power TV or TV translator station may be licensed to the same applicant whether or not such stations serve substantially the same area. Low power TV and TV translator stations are not counted for purposes of § 73.3555, concerning multiple ownership.