No. 22-14274

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

Gray Television, Inc.,

*Petitioner*,

v.

Federal Communications Commission
and United States of America,

*Respondents*.

On Petition for Review of an Order of
the Federal Communications Commission

**RESPONDENTS' SUPPLEMENTAL BRIEF
REGARDING *LOPER BRIGHT ENTERPISES v. RAIMONDO***

## INTRODUCTION

The Federal Communications Commission and United States of America hereby respond to the Court's order of July 10, 2024 ("July Order"), which directed supplemental briefing to address "whether and to what extent *Loper Bright Enterprises v. Raimondo*," 144 S. Ct. 2244 (2024), "impacts the analysis on the appropriate deference to afford the FCC's interpretation of Note 11 in this case." July Order at 2. *Loper Bright* overruled *Chevron USA, Inc. v. Natural Resources*

*Defense Council, Inc.*, 467 U.S. 837 (1984), which previously had required judicial deference to agencies' permissible interpretations of their organic statutes.

*Loper Bright* should in no way affect this Court's review of the FCC's interpretation of Note 11. To begin with, because the FCC applied the best reading of Note 11, the Court need not afford any deference to the agency to uphold the *Order*. Moreover, because Note 11 is an FCC rule, the FCC's interpretation of its own rule is governed by the Supreme Court's decision in *Kisor v. Wilkie*, 588 U.S. 558 (2019). Gray asserts that the Supreme Court's reasoning in *Loper Bright* "logically" undermines *Kisor*, Supp. Br. 13; *see id.* at 11–14, even though *Loper Bright* repeatedly cites (and does not question) *Kisor*. In any event, the Court should not entertain Gray's argument to ignore an applicable decision of the Supreme Court. *See Knight v. Fla. Dep't of Corr.*, 936 F.3d 1322, 1336 (11th Cir. 2019) (explaining that Supreme Court precedent remains binding "unless and until the [Supreme] Court itself sets [it] aside").

Ignoring the limited scope of the Court's July Order, Gray devotes the majority of its supplemental brief to arguments concerning the FCC's statutory authority. *See* Supp. Br. 4–11. Under the Eleventh Circuit's internal operating procedures—which allow supplemental briefing only as directed by the Court, *see* 11th Cir. I.O.P. 5 to Fed. R. App. P. 28 ("I.O.P. 5")—the Court should disregard Gray's uninvited arguments. In any event, Section 405(a) of the Communications

Act forecloses the Court from reaching Gray's challenge to the FCC's statutory authority, on which the agency had "no opportunity to pass" during the underlying administrative proceedings. 47 U.S.C. § 405(a); *see* Resp. Br. 26–27, 34.

## ARGUMENT

### I. THE FCC APPLIED THE BEST READING OF NOTE 11.

*Loper Bright* does not affect "the appropriate deference to afford the FCC's interpretation of Note 11 in this case," July Order at 2, because the agency adopted the best reading of the rule, which the Court should uphold without need for deference.

#### A. Note 11 Does Not Permit Gray To Demonstrate Compliance Using Data Not Available Until After The Transaction.

Gray's challenge to the FCC's application of Note 11 depends on the premise that "Gray already owned two top-four stations at the time of the Anchorage Transaction." Supp. Br. 15. The only evidence Gray presented to the Commission (or has ever offered) in support of that claim is "July 2020 Comscore [audience-share] data." *Id.* The Commission concluded that those data were "not relevant" to the application of Note 11, because they were not available at the time Gray entered into the Anchorage transaction. *Order* ¶ 11 (A5). The agency's determination reflects the best understanding of the text, context, and purpose of Note 11.

The text of Note 11—read in conjunction with the Commission's *Second Report and Order*[1]—makes clear that the Commission will evaluate compliance with the "top-four prohibition" in the same way it does for licensing transactions. Note 11 directs parties to "refer to the Second Report and Order" when interpreting the Note. 47 C.F.R. § 73.3555 Note 11. The *Second Report and Order*, in turn, provides that "for purposes of making [the] determination" of whether a "change in network affiliations would result in" a violation of the top-four prohibition, "the new affiliate's post-consummation ranking will be the ranking of the previous affiliate at the time the agreement is executed, *determined in accordance with Section 73.3555(b)(1)(i) of the Commission's rules*." *Second Report & Order*, 31 FCC Rcd at 9885 ¶ 52 & n.141 (emphasis added). The referenced provision—which has, since the adoption of Note 11, been renumbered Section 73.3555(b)(1)(ii), *see Order* ¶ 11 n.30 (A5)—is the top-four prohibition as applied to licensing transactions. It thus follows from the text of Note 11 that compliance with the Note will be determined in the same way as compliance with the top-four prohibition for licensing transactions.

As Gray itself has previously recognized, the FCC determines compliance with the top-four prohibition for licensing transactions using data available at the time "parties . . . file [their] application"—i.e., "*before* a transaction is

---

[1] *2014 Quadrennial Regulatory Review*, 31 FCC Rcd 9864 (2016).

consummated." Reply Br. 17. The text of the top-four prohibition makes this clear, providing that the Commission will look to the "most recent" data "[a]t the time the application . . . is filed." 47 C.F.R. § 73.3555(b)(1)(ii).

Given the Commission's uncontested reliance, in the context of licensing transactions, on data available at the time an application is filed—and because compliance with Note 11 for network affiliation changes is determined "in accordance with" Section 73.3555(b)(1)(ii), *Second Report & Order*, 31 FCC Rcd at 9885 ¶ 52 n.141—the Commission's view that compliance with the Note must be determined based on data available "at the time" parties execute agreements to change network affiliations is the best reading of the rule, considering its text and the broader context of the FCC's media ownership rules. *Order* ¶ 11 (A5).

Not only is the FCC's interpretation of Note 11 faithful to the regulatory text and context, it comports with the underlying purpose of the rule. The Commission adopted Note 11 to "clos[e] a potential loophole and prevent[] circumvention of the Commission's" top-four prohibition. *Second Report & Order*, 31 FCC Rcd at 9882 ¶ 47. If station owners were permitted, under Note 11, to justify network affiliation changes using data on which they cannot rely in the licensing context, Note 11 would not serve that intended purpose. *See* Resp. Br. 21.

## B. Note 11 Applies When The Owner Of An Existing Duopoly Increases Its Market Power Through A Network Affiliation Change.

If the Court agrees that the best reading of Note 11 forecloses Gray's reliance on the Comscore audience-share data, there is no need to consider Gray's argument that the Anchorage transaction "did ***not result in*** Gray['s] owning two top-four stations . . . because Gray ***already*** owned two top-four stations." Supp. Br. 15. But if the Court does reach that claim, the FCC's view that Note 11 applies to owners of existing duopolies is the best reading of the rule. *See* Resp. Br. 21–25.

There is no exemption in the text of Note 11 for stations that already own two top-four stations. The text of the rule, moreover, is focused on the state of affairs *after* a transaction, not before. *See* Resp. Br. 22–23. It asks what "*would*" be the "*result*" of "*the* change in network affiliations." *Id.* at 22 (emphasis in original; quoting 47 C.F.R. § 73.3555 Note 11). And it addresses the rating of the "new affiliate" only after the transaction. *See id.* at 23.

Gray contends that its duopoly of first- and second-ranked television stations in Anchorage did not "result" from the disputed transaction because (crediting the Comscore audience-share data) Gray already owned Anchorage's first- and fourth-ranked stations. Gray Br. 35. But Gray indisputably gained a new, more powerful combination of stations as a "result" of the Anchorage transaction. And where the focus of Note 11 is the state of affairs after a network affiliation change, and

nothing in the rule exempts existing duopolies, Gray's interpretation of Note 11 is not the best or most natural reading of its text.

Gray's strained reading also ignores the broader regulatory context. For licensing transactions—as Gray does not dispute—the top-four prohibition applies to transactions that would "create new *or increased* concentration of ownership." 47 C.F.R. § 73.3555 Note 4 (emphasis added). Accordingly, "had Gray agreed to purchase KTVA's license, the purchase would have been subject to the top-four prohibition and would have required FCC authorization." Resp. Br. 23 (citing *Order* ¶ 14 (A6)). Gray's reading of Note 11 would mean that the Note would apply differently, as to network affiliation changes, from how the top-four prohibition applies to licensing transactions. That disparity would be at odds with Note 11's purpose to prevent evasion of the top-four prohibition, which in turn is designed to ensure FCC oversight of transactions that might threaten local competition and viewpoint diversity. *See* Resp. Br. 23–24.

For all of these reasons, the Commission's interpretation of Note 11 reflects the best reading of the rule. Therefore, no deference is required.

### C. *Kisor* Governs Judicial Review Of The FCC's Reading Of Note 11.

Note 11 is an agency rule, not a statute. Judicial review of FCC's interpretation is thus governed by *Kisor*, 588 U.S. at 573–79, a decision that *Loper Bright* cited repeatedly and did not question, *see* 144 S. Ct. at 2261, 2262, 2267, 2268.

Under *Kisor*, a court must "carefully consider the text, structure, history, and purpose of a regulation," as if there were "no agency [interpretation] to fall back on." *Autauga Cnty. Emergency Mgmt. Comm'n Dist. v. FCC*, 17 F.4th 88, 98 (11th Cir. 2021) (quoting *Kisor*, 588 U.S. at 575). If there is no "uncertainty" as to a regulation's meaning, it just "means what it means." *Kisor*, 588 U.S. at 575. That can sometimes require that courts resolve "hard interpretive conundrums, even relating to complex rules," and resolving those inquiries will often resolve facial ambiguity. *Id.* If ambiguity nevertheless remains, *Kisor* explained that deference to an agency's interpretation of its regulations may be appropriate when the interpretation (1) falls within the bounds of the ambiguity identified by the court, (2) reflects the agency's authoritative position, (3) reflects the agency's "fair and considered judgment," and (4) implicates the agency's "substantive expertise." *Id.* at 575–79. Although the FCC's interpretation is the best reading of Note 11, if the Court were to conclude that ambiguity remains even after an exhaustive construction of the text, then *Kisor*'s analysis would apply, as explained in our response brief (at 21).

Gray urges that this Court may disregard *Kisor* based on its assertion that *Loper Bright* "logically" undermines *Kisor*. Supp. Br. 13–14. But this Court is not the proper forum to revisit binding Supreme Court precedent. Instead, as this Circuit has previously recognized, "the [Supreme] Court has repeatedly instructed"

lower courts "to follow its precedents, even if later decisions appear to undermine [those precedents], unless and until the Court itself sets them aside." *Knight*, 936 F.3d at 1336 (citing *Bosse v. Oklahoma*, 580 U.S. 1, 3 (2016) (per curiam)). Because *Loper Bright* did not overrule *Kisor*, *Kisor* remains binding.

## II. GRAY'S STATUTORY ARGUMENTS ARE NOT PROPERLY PRESENTED, AND THEY ARE UNAVAILING IN ANY EVENT.

Gray devotes the bulk of its supplemental brief to discussing issues outside the scope of the July Order. *See* Supp. Br. 4–11. Gray argues that *Loper Bright* requires this Court to address "whether the FCC had statutory authority under [47 U.S.C.] § 310(d) to promulgate and enforce Note 11," *id.* at 4, affording "no respect" to the agency's "interpretation of its statutory authority," *id.* at 8 (internal quotation marks omitted). The Court should disregard this portion of Gray's supplemental brief. *See* I.O.P. 5. Indeed, the Court is barred by the Communications Act from addressing Gray's statutory authority claim. *See* 47 U.S.C. § 405(a). Regardless, given the Commission's well-established authority to adopt media ownership restrictions to promote competition and viewpoint diversity in broadcasting, Gray's statutory claim is unpersuasive on the merits. *See* Resp. Br. 33–38.

### A. Gray Improperly Expanded The Scope Of Supplemental Briefing, And The Court May Not Reach Arguments On Which The FCC Had No "Opportunity To Pass" In The Administrative Proceedings.

The Eleventh Circuit's internal operating procedures make clear that "[s]upplemental briefs may not be filed without leave of court." I.O.P. 5. Here, consistent with those procedures, the Court "call[ed] for supplemental briefs on [a] specific issue[.]" *Id.* The Court directed the parties to address "whether and to what extent [*Loper Bright*] impacts the analysis on the appropriate deference to afford the FCC's interpretation of Note 11." July Order at 2. Because the Court did not give "leave" for supplemental briefing on the FCC's statutory authority, I.O.P. 5, it should disregard Gray's supplemental brief except as to arguments concerning the FCC's interpretation of Note 11, *see* Supp. Br. 11–15.

Even if the Court overlooks the improper scope of Gray's supplemental briefing, judicial review of Gray's statutory authority claim is barred. Gray never raised its statutory authority claim in the FCC proceedings. *See* Resp. Br. 33–34. And Section 405(a) of the Communications Act, 47 U.S.C. § 405(a), limits judicial review of FCC orders to issues on which the agency had an "opportunity to pass" in the underlying administrative proceedings. Resp. Br. 26.

Gray pointedly did not argue, in the underlying administrative proceedings, that the FCC lacked authority to promulgate Note 11. Resp. Br. 34. Instead, Gray took the position that the FCC "may or may not [have been] correct" to assert

"authority to prohibit transactions that are the 'functional equivalent' of . . . license transfers or assignments" pursuant to "Section 310(d) of the Communications Act." A58. Gray expressly "assum[ed]," in its arguments before the agency, that the Commission *did* have such authority. *Id.*[2] In these circumstances, it cannot be said that "a reasonable Commission" would "necessarily" have understood Gray to challenge the Commission's authority to regulate anything but license transfers, *AT&T Corp. v. FCC*, 317 F.3d 227, 236 (D.C. Cir. 2003), which is Gray's position before this Court, *see* Gray Br. 21–22.

For this analysis, it does not matter whether Section 405(a) is construed as a "jurisdictional" requirement or alternatively—as Gray would have it, *see* Supp. Br. 7—as a statutory "exhaustion" provision. *Compare, e.g.*, *Viasat, Inc. v. FCC*, 47 F.4th 769, 778 (D.C. Cir. 2022) ("We lack jurisdiction to consider these arguments, which [the petitioner] failed to press before the FCC."), *with M2Z*

---

[2] *See also* A29 ("Although the Commission *may be correct that it has the right to regulate affiliation swaps that are the 'functional equivalent' of a license transfer*, it has no authority . . . to regulate affiliation transactions that do not meet that criteri[on]."); A59 ("[T]he Commission *has a reasonable argument* that such evasions"—i.e., "transactions that are indistinguishable from a license transfer but for the fact that the parties did not seek Commission approval for the transfer of [a] license"—"should be within its jurisdiction." (emphasis added)); A60 ("*Because the Anchorage transaction bears no resemblance to a license transfer – let alone [is] the 'functional equivalent' of one* – the Commission cannot justify its proposed actions . . . as ancillary to its Section 310(d) authority over license transfers." (emphasis added)).

*Networks Inc. v. FCC*, 558 F.3d 554, 558 (D.C. Cir. 2009) (characterizing Section 405(a) as "an exhaustion requirement" (internal quotation marks omitted)). That is so because, like jurisdictional requirements, statutory exhaustion provisions that "establish mandatory exhaustion regimes, foreclos[e] judicial discretion" to reach unexhausted claims. *Ross v. Blake*, 578 U.S. 632, 639 (2016).

The "issue-exhaustion mandate" in Section 405(a), jurisdictional or otherwise, "could not be stated in plainer terms." *Isl. Creek Coal Co. v. Bryan*, 937 F.3d 738, 746 (6th Cir. 2019). It contains no equitable exceptions, *see Wash. Ass'n for Television & Child. v. FCC*, 712 F.2d 677, 681 (D.C. Cir. 1983), and judge-made exceptions are not permitted, *see Ross*, 578 U.S. at 639 ("Congress sets the rules—and courts have a role in creating exceptions only if Congress wants them to.").

Gray's passing assertion that presenting its statutory argument to the FCC would have been "futile," Supp. Br. 7 n.2, is therefore unavailing, *see Booth v. Churner,* 532 U.S. 731, 741 n.6 (2001) ("we will not read futility or other exceptions into statutory exhaustion requirements"). The Court should likewise reject Gray's suggestion that FCC's determination in a separate proceeding—"years before the FCC issued the [*Order*]," Supp. Br. 7, which Gray does not contend the agency reopened here, *see id.*—permits judicial review under Section 405(a).

Finally, contrary to Gray's assertion (Supp. Br. 6), there has been no call in this case for "deference" to the FCC's interpretation of Section 405(a). And insofar

as Gray emphasizes that the Supreme Court in *Loper Bright* relied on the requirements of the APA, *see* Supp. Br. 5–6, those requirements do not negate the independent requirements of Section 405(a).

### B. Note 11 Is A Valid Exercise Of The FCC's Licensing Authority.

The Court's analysis should go no further. Nevertheless, we have explained why—as a measure "necessary to the effective performance of [the FCC's] statutory licensing responsibilities," Resp. Br. 35—Note 11 was "a valid exercise of statutory authority that the Supreme Court has repeatedly recognized to justify broadcast ownership restrictions." *Id.* at 38; *see id.* at 34–38. *Loper Bright* did not disturb the Supreme Court's well-established precedents in this area. *E.g.*, *NBC v. United States*, 319 U.S. 190, 213–23 (1943). Indeed, *Loper Bright* recognizes that a "statute's meaning may well be that [an] agency is authorized to exercise a degree of discretion" in effectuating the statutory scheme. *Loper Bright*, 144 S. Ct. at 2263. *Loper Bright* in no way undermines the government's merits defense of the FCC's statutory authority.

## CONCLUSION

For the foregoing reasons, and for the reasons stated in the government's brief and at oral argument, the Court should deny the petition for review.

Dated: August 7, 2024

Respectfully submitted,

/s/  *William J. Scher*

P. Michele Ellison
   *General Counsel*

Sarah E. Citrin
   *Deputy Associate General Counsel*

William J. Scher
   *Counsel*

Robert B. Nicholson
   *Attorney*

U.S. DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
950 Pennsylvania Ave. NW
Washington, DC 20530

FEDERAL COMMUNICATIONS COMMISSION
45 L Street NE
Washington, DC 20554
(202) 418-1740
fcclitigation@fcc.gov

*Counsel for Respondent*
   *United States of America*

*Counsel for Respondent Federal*
   *Communications Commission*

# CERTIFICATE OF COMPLIANCE

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1. This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

    ☒ this document contains 2,930 words, *or*

    ☐ this document uses a monospaced typeface and contains _ lines of text.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    ☒ this document has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman, *or*

    ☐ this document has been prepared in a monospaced spaced typeface using _____ with _____.

/s/ *William J. Scher*
William J. Scher
*Counsel for Respondent*
*Federal Communications Commission*

# CERTIFICATE OF FILING AND SERVICE

I, William J. Scher, hereby certify that on August 7, 2024, I filed the foregoing Respondent's Supplemental Brief Regarding *Loper Bright Enterprises v. Raimondo* with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit using the electronic CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

*/s/ William J. Scher*

William J. Scher
Counsel

Federal Communications Commission
Washington, D.C. 20554
(202) 418-1740