**22-14274**

IN THE

# United States Court of Appeals

## FOR THE ELEVENTH CIRCUIT

◆◆◆

GRAY MEDIA, INC.,

*Petitioner,*

—v.—

FEDERAL COMMUNICATIONS COMMISSION, UNITED STATES OF AMERICA,

*Respondents.*

ON PETITION FOR REVIEW FROM THE
FEDERAL COMMUNICATIONS COMMISSION

## PETITION FOR REHEARING AND REHEARING *EN BANC*

DAVID E. MILLS
ROBERT M. McDOWELL
ROBBY L.R. SALDAÑA
COOLEY, LLP
1299 Pennsylvania Avenue NW,
Suite 700
Washington, DC 20004

*Attorneys for Petitioner
Gray Media, Inc.*

*Gray Media, Inc. v. Fed. Comm'cns Comm.*
No. 22-14274

## <u>CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1 through 26.1-3, Petitioner Gray Media, Inc.[1] ("Petitioner" or "Gray") submits the following Certificate of Interested Persons and Corporate Disclosure Statement.

To the best of Petitioner's knowledge, the following is a list of all trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this case or appeal, including subsidiaries, conglomerates, affiliates, parent corporations, any publicly held corporation that owns 10% or more of the party's stock, and other identifiable legal entities related to a party:

1.　　Assembly Atlanta , LLC, *Subsidiary of Gray Local Media, Inc.*

2.　　Citrin, Sarah E., *Counsel for Respondent Federal Communications Commission*

3.　　Cooley LLP, *Counsel for Petitioner*

4.　　Dynamic Captioning, LLC, *Subsidiary of Local Media, Inc.*

5.　　Federal Communications Commission, *Respondent*

6.　　Feore, John R., Cooley LLP (Retired), *Counsel for Gray Media, Inc.*

---

[1] Petitioner's name has changed from "Gray Television, Inc." to "Gray Media, Inc."

*Gray Media, Inc. v. Fed. Comm'cns Comm.*
No. 22-14274

*(Forfeiture Proceeding)*

7.  Folliard III, Robert J., *Gray Media, Inc., Senior Vice President of Government Relations & Distribution*

8.  Gray AR, LLC, *Subsidiary of Gray Local Media, Inc.*

9.  Gray Local Media, Inc., *Subsidiary of Petitioner*

10. Gray Media, Inc. (GTN), *Petitioner*

11. Gray Television Licensee, LLC, *Subsidiary of Gray Local Media, Inc.*

12. Joslin, William P., *Gray Local Media, Inc., Assistant General Counsel and Assistant Secretary*

13. Kreisman, Barbara A., *Federal Communications Commission, Chief – Video Division, Media Bureau*

14. Latek, Kevin P., *Gray Media, Inc., Executive Vice President and Chief Legal and Development Officer*

15. McDowell, Robert M., *Cooley LLP, Counsel for Petitioner*

16. Miller, Keith S., *Gray Media, Inc., Vice President, Assistant General Counsel*

17. Mills, David E., *Cooley LLP, Counsel for Petitioner*

18. Nicholson, Robert B., *Counsel for Respondent United States of America*

19. PowerNation Studios, LLC, *Subsidiary of Gray Local Media, Inc.*

20. Rademacher, Jason E., *Counsel for Gray Media, Inc. (Forfeiture Proceeding)*

21. Raycom Sports Network, LLC, *Subsidiary of Gray Local Media, Inc.*

*Gray Media, Inc. v. Fed. Comm'ns Comm.*
No. 22-14274

22.   Saldaña, Robby L.R., *Cooley LLP, Counsel for Petitioner*

23.   Scher, William J., *Counsel for Respondent Federal Communications Commission*

24.   Stewart, Joan, *Wiley Rein LLP, Counsel for Gray Media, Inc.*

25.   Tupelo Media Group, LLC, *Subsidiary of Gray Local Media, Inc.*

26.   United States of America, *Respondent*

27.   Wendel, Henry H., *Cooley LLP, Counsel for Gray Television Licensee, LLC*

To the best of Petitioner's current knowledge, no other persons, associations of persons, firms, partnerships, or corporations have an interest in the outcome of this case or appeal.

*/s/ David E. Mills*
David E. Mills
Robert M. McDowell
Robby L.R. Saldaña
COOLEY LLP
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400
dmills@cooley.com
rmcdowell@cooley.com
rsaldana@cooley.com

*Counsel for Petitioner Gray Media, Inc.*

## ELEVENTH CIRCUIT LOCAL RULE 40-3(C) CERTIFICATION

We express a belief, based on a reasoned and studied professional judgment, that the panel decision is contrary to the following decisions of the Supreme Court of the United States and that consideration by the full court is necessary to secure and maintain uniformity of decisions in this Court: *Loper Bright Enterprises v. Raimond*, 603 U.S. 369 (2024); *Sec. & Exch. Comm'n v. Jarkesy*, 603 U.S. 109 (2024). We also express a belief, based on a reasoned and studied professional judgment, that this appeal involves questions of exceptional importance, specifically whether: (1) remanding to the FCC to impose a forfeiture penalty in an administrative enforcement proceeding contravenes the Fifth Circuit's decision in *AT&T, Inc. v. Fed. Commc'ns Comm'n*, No. 24-60223, 2025 WL 1135280 (5th Cir. Apr. 17, 2025) and (2) the application of 47 U.S.C. § 405(a) to decline judicial review of the FCC's statutory authority to enforce a regulation contravenes decisions of the D.C. Circuit allowing review of agency action patently in excess of authority.

<div align="right">

*/s/ David E. Mills*
David E. Mills
Robert M. McDowell
Robby L.R. Saldaña
COOLEY LLP
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400
dmills@cooley.com
rmcdowell@cooley.com
rsaldana@cooley.com

*Counsel for Petitioner Gray Media, Inc.*

</div>

i

## TABLE OF CONTENTS

ELEVENTH CIRCUIT LOCAL RULE 40-3(C) CERTIFICATION......................i

TABLE OF CONTENTS.............................................................................. ii

TABLE OF CITATIONS ........................................................................... iii

ISSUES WARRANTING REHEARING/REHEARING EN BANC.....................1

INTRODUCTION ....................................................................................1

STATEMENT OF THE COURSE OF PROCEEDINGS AND
     DISPOSITION OF THE CASE ...................................................4

I.     BACKGROUND. ..........................................................................4

II.    THE OPINION. ...........................................................................6

III.   THE CONCURRENCE.................................................................7

ARGUMENT ..........................................................................................8

I.     THE COURT SHOULD CORRECT THE OPINION'S SECTION
     405(a) ERROR BECAUSE THE FCC ADDRESSED ITS
     STATUTORY AUTHORITY TO ENFORCE NOTE 11............................8

II.    DECLINING TO REVIEW THE FCC'S STATUTORY
     AUTHORITY TO ENFORCE NOTE 11 IS INCONSISTENT WITH
     *LOPER BRIGHT*..................................................................12

III.   THE FCC'S IMPOSITION OF A FORFEITURE PENALTY IN AN
     ADMINISTRATIVE PROCEEDING WITHOUT AN ARTICLE III
     DECISIONMAKER OR JURY TRIAL CONTRAVENES *JARKESY*. ......14

CONCLUSION .....................................................................................16

CERTIFICATION OF COMPLIANCE WITH FRAP 32(g)(1) ...........................17

# TABLE OF CITATIONS

**Page(s)**

**Cases**

*AT&T, Inc. v. Fed. Commc'ns Comm'n*,
No. 24-60223, 2025 WL 1135280 (5th Cir. Apr. 17, 2025)......................*passim*

*Ins. Mktg. Coal. Ltd. v. FCC*,
127 F.4th 303 (11th Cir. 2025) ...........................................................................13

*Loper Bright Enterprises v. Raimond*,
603 U.S. 369 (2024)...................................................................................*passim*

*Marbury v. Madison*,
1 Cranch 137 (1803) ..........................................................................................13

*NetworkIP, LLC v. FCC*,
548 F.3d 116 (D.C. Cir. 2008)...........................................................................10

*NTCH, Inc. v. FCC*,
841 F.3d 497 (D.C. Cir. 2016)...........................................................................11

*Office of Communication of United Church of Christ v. FCC*,
465 F.2d 519 (D.C. Cir. 1972)..............................................................................8

*Omnipoint Corp. v. F.C.C.*,
78 F.3d 620 (D.C. Cir. 1996).............................................................................11

*Petroleum Commc'ns Inc. v. FCC*,
22 F.3d 1164 (D.C. Cir. 1994)...........................................................................11

*Sec. & Exch. Comm'n v. Jarkesy*,
603 U.S. 109 (2024)...................................................................................*passim*

*Time Warner Entm't Co. v. FCC*,
144 F.3d 75 (D.C. Cir. 1998)................................................................................8

*Verizon & AT&T, Inc. v. FCC*,
770 F.3d 961 (D.C. Cir. 2014)...........................................................................11

*W. Va. v. EPA*,
    597 U.S. 697 (2022)..................................................................................12

*Wash. Ass'n for Television & Children v. FCC*,
    712 F.2d 677 (D.C. Cir. 1983)...............................................................11

## FCC Authorities

*In the Matter of 2014 Quadrennial Regul. Rev. F Rev. of the
    Commission's Broad. Ownership Rules & Other Rules Adopted
    Pursuant to Section 202 of the Telecommunications Act of 1996*,
    29 F.C.C. Rcd. 4371 (2014)....................................................................10

*In the Matter of 2014 Quadrennial Regulatory Review – Review of the
    FCC's Broadcast Ownership Rules and Other Rules Adopted
    Pursuant to Section 202 of the Telecommunications Act of 1996*,
    31 F.C.C. Rcd. 9864 (2016)....................................................................10

## Statutes

47 U.S.C.
    § 154(i).............................................................................................9, 10
    § 303(r).............................................................................................9, 10
    § 310(d)............................................................................................9, 10
    § 326.......................................................................................................7
    § 405(a).........................................................................................*passim*
    § 503(b)(2)(E)......................................................................................15
    § 503(b)(3)(A)........................................................................................5
    § 503(b)(4)(C)........................................................................................5

## Regulations

47 C.F.R. § 73.3555(b), n.11 .........................................................*passim*

## Other Authorities

U.S. Const. amend. VII...........................................................1, 4, 14, 15

## ISSUES WARRANTING REHEARING/REHEARING EN BANC

1. Whether the Panel should consider the Federal Communications Commission's ("FCC") lack of statutory authority to enforce 47 C.F.R. § 73.3555(b), n.11 ("Note 11") because:

   a. consistent with 47 U.S.C. § 405(a), the FCC **was** afforded the opportunity to consider its authority both in the rulemaking process and the forfeiture proceeding.

   b. Section 405(a) cannot bar judicial review where the agency patently lacks authority, as it does here.

2. Whether declining to review the FCC's authority to enforce Note 11 contravenes *Loper Bright Enterprises v. Raimond*, 603 U.S. 369 (2024).

3. Whether allowing the FCC to impose a civil forfeiture penalty in an administrative proceeding without an Article III decisionmaker and jury trial violates Article III and the Seventh Amendment under *Securities & Exchange Commission v. Jarkesy*, 603 U.S. 109 (2024).

## INTRODUCTION

Two of three Judges on the panel ("Panel) have "grave concerns" that the FCC had no statutory authority to enforce the regulation on which the agency relied to bring an administrative proceeding against Gray Media, Inc. ("Gray"). The FCC accused Gray of violating the regulation, decided that Gray did so, and imposed a

1

maximum penalty ("Penalty") in an administrative proceeding that "concentrate[d] the roles of prosecutor, judge, and jury in the hands of the [FCC]." *Jarkesy*, 603 U.S. at 140. The Panel's Opinion ("Opinion" or "Op.") declines to address the FCC's statutory authority, reasoning that the FCC purportedly had no opportunity to consider that issue within the meaning of 47 U.S.C. § 405(a). That conclusion was error. The FCC had multiple opportunities to address (and did address) its statutory authority. It also elides the duty of a court reviewing agency action to decide ***all*** relevant questions of law. *See Loper Bright*, 603 U.S. at 398. In this case, no question is more fundamental than whether the agency had the statutory authority to act at all. The Panel should have addressed the FCC's authority to enforce Note 11.

If the Panel had reached the merits of Gray's authority argument, it would have concluded—as explained in the concurrence ("Concurrence") authored by Judge Brasher and joined by Chief Judge Pryor—that Note 11 exceeds the authority Congress delegated to the FCC in the Communications Act to license the use of broadcasting frequencies for radio and television stations in the United States. Exceeding this authority, the regulation purports to prohibit an entity from acquiring from another licensee the network affiliation of another station in the same DMA if the change in network affiliations would result in the licensee owning two of the top-four rated television stations in the DMA. 47 C.F.R. § 73.3555(b), n.11. Rehearing is necessary to prevent the anomalous situation where the FCC enforces on remand

2

a regulation that a majority of the Panel would find ultra vires.

*First*, rehearing is necessary to correct the erroneous determination that Gray failed to satisfy section 405(a)—a determination on which the Panel relied to decline to address the FCC's statutory authority to enforce Note 11.  Section 405(a) required only that the FCC have the opportunity to pass on this issue.  Gray raised and the FCC considered the issue and thus section 405(a) does not bar judicial review of the FCC's lack of statutory authority to enforce Note 11.  Moreover, as D.C. Circuit decisions show, section 405(a) cannot bar this Court from setting aside an agency action that patently exceeds the FCC's authority, as Note 11 does.  The Court should adopt the Concurrence's conclusion that the FCC lacks statutory authority to enforce Note 11 and vacate the Forfeiture Order in its entirety.

*Second*, rehearing is necessary because the refusal to review the FCC's statutory authority is inconsistent with the Supreme Court's decision in *Loper Bright Enterprises v. Raimond*, 603 U.S. 369 (2024), which instructs that courts reviewing agency action must decide relevant questions of law and fix the boundaries of agency authority.  The Opinion declines to address the FCC's authority to enforce Note 11 and thereby allows enforcement of a regulation that plainly exceeds the FCC's authority.

*Third*, rehearing is necessary because the FCC imposed a civil forfeiture proceeding on Gray in an administrative proceeding ***without*** an Article III

3

decisionmaker and jury trial. This administrative adjudication was inconsistent with *Jarkesy* and violated Article III and the Seventh Amendment, as confirmed by the Fifth Circuit's recent decision in *AT&T, Inc. v. FCC*, No. 24-60223, 2025 WL 1135280 (5th Cir. Apr. 17, 2025). Rehearing will allow the Court to vacate the Forfeiture Order and prevent the FCC from imposing another penalty on remand pursuant to its constitutionally defective forfeiture proceedings.

Accordingly, Gray petitions for rehearing, requests vacatur of the Forfeiture Order, and a refund of the Penalty with interest.

## STATEMENT OF THE COURSE OF PROCEEDINGS AND DISPOSITION OF THE CASE

### I.    BACKGROUND.[2]

Gray entered the Anchorage Designated Market Area ("DMA") in 2016 when it acquired NBC affiliate KTUU-TV, a full-power TV station. A31. Gray also acquired a second full-power station in the DMA, MyNetworkTV-affiliated KYES-TV, pursuant to an FCC-approved failing station waiver. KYES-TV became the fourth-rated full-power TV station in the DMA in July 2020 because of Gray's substantial investment and improvement. A32. In July 2020, Gray also acquired the CBS network affiliation in the DMA from KTVA(TV) (the "Transaction"). Gray did not purchase the station license or broadcasting facilities. A8.

---

[2] Gray's Opening Brief has a detailed factual and legal background. O.B. 6–17.

Five months later, the FCC began an inquiry into whether the Transaction violated Note 11.  A35.  Gray cooperated with FCC staff.  Pursuant to a plan modified at the request of FCC staff, Gray placed the CBS program stream on a low-power station in the DMA by March 3, 2021, ending the alleged Note 11 violation.

On July 7, 2021, the FCC initiated an administrative enforcement proceeding by issuing a notice of apparent liability ("*NAL*") under 47 U.S.C. § 503(b)(3)(A). The FCC charged Gray with "apparently violat[ing] Note 11" by purchasing the CBS affiliation, which "caused a change in network affiliation that resulted in Gray's owning and operating two … top-four stations in the Anchorage DMA."  A76.  The FCC had "not previously proposed a forfeiture for" a Note 11 violation, but it proposed a $518,283 forfeiture—the statutory maximum.  A79.

With only a month to respond, A81, Gray submitted a written opposition (the only way to oppose a *NAL*, *see* 47 U.S.C. § 503(b)(4)(C)).  Gray urged the FCC to cancel the *NAL* and proposed forfeiture.  A25.  Gray argued that the Transaction did not violate Note 11.  *Id.*  Gray also argued, in relevant part, that the FCC's authority over license transfers did not encompass a station's affiliation change.  A57–60.

On November 1, 2022, nearly 15 months later, the FCC issued the Forfeiture Order in a 3-1 decision.  A1.  The FCC affirmed its view that Gray violated Note 11 by acquiring the CBS network affiliation but adopted new reasoning not in the *NAL*. A4.  The FCC disagreed that Note 11 exceeded its authority.  A10.  It opined that an

5

"affiliation transfer" has the "same result" as a transfer of control or assignment of a license, "which would be subject to [FCC] review...." *Id.* The FCC invoked its "general rulemaking authority" to justify its promulgation and enforcement of Note 11. *Id.* 11. Ultimately, the FCC imposed a $518,283 forfeiture penalty. *Id.* In doing so, the FCC relied on an egregiousness finding that it did not make in the *NAL*. A12. Commissioner Simington dissented from the FCC's liability conclusions. A18.

Gray paid the Penalty and timely petitioned for review of the Forfeiture Order. After full briefing and oral argument, the Supreme Court issued decisions in *Loper Bright* and *Jarkesy*. The parties provided supplemental briefing concerning *Loper Bright*. Gray moved for leave to file supplemental briefing concerning the impact of *Jarkesy* on the constitutionality of the FCC's imposition of a forfeiture penalty in an administrative proceeding, Dkt. No. 61, which was denied, Dkt. No. 66.

## II.    THE OPINION.

The Panel denied in part and granted in part the Petition.

*First*, the Panel declined to address whether Note 11 exceeds the FCC's statutory authority. Op. 10–15. Relying on 47 U.S.C. § 405(a), the Panel reasoned that "Gray did not raise [the issue] in the administrative proceedings," Op. 10, and thus "did not give the FCC an opportunity to pass on its statutory authority argument with respect to Note 11," *id.* at 14.

*Second*, applying a deferential arbitrary and capricious standard, the Panel

determined the FCC had reasonably concluded that Gray violated Note 11.  Op. 1–19.  The Panel rejected Gray's arguments that the Forfeiture Order violated Gray's due process rights, the First Amendment, and 47 U.S.C. § 326.  Op. at 19–26.

*Third*, the Panel determined that the Penalty was arbitrary and capricious.  In relevant part, the FCC had failed to give Gray notice of the egregiousness finding on which it relied to impose the Penalty and failed to consider Gray's good faith.  Op. 31–36.  Thus, the Panel vacated the Penalty and remanded.  Op. 36.

## III.    THE CONCURRENCE.

In the Concurrence joined by Chief Judge Pryor, Judge Brasher expressed "concern that Note 11 may exceed the authority given to the FCC," Con. 1, and "grave doubts that the FCC has statutory authority to enforce Note 11," *id*. 4.  As Judge Brasher explained, "there is no statutory authority for the FCC to regulate the affiliation that provides the content that a licensed station broadcasts." *Id*. 4.  Indeed, there is "scant support" in the FCC's licensing authority or ancillary authority for Note 11.  *Id.* 5–6.  He further explained that the FCC's "functional equivalent of a license transfer" theory, judicial precedents involving the FCC's licensing authority, and the FCC's policy rationale do not justify Note 11.  *Id*. 6–10.  He "likely would have voted to vacate the forfeiture order in its entirety." *Id*. 1.

Gray now petitions for panel rehearing or rehearing en banc.

## ARGUMENT

**I.    THE COURT SHOULD CORRECT THE OPINION'S SECTION 405(a) ERROR BECAUSE THE FCC ADDRESSED ITS STATUTORY AUTHORITY TO ENFORCE NOTE 11.**

The Panel declined to address the FCC's statutory authority to enforce Note 11 by determining that "Gray did not give the FCC an opportunity to pass on its statutory authority argument with respect to Note 11."  Op. 14.  That was error. Section 405(a) does not require Gray to raise an issue; the FCC may itself raise an issue.  Not only did Gray raise the issue below, but also the FCC repeatedly addressed its statutory authority for Note 11.  Furthermore, section 405(a) does not bar judicial review where, as here, the agency has patently exceeded its authority.

Section 405(a) provides that "[t]he filing of a petition for reconsideration shall not be a condition precedent to judicial review of any such order, . . . except where the party seeking such review . . . relies on questions of fact or law upon which the [FCC] . . . has been afforded no opportunity to pass."  47 U.S.C. § 405(a).  It is well established that "§ 405[] commands only that the [FCC] be afforded the opportunity to pass on issues."  *Office of Communication of United Church of Christ v. FCC*, 465 F.2d 519, 523 (D.C. Cir. 1972).  It "does not refer to the necessity of a party raising an argument before the Commission—as does the typical exhaustion statute…."  *Time Warner Entm't Co. v. FCC*, 144 F.3d 75, 79 (D.C. Cir. 1998). Thus, even if Gray had not raised the issue of the FCC's statutory authority (and it

did), that would not bar judicial review.

Section 405(a) does not bar review of the FCC's authority to enforce Note 11 because the FCC had multiple opportunities to consider it and did.

*First*, section 405(a) is satisfied because Gray raised, and the FCC considered, the agency's authority to enforce Note 11 in the Forfeiture Order.  *See* O.B. 23.[3]  In opposing the *NAL*, Gray argued to the FCC that it "would need a jurisdictional theory other than its unrelated [§] 310(d) authority," A60, to justify the application of Note 11 to the Transaction and that the FCC "cannot justify its proposed actions in the *NAL* as ancillary to its Section 310(d) authority over license transfers," *id*.  Contrary to the FCC's arguments on appeal, it had the opportunity to address its authority to enforce Note 11.  The FCC clearly understood Gray's argument as a challenge to such authority and addressed its authority in the Forfeiture Order, consistent with the Panel's view that the FCC should have had the opportunity to do so.  The FCC pronounced that "[w]e reject Gray's argument that the NAL *exceeded our authority* …."  A10 (emphasis added).  The FCC opined that, even if section 310(d) authority over a license transfer did not authorize Note 11, sections 154(i) and 303(r) justified its enforcement of Note 11.  A11.  Clearly, the FCC considered whether Note 11 and the Forfeiture Order exceeded its authority and decided they did not.  *See NetworkIP,*

---

[3] Gray's prior briefs are: Opening Brief ("O.B."), Dkt. No. 21; Reply Brief ("R.B."), Dkt. No. 35; Supplemental Brief, ("S.B."), Dkt. No. 58; Supplemental Reply Brief ("SRB"), Dkt. No. 60.

*LLC v. FCC*, 548 F.3d 116, 122 (D.C. Cir. 2008) (section 405(a) met where issue was "necessarily implicated" by the FCC's decision).

*Second*, section 405(a) is satisfied for the independent reason that the FCC considered its authority prior to and during the Note 11 rulemaking process. As Gray explained, O.B. 22, the FCC determined in 2014 that "[b]ecause . . . affiliation swaps do not involve the assignment or transfer of a station license, the transaction is not subject to prior [FCC] approval under [47 U.S.C. §] 310(d)," which is the statute that allows the FCC to regulate the transfer of a station license.[4] However, as the Concurrence acknowledges, Con. 6, during the Note 11 rulemaking process, the FCC rejected the argument that it "has no explicit statutory authority to regulate affiliation swaps" and invoked 47 U.S.C. §§ 154(i) and 303(r) to justify the regulation.[5] *In the Matter of 2014 Quadrennial Regulatory Review – Review of the FCC's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, 31 F.C.C. Rcd. 9864, 9882 n.122 (2016). Section 405(a) cannot bar review because the FCC has already addressed

---

[4] *In the Matter of 2014 Quadrennial Regul. Rev. F Rev. of the Commission's Broad. Ownership Rules & Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, 29 F.C.C. Rcd. 4371, 4391 ¶ 47 (2014) ("*FNPRM*").

[5] Sections 154(i) and 303(r) authorize the FCC to make rules and regulations necessary to carry out its statutory functions and authority. *See* 47 U.S.C. §§ 154(i), 303(r).

the issue.[6]  *See Verizon & AT&T, Inc. v. FCC*, 770 F.3d 961, 967 n.6 (D.C. Cir. 2014) (rejecting FCC's assertion that argument was "not properly before" the Court because "the FCC has decisively" addressed the issue).

*Third*, the Opinion's application of section 405(a) also conflicts with decisions in which the D.C. Circuit has repeatedly explained that, notwithstanding section 405(a), "[a] reviewing court may also set aside agency action that is 'patently in excess of [the agency's] authority'…." *Wash. Ass'n for Television & Children v. FCC*, 712 F.2d 677, 682 (D.C. Cir. 1983); *see also NTCH, Inc. v. FCC*, 841 F.3d 497, 508 (D.C. Cir. 2016) (same); *Petroleum Commc'ns Inc. v. FCC*, 22 F.3d 1164, 1170 (D.C. Cir. 1994) (same).  The reasoning in these decisions fully applies here.  The FCC had no authority to take the action under review, as shown above and in the Concurrence.  Con. 4–10.  Therefore, section 405(a) cannot preclude review of the FCC's statutory authority.

Accordingly, the Court should grant rehearing and conclude that section 405(a) was satisfied and/or does not bar consideration of the FCC's statutory authority for Note 11.  If the Court grants rehearing, it should hold that Note 11 exceeds the FCC's statutory authority as Gray has explained, O.B. 20–28; R.B. 4–

---

[6] The FCC's prior consideration of the issue also shows that it would have been futile for Gray to raise the issue again. *See Omnipoint Corp. v. F.C.C.*, 78 F.3d 620, 635 (D.C. Cir. 1996) (issue was properly before court because "attempting to raise this issue before the Commission would have been futile").

11, and which the Concurrence explains in detail, Con. 4–10.

## II. DECLINING TO REVIEW THE FCC'S STATUTORY AUTHORITY TO ENFORCE NOTE 11 IS INCONSISTENT WITH *LOPER BRIGHT*.

The Opinion's refusal to review the FCC's statutory authority to enforce Note 11 is inconsistent with the Supreme Court's decision in *Loper Bright*. Rehearing is necessary to ensure that the Court discharges its duty under the APA and Article III as a court reviewing agency action and fixes the statutory boundaries that constrain any authority the FCC may have to impose a substantial forfeiture penalty.

The Supreme Court has instructed that, under the APA, "the reviewing court—not the agency whose action it reviews—is to 'decide *all* relevant questions of law', and 'interpret … statutory provisions.'" *Loper Bright*, 603 U.S. at 398 (emphasis in original) (citation omitted). Whether the agency had the statutory authority to take the challenged action is clearly a relevant—and threshold— question because "[a]gencies have *only* those powers given to them by Congress." *W. Va. v. EPA*, 597 U.S. 697, 723 (2022). Thus, the Court instructed that "the role of the reviewing court under the APA is" to "'fix[ ] the boundaries of [the] delegated authority' and ensur[e] the agency has engaged in 'reasoned decisionmaking' within those boundaries." *Loper Bright*, 603 U.S. at 395 (citation omitted); *see also id*. at 404 (a court must "police the [] statutory boundaries of those delegations").

The judicial role under the APA mirrors the role under Article III. As Chief Judge Roberts underscored in *Loper Bright*, "Article III of the Constitution assigns

to the Federal Judiciary the responsibility and power to adjudicate 'Cases' and 'Controversies'…" 603 U.S. at 384. Under the Constitution, "'[i]t is emphatically the province and duty of the judicial department to say what the law is.'" *Id.* at 385 (quoting *Marbury v. Madison*, 1 Cranch 137, 177 (1803)). "The APA … codifies for agency cases the unremarkable, yet elemental proposition reflected by judicial practice dating back to *Marbury*: that courts decide legal questions by applying their own judgment." *Id.* at 391–92. This function is critical where an agency seeks to enforce regulations in administrative proceedings under penalty of forfeiture. *Id*. at 385 ("When the meaning of a statute was at issue, the judicial role was to 'interpret the act of Congress, in order to ascertain the rights of the parties.'" (citation omitted)).

In its supplemental briefing, Gray argued extensively that *Loper Bright* required addressing whether the FCC had statutory authority to enforce Note 11. S.B. 4–8; S.R.B. 2–5. After submission of that briefing, another panel of this Court confirmed that the APA's standards apply to review of an FCC order under the Hobbs Act, holding that "the scope of an agency's statutory authority and whether an agency has acted within that authority are legal questions [the Court must] decide independently." *Ins. Mktg. Coal. Ltd. v. FCC*, 127 F.4th 303, 311 (11th Cir. 2025) (citing *Loper Bright*, 603 U.S. at 391–92 & n.4) (vacating FCC order).

Contrary to *Loper Bright*, the Opinion fails to fix the boundaries of the FCC's

13

authority to enforce Note 11 against Gray.  The Opinion invokes section 405(a) to decline to address whether the FCC had the authority to enforce Note 11, and it applies a highly deferential review standard to affirm liability findings the FCC could not lawfully make *unless* it had the authority to enforce Note 11.  This leads to an incongruous result: the Panel concludes that the FCC reasonably found a Note 11 violation although a majority of the Panel would hold that the FCC lacked statutory authority to enforce Note 11.  That outcome cannot stand.  As *Loper Bright* confirms, it is squarely this Court's duty to address the FCC's authority to enforce Note 11 in the first place.  The Court should grant rehearing to discharge this duty.

## III.    THE FCC'S IMPOSITION OF A FORFEITURE PENALTY IN AN ADMINISTRATIVE PROCEEDING WITHOUT AN ARTICLE III DECISIONMAKER OR JURY TRIAL CONTRAVENES *JARKESY*.

Rehearing is also warranted to address grave defects in the Forfeiture Order. The FCC imposed the Penalty in an administrative proceeding *without* an Article III decisionmaker and jury trial.  That is inconsistent with *Jarkesy* and violates Article III and the Seventh Amendment, as confirmed by the Fifth Circuit's recent decision in *AT&T, Inc. v. FCC*, No. 24-60223, 2025 WL 1135280 (5th Cir. Apr. 17, 2025). The Panel's decision to remand this proceeding to the FCC squarely raises whether the FCC had the authority to impose a forfeiture penalty on Gray in the first place and whether the FCC may do so on remand consistent with *Jarkesy*.

In *Jarkesy*, the Supreme Court affirmed that in "[s]uits at common law, ... the

right of trial by jury shall be preserved." U.S. Const. amend. VII. The Court explained that "[i]f a suit is in the nature of an action at common law, then … adjudication by an Article III court is **mandatory**." *Jarkesy*, 603 U.S. at 111–12 (emphasis added). As the Fifth Circuit has now concluded, the FCC's imposition of a forfeiture penalty pursuant to its administrative proceeding violates Article III and the Seventh Amendment. *See AT&T*, 2025 WL 1135280, at *1, 10.

The FCC's forfeiture penalty is "legal in nature," *Jarkesy*, 603 U.S. at 122. The FCC's "civil penalties 'are the prototypical common law remedy,'" *AT&T*, 2025 WL 1135280, at *4 (quoting *Jarkesy*, 603 U.S. at 123); they are "designed to punish or deter violators," *id*. "This is evident from the statutory factors" and "considerations" used by the FCC, such as whether Gray acted "willfully" and "repeatedly." *See id.* (discussing 47 U.S.C. § 503(b)(2)(E), which requires the FCC to consider certain factors to determine forfeiture amount, including "gravity of the violation," "the degree of culpability," and "any history of prior offenses"). "Moreover, the penalties are not remedial.'" *Id*. at *5. Not only are there no victims in a purported Note 11 violation, but the FCC's forfeiture penalty goes to the United States—not to compensate any private party. All of this "effectively decides that this suit implicates the Seventh Amendment right, and that a defendant would be entitled to a jury on these claims." *Jarkesy*, 603 U.S. at 125.

Unless the Court grants rehearing on the grounds set forth in Part I and II, the

conclusion that the FCC's Penalty is a common law claim requires vacatur. "When a matter 'from its nature, is the subject of a suit at the common law,' Congress may **not** 'withdraw [it] from judicial cognizance.'" *Jarkesy*, 603 U.S. at 140 (emphasis added). The so-called "public rights" exception to adjudication in an Article III court "d[oes] not apply" here. *Id.* at 120; *see also AT&T*, 2025 WL 1135280, at *6–9 (rejecting FCC's "public rights" arguments). The FCC's administrative proceeding denied Gray the "Constitution's guarantees of an Article III decisionmaker and a jury trial." *AT&T*, 2025 WL 1135280, at *10. Accordingly, the Court should grant rehearing on this basis and vacate the Forfeiture Order.

## CONCLUSION

For the foregoing reasons, the Court should grant rehearing, vacate the Forfeiture Order in its entirety, and order the FCC to issue a full refund to Gray with interest.

Dated:  April 21, 2025

Respectfully submitted,

*/s/ David E. Mills*
David E. Mills
Robert M. McDowell
Robby L.R. Saldaña
COOLEY LLP
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400
dmills@cooley.com
rmcdowell@cooley.com
rsaldana@cooley.com

*Counsel for Petitioner Gray Media, Inc.*

## CERTIFICATION OF COMPLIANCE WITH FRAP 32(g)(1)

Undersigned counsel certifies that, pursuant to 11th Cir. R. 40-3 and Rule 32(c)(2), this Petition complies with the typeface and type style requirements of Rule 32(a)(5) because it has been prepared in a proportionally spaced typeface using font size 14 Times New Roman.

Pursuant to Rule 40(d)(3)(A) and 11th Circ. R. 40-4, this Petition is 3,887 words, exclusive of the components set forth in 11th Circ. R. 40-3(a), (b), (c), (d), and (j).

Dated: April 21, 2025

*/s/ David E. Mills*
David E. Mills
COOLEY LLP
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400
dmills@cooley.com

*Counsel for Petitioner Gray Media, Inc*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 21, 2025, I served the foregoing document on all parties through the appellate CM/ECF system for the United States Court of Appeals for the Eleventh Circuit.

<div style="margin-left: 40%;">

*/s/ David E. Mills*
David E. Mills
COOLEY LLP
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400
dmills@cooley.com

*Counsel for Petitioner Gray Media, Inc.*

</div>

[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————————

No. 22-14274

————————————————

GRAY TELEVISION, INC.,

Petitioner,

*versus*

FEDERAL COMMUNICATIONS COMMISSION,

Respondent.

————————————————

Petition for Review of a Decision of the
Federal Communications Commission
Agency No. FCC 22-83

————————————————

Before WILLIAM PRYOR, Chief Judge, and JORDAN and BRASHER, Circuit Judges.

JORDAN, Circuit Judge:

Gray Television, a broadcaster in Alaska, seeks review of a final forfeiture order of the Federal Communications Commission. The FCC assessed the maximum forfeiture penalty on Gray after finding that it violated the prohibition on transactions that result in ownership of two top-four stations in a single designated market area.  After review of the record and the parties' briefs, and with the benefit of oral argument, we affirm the FCC's determination of a violation but vacate the forfeiture penalty and remand for further proceedings.

## I

Congress, through the Communications Act, has granted the Federal Communications Commission authority to license the use of broadcast stations.  As relevant here, the Act provides as follows:

> No . . . station license, or any rights thereunder, shall be transferred, . . . in any manner, voluntarily or involuntarily, directly or indirectly, . . . to any person except upon application to the [FCC] and upon finding by the [FCC] that the public interest, convenience, and necessity will be served thereby.

47 U.S.C. § 310(d).  The FCC has exercised this authority to promulgate rules that impose certain restrictions on licensees.  Among these regulations is the "Local Television Multiple Ownership

Rule" (the "Rule"), which bars an entity from owning two television stations in the same designated market area ("DMA") if both are rated among the top four stations in terms of audience share. At the time of the disputed transaction in this case, the Rule read in relevant part as follows:

> An entity may directly or indirectly own, operate, or control two television stations licensed in the same Designated Market Area (DMA) (as determined by Nielsen Media Research or any successor entity) if: . . . [a]t the time the application to acquire or construct the station(s) is filed, at least one of the stations is not ranked among the top four stations in the DMA, based on the most recent all-day (9 a.m.–midnight) audience share, as measured by Nielsen Media Research or by any comparable professional, accepted audience ratings service . . . .

47 C.F.R. § 73.3555(b)(1)(i) (2020) (now codified as 47 C.F.R. § 73.3555(b)(1)(ii) (2024)).[1]

---

[1] In addition to being recodified, this portion of the Rule has also been amended to provide more detail as to how to determine a station's ranking: "At the time the application to acquire or construct the station(s) is filed, at least one of the stations is not ranked among the top four stations in the DMA, based on the Sunday to Saturday, 7AM to 1AM daypart audience share from ratings averaged over a 12–month period immediately preceding the date of application, as measured by Nielsen Media Research or by any comparable professional, accepted audience ratings service." 47 C.F.R. § 73.3555(b)(1)(ii) (2024).

At the time, a licensee was able to file an application to waive the Rule's restrictions. *See* 47 C.F.R. § 73.3555 n.7 (2020). This portion of the Rule has since been recodified and amended to provide that the top-four prohibition "shall not apply in cases where, at the request of the applicant, the Commission makes a finding that permitting an entity to directly or indirectly own, operate, or control two television stations licensed in the same DMA would serve the public interest, convenience, and necessity." 47 C.F.R. § 73.3555(b)(2) (2024).[2]

The FCC has also published various notes interpreting the Rule. In 2016, for example, the FCC issued Note 11, which states:

> An entity will not be permitted to directly or indirectly own, operate, or control two television stations in the same DMA through the execution of any agreement (or series of agreements) involving stations in the same DMA, or any individual or entity with a cognizable interest in such stations, in which a station (the "new affiliate") acquires the network affiliation of another station (the "previous affiliate"), *if the change in network affiliations* would *result in* the licensee of the new affiliate, or any individual or entity with a cognizable interest in the new affiliate, directly or indirectly owning, operating, or controlling *two of the top-four rated television stations* in the DMA at the time of the agreement.

---

[2] Unless otherwise noted, in the rest of the opinion we refer to and apply the 2020 version of the Rule.

*Id.* at n.11 (2020) (emphasis added).  Note 11 expanded the application of the Rule's top-four prohibition from station license applications to transactions in which one licensee acquires the network affiliation of another station.

Note 11 also referred regulated entities to the so-called Second Report and Order, released as part of the FCC's 2014 Quadrennial Regulatory Review.  *See id.*  Among other things, the Second Report and Order sets out the FCC's position that affiliation swaps—transactions in which licensees exchange network affiliations—must also "comply with the top-four prohibition at the time the agreement is executed," and that "any party that directly or indirectly owns, operates, or controls two top-four stations in the same DMA as a result of such transactions [will] be in violation of the top-four prohibition and subject to enforcement action."  *In re 2014 Quadrennial Regulatory Review*, 31 FCC Rcd. 9864, 9885 (2016).

Gray Television entered the Anchorage DMA in 2016 when it acquired NBC affiliate KTUU-TV, the highest-rated station in the market.  Shortly thereafter, Gray acquired a second full-power station—KYES-TV—in the same DMA.  At that time, KYES had no major network affiliation.  Gray claimed that after making substantial investments to its broadcasting facilities, KYES became the fourth-rated television station in the Anchorage DMA in July of 2020.

On July 24, 2020, Gray executed an agreement with Denali Media Holdings (the "Denali transaction") to acquire the local CBS network affiliation of another Anchorage station, KTVA-TV, for

Gray's own KYES, with Denali retaining KTVA's license and trans-
mission facilities.  At the time of this purchase, KTVA's audience
share ranked second in the Anchorage DMA behind Gray's KTUU.
Gray did not file an application with the FCC requesting a waiver
of the Rule and approval of the Denali transaction.

About a year later, the FCC issued a Notice of Apparent Li-
ability for Forfeiture ("NAL") against Gray for allegedly violating
Note 11 of the Rule.  The FCC preliminarily found that the pur-
chase of KTVA's CBS network affiliation from Denali gave Gray
ownership of the two highest-rated stations in the Anchorage
DMA.  *See* NAL, E.R. at 76.  The FCC also proposed assessing a
penalty on Gray by applying the base amount of $8,000 for "unau-
thorized substantial transfer of control" cases to each day of the
continued violation from July 31, 2020—the date that Gray ac-
quired KTVA—to March 3, 2021.  *See id.* at 79–80.  This calculation
produced a forfeiture amount of $1.72 million, which the FCC pro-
posed to reduce to $518,283, the then-statutory maximum penalty
for a single violation by a broadcast station licensee.  *See id.* at 80.

Gray filed a response requesting that the FCC cancel the
NAL and the proposed forfeiture penalty.  First, Gray asserted that
according to the Comscore ratings data from July of 2020, the De-
nali transaction did not violate Note 11 because KYES was already
a top-four ranked station in the Anchorage DMA prior to the trans-
action.  *See* Gray's Response to NAL, E.R. at 37.  As a result, Gray
argued, the transaction did not "result in" a prohibited top-four
combination in violation of the plain language of Note 11.  *See id.*

Second, Gray argued that the FCC failed to provide fair notice of its interpretation of Note 11, which extended the top-four prohibition to affiliation acquisitions in addition to affiliation swaps. *See id*. at 44. While conceding that the FCC likely had "the right to regulate affiliation swaps that are the 'functional equivalent' of a license transfer," Gray maintained that the Denali transaction did not meet those criteria. *See id*. at 29. Third, Gray claimed that the enforcement action violated the First Amendment and § 326 of the Communications Act, 47 U.S.C. § 326, by seeking to regulate its programming choices. *See id*. at 58. Finally, Gray objected to the FCC's proposed forfeiture penalty, maintaining that it was contrary to law on a number of grounds. *See id*. at 29–31.

By a 3-1 vote, the FCC issued a final forfeiture order affirming the proposed findings set out in in the NAL. *See In re Gray Television, Inc.*, 37 FCC Rcd. 13475 (2022). The FCC explained that Gray had violated Note 11 because its "acquisition of KTVA[ ]'s programming, including the CBS affiliation, and its placement of that programming on the primary stream of KYES resulted in a new top-four combination." *Id*. at 13478. The FCC rejected the contention that Gray had already owned two top-four stations because the Comscore ratings data for KYES from July of 2020 was "not the most recent ratings data available at the time the agreement was executed." *Id*. at 13479 (internal quotation marks omitted). Relying instead on Nielsen ratings data from June of 2020—which ranked KYES fifth in the Anchorage DMA—the FCC found that Gray only owned one top-four station prior to the Denali transaction, and so the acquisition of KTVA's CBS network

affiliation resulted in Gray impermissibly owning two top-four sta-
tions in the same DMA.  *See id.*

The FCC also found, as an alternative and independent
ground, that "regardless of whether Gray already legally possessed
a top-four combination through organic growth at the time of the
transaction," Gray's purchase of the CBS affiliation from Denali
still violated Note 11 because it "resulted in a combination of the
market's first- and second-ranked stations."  *Id.* at 13480.  The FCC
characterized Gray's affiliation acquisition as the "functional equiv-
alent" of a station license transfer because an "affiliation transfer"
has the "same result" as a transfer of control or assignment of a
license, subjecting it to Note 11 compliance.  *See id.* at 13484.

Finally, the FCC imposed the proposed $518,283 forfeiture
penalty.  It provided a number of reasons for doing so.  *See id.* at
13485–89.

Commissioner Nathan Simington dissented from the FCC's
final forfeiture order.  In his dissenting statement, he explained that
he believed the order's alternative rationale "misapplie[d] the plain
language of [§] 73.3555, Note 11" by going beyond simply assessing
whether Gray in fact owned two top-four stations in the same
DMA prior to the Denali transaction, which would have meant the
transaction did not "result in" the prohibited ownership of two top-
four stations in the Anchorage market.  *See id.* at 13491 (Simington,
Comm'r, dissenting).  He also took issue with the order asserting
that a "new top four combination" would itself violate the Rule re-
gardless of whether a licensee already owned two top-four stations

at the time of the transaction. *See id.* In his view, Note 11's enforcement depends entirely on whether the transaction resulted in the prohibited ownership of two top-four stations. He argued that without "a causal relationship between an action [i.e., the transaction] and an outcome [i.e., ownership of two top-four stations in the same DMA]" there could be no Note 11 violation. *See id.*

Additionally, Commissioner Simington asserted that reading the Rule as the order alternatively did would result in "unintended or absurd consequences," such as requiring licensees to seek a waiver to "consummate a network affiliation swap resulting in *diminished* market share in a DMA" as opposed to an increased market share. *See id.* at 13492 (emphasis in original). In effect, he believed that such a reading would subvert the FCC's public interest mandate by requiring a party to seek a waiver to effectuate a transaction that would increase competition and localism. *See id.*

Gray petitioned for review of the FCC's final forfeiture order.

## II

Under the Administrative Procedure Act, we must "set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "The APA's arbitrary-and-capricious standard requires that the agency action be reasonable and reasonably explained." *F.C.C. v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Under this deferential and "narrow" standard, we will not "substitute [our] judgment for that of the agency."

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Our task is to "ensure[ ] that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision."  *Prometheus Radio Project*, 592 U.S. at 423.  We ask only whether the "agency came to a rational conclusion."  *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1360 (11th Cir. 2008).[3]

## III

Gray asserts that the FCC's forfeiture order should be vacated for several reasons.  We address each of those reasons below.

## A

Gray argues that the FCC exceeded its statutory authority in issuing Note 11.  The FCC responds that this argument is not properly before us because Gray did not raise it in the administrative proceedings.  We agree with the FCC.

Exhaustion of administrative remedies is largely a judicially-created doctrine.  *See Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 50–51 (1938); 2 Kristin E. Hickman & Richard J. Pierce, Jr., Administrative Law Treatise § 17.2 (7th ed. 2024).  Congress has on

---

[3] The APA also allows a court to "set aside administrative action where [it is] contrary to constitutional right."  5 U.S.C. § 706(2)(B).  But whether agency action is unconstitutional is conceptually a separate question from whether the action is arbitrary and capricious.  *See F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009).

occasion, however, codified exhaustion requirements by statute. And that is the case here. The Communications Act provides that

> [t]he filing of a petition for reconsideration shall not be a condition precedent to judicial review of [an FCC decision] except where the party seeking such review . . . relies on questions of fact or law upon which the Commission . . . has been afforded no opportunity to pass.

47 U.S.C. § 405(a).

The purpose of § 405(a) "is to require complainants to give the FCC a 'fair opportunity' to pass on a legal or factual argument before coming to . . . court." *Chadmoore Commc'ns, Inc. v. F.C.C.*, 113 F.3d 235, 239 (D.C. Cir. 1997). As the D.C. Circuit has explained, § 405(a) is not jurisdictional. *See M2Z Networks, Inc. v. F.C.C.*, 558 F.3d 554, 558 (D.C. Cir. 2009). But the FCC has raised § 405(a), so we must enforce it. *See Fort Bend Cnty. v. Davis*, 587 U.S. 541, 549 (2019) ("A claim-processing rule may be 'mandatory' in the sense that a court must enforce the rule if a party 'properly raise[s]' it.") (citation omitted).

Gray never argued in the administrative proceedings that the FCC lacked statutory authority to issue Note 11. Instead, Gray assumed in its arguments before the FCC that the agency had the ability to regulate the "functional equivalent" of a station transfer. *See* Gray's Response to NAL, E.R. at 58. Gray even recognized that, as to such transactions—which it characterized as "transactions that are indistinguishable from a license transfer but for the fact that the parties did not seek [FCC] approval for the transfer of the

license"—the FCC "has a reasonable argument that such evasions should be within its jurisdiction." *Id.* at 59. Gray argued only that the Denali transaction was *not* the functional equivalent of a station transfer by its terms. *See id.*

The FCC rejected Gray's interpretation of the scope of Note 11. It alternatively concluded that, even if that interpretation was valid, the acquisition of KTVA's CBS network affiliation was the "functional equivalent of a station license transfer." *Gray Television*, 37 FCC Rcd. at 13482. Given the thrust of Gray's argument, the FCC did not address its statutory authority to issue Note 11.

We conclude that the FCC "was never put on notice that [Gray] meant to challenge [its] statutory authority to [issue Note 11,] the [provision] at issue in this case." *Nat'l Lifeline Ass'n v. F.C.C.*, 983 F.3d 498, 509 (D.C. Cir. 2020). If Gray believed that the FCC had overlooked an argument about the lack of statutory authority, it could have petitioned for rehearing. *See* § 405(a); *Wash. Ass'n for Television & Child. (WATCH) v. F.C.C.*, 712 F.2d 677, 681 (D.C. Cir. 1983). But it did not do so.

Even though § 405(a) contains no exceptions to its exhaustion requirement, the D.C. Circuit has read it to "codify the judicially-created doctrine of exhaustion of administrative remedies, which permits courts some discretion to waive exhaustion." *WATCH*, 712 F.2d at 681. *See also M2Z*, 558 F.3d at 558 (same). One of the traditionally recognized exceptions to the judge-made exhaustion doctrine is futility. *See generally Shalala v. Ill. Council on*

*Long Term Care, Inc.*, 529 U.S. 1, 13 (2000); 2 Hickman & Pierce, Administrative Law Treatise, at § 17.2.

Gray argues that, even if it did not present its statutory authority argument to the FCC, we should waive § 405(a)'s exhaustion requirement under the futility exception. We doubt that we can engraft a judge-made exception onto an exhaustion statute that does not contain that exception. *See Ross v. Blake*, 578 U.S. 632, 639 (2016) ("Time and again, this Court has taken [exhaustion] statutes at face value—refusing to add unwritten limits onto their rigorous textual requirements."); *Booth v. Churner*, 532 U.S. 731, 741 n.6 (2001) ("[W]e will not read futility or other exceptions into statutory exhaustion requirements where Congress has provided otherwise."); *Morales v. U.S. Att'y Gen.*, 33 F.4th 1303, 1310 (11th Cir. 2022) ("[W]hen we are dealing with [8 U.S.C.] § 1252(d)(1)'s exhaustion requirement, 'we are dealing with a statutory exhaustion requirement, and we will not read futility or other exceptions into [it] where Congress has provided otherwise.'") (citation omitted and alteration in bracket). But even if we assume that futility can be an exception to § 405(a)'s exhaustion requirement, Gray has not shown that the statutory authority argument would have been futile.

There is "no 'perceived futility' exception" to the exhaustion doctrine. *See K.Y. v. U.S. Att'y Gen.*, 43 F.4th 1175, 1184 (11th Cir. 2022). This matter was the first enforcement action brought by the FCC alleging a Note 11 violation based on the acquisition of a station's network affiliation. Had the FCC been given the

opportunity to consider the statutory authority argument Gray now raises, it could have chosen to terminate the enforcement action or reject the NAL if it ultimately agreed with Gray. In short, this is not a case in which the FCC had an established track record of rejecting statutory authority arguments as to Note 11. And the fact that the FCC now asserts that it acted within its statutory authority does not demonstrate futility: "If futility could be established by the mere fact that the [agency] opposes a petitioner's position on appeal, then futility could always be demonstrated and the requirement of § 405[(a)] would be eviscerated." *Freeman Eng'g Assocs., Inc. v. F.C.C.*, 103 F.3d 169, 183 (D.C. Cir. 1997).

In sum, Gray did not give the FCC an opportunity to pass on its statutory authority argument with respect to Note 11. We therefore decline to consider that contention.

## B

Our review, under the arbitrary and capricious standard, focuses on whether the FCC's decision was reasonable and reasonably explained. *See Prometheus Radio Project*, 592 U.S. at 423. We may not substitute our own judgment "as long as [the FCC's] conclusions are rational." *Miccosukee Tribe of Indians of Fla. v. United States*, 566 F.3d 1257, 1264 (11th Cir. 2009). "Still, we are not a rubber stamp – 'courts retain a role, and an important one, in ensuring that agencies have engaged in reasoned decisionmaking.'" *In re Gateway Radiology Consultants, P.A.*, 983 F.3d 1239, 1263 (11th Cir. 2020) (quoting *Judalang v. Holder*, 565 U.S. 42, 53 (2011)).

Gray argues that the FCC's decision was not reasonable for two reasons.  First, the Denali transaction did not "result in" Gray owning two top-four stations in the same DMA under the plain meaning of Note 11 because it already owned two top-four stations in the Anchorage DMA prior to and at the time of the transaction (based on the Comscore data on which it relied and presented to the FCC).  Second, the Denali transaction was not the "functional equivalent" of a license transfer because KTVA retained its broadcasting license and facilities and resumed broadcasting with different programming after the transaction.  We reject both of Gray's arguments.

Note 11 prohibits the acquisition of the network affiliation of another station in the same DMA "if the change in network affiliations would *result in* the licensee of the new affiliate . . . directly or indirectly owning . . . two of the top-four rated television stations in the DMA *at the time of the agreement*."  47 C.F.R. § 73.3555 n.11 (2020) (emphasis added).  The word "result" means to come about as a "consequence."  *See* The American Heritage Dictionary of the English Language 1487 (4th ed. 2009); Black's Law Dictionary 1509 (10th ed. 2014).

It is undisputed that, at the time of the Denali transaction, Gray owned KTUU, which was the top-rated station in the Anchorage DMA.  Whether the Denali transaction resulted in Gray owning two of the top four stations in the Anchorage DMA in violation of Note 11 therefore depends on the ranking of KYES (the station

for which Gray acquired the CBS network affiliation of KTVA) at the time of the transaction.

The Denali transaction took place on July 24, 2020. In finding that Gray violated Note 11, the FCC relied on the Nielsen ratings data for June of 2020, which showed that KYES was then the fifth-rated station in the Anchorage DMA. *See Gray Television*, 37 FCC Rcd. at 13479. Gray had asserted that the relevant information for purposes of Note 11 came from the Comscore ratings data compiled at the end of July of 2020, which showed that KYES was at that time the fourth-rated station in the DMA. But the FCC declined to use the July 2020 Comscore ratings data, explaining that it was "not the most recent ratings available at the time the agreement was executed" on July 24, 2020. *See id.* (internal quotation marks omitted).

At the time of the Denali transaction, the Rule provided that a station's rank within a given DMA would be "based on the *most recent* all-day (9 a.m.–midnight) audience share, as measured by Nielsen Media Research or by any comparable professional, accepted audience ratings service." 47 C.F.R. § 73.3555(b)(1)(i) (2020). No one denies that Comscore is a "comparable professional, accepted audience ratings service," so we focus on the dates of the competing ratings data from Nielsen and Comscore.

The FCC found the July 2020 Comscore ratings data irrelevant because it was based in part on information from seven days which postdated the transaction (i.e., July 25–31, 2020). In our view, it was not arbitrary and capricious for the FCC to consider

only the June 2020 Nielsen ratings data.  The Rule at the time specified that a station's ranking would be based on the "most recent . . . audience share" at the time the agreement was executed or the application was filed.  "Recent" means "[o]f, belonging to, or occurring at a time immediately before the present," American Heritage Dictionary of the English Language at 1459, and the July 2020 Comscore ratings data—by its own terms—was not the most recent data because it relied in part on information from seven days which came after the Denali transaction.  Gray could have submitted Comscore ratings data compiled at the end of June of 2024, or at any date up to and including the date of the transaction, but it did not.

We also reject Gray's related contention that the FCC improperly imposed a new requirement that the ratings data be "available at" the time of the transaction.  As explained above, the language of Note 11 at the time of the Denali transaction expressly referred to the "most recent" data for determining a station's ranking in a given DMA.

Gray's second argument, that the Denali transaction did not amount to the "functional equivalent" of a license transfer under Note 11, misconstrues the accompanying Second Report and Order explaining the adoption and application of Note 11.  Gray argues that the functional equivalent of a license transfer is one that is "indistinguishable from a license transfer but for the fact that the parties did not seek [FCC] approval for the transfer of the license."  The FCC rejected this interpretation of Note 11 because the plain

language of the Rule only requires evidence of a station "ac-
quir[ing] the network affiliation of another station" to establish a
Note 11 violation. *See* 47 C.F.R. § 73.3555 n.11 (2020); *2014 Quad-
rennial Regulatory Review*, 31 FCC Rcd. at 9884. We conclude that
the FCC reasonably rejected Gray's reading of functional equiva-
lence because it mischaracterized the FCC's explanation in the Sec-
ond Report and Order. The FCC explained that it has long believed
that common ownership of two top-four rated stations would be
permissible if such ownership was the result of organic growth;
common ownership, however, is impermissible if it occurs through
the "sale or swap of network affiliations" rather than organic
growth. *See 2014 Quadrennial Regulatory Review*, 31 FCC Rcd. at
9883.

Based on the June 2020 Nielsen ratings data reasonably re-
lied upon by the FCC, Gray did not own two of the top four sta-
tions in the Anchorage DMA prior to the Denali transaction. The
FCC found that organic growth was not a factor in Gray's eventual
common ownership of two top-four rated stations, which occurred
solely as a result of the "sale" of a network affiliation considered
the functional equivalent of a license transfer. In other words, but
for the Denali transaction, Gray would not have owned two top-
four rated stations. This determination was reasonable.

In sum, we hold that the FCC's finding of a Note 11 violation
on this record was not arbitrary and capricious. The FCC was re-
quired to "examine the relevant data and articulate a satisfactory
explanation for its action including a rational connection between

the facts found and the choice made," *State Farm*, 463 U.S. at 43 (citation and internal quotation marks omitted), and did so here. Based on the Nielsen ratings data from June of 2020, Gray did not own two of the top four stations in the Anchorage DMA at the time of the Denali transaction, and its acquisition of KTVA's CBS network affiliation resulted in KYES becoming one of the top four stations. As a result of the Denali transaction, therefore, Gray owned two of the top four stations in the Anchorage DMA (KTUU and KYES) in violation of Note 11.

## C

Gray argues that the FCC violated due process by failing to provide fair notice that transactions involving network affiliations *other than* affiliation swaps are subject to Note 11. This argument lacks merit because Note 11 expressly prohibits the transaction at issue here—the acquisition of a network affiliation that results in an entity owning or controlling two of the top four stations in a given DMA.

"[L]aws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). A "punishment fails to comply with due process if the statute or regulation under which it is obtained 'fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.'" *Id.* (citation omitted). *See also SNR Wireless LicenseCo, LLC v. F.C.C.*, 868 F.3d 1021, 1043 (D.C. Cir. 2017) ("Notice is fair if it allows regulated

parties to identify, with ascertainable certainty, the standards with which the agency expects [them] to conform.") (citation and internal quotation marks omitted) (alteration in original).

In this case, we "consider whether [Note 11] is vague as applied to the particular facts at issue, for '[a] p[arty] who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.'" *Holder v. Humanitarian L. Project*, 561 U.S. 1, 18–19 (2010) (citation omitted). As we have said, "nonspeech vagueness challenges are only cognizable as applied." *United States v. Esquenazi*, 752 F.3d 912, 929 (11th Cir. 2014). *See also United States v. Mazurie*, 419 U.S. 544, 550 (1975) ("It is well established that vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand.").

In the Second Report and Order, which sets out the rationale for Note 11, the FCC discussed targeting affiliation swaps—transactions in which licensees exchange network affiliations—as the "functional equivalent" of station license transfers "in order to close this loophole" and prevent regulatory arbitrage. *See 2014 Quadrennial Regulatory Review*, 31 FCC Rcd. at 9884–85. And it provided an example of an affiliation swap as a transaction that would be covered by Note 11. *See id.* at 9884 n.137.

But Note 11—the provision at issue here—expressly references agreements "in which a station . . . acquires the network affiliation of another station" and does not mention affiliation swaps. Gray therefore had fair notice that the Denali transaction, which

involved its acquisition of KTVA's CBS network affiliation, would be subject to Note 11 if it resulted in the ownership or control of two of the top–four ranked stations in the Anchorage DMA.  *See Gen. Elec. Co. v. U.S. E.P.A.*, 53 F.3d 1324, 1329 (D.C. Cir. 1995) (explaining that fair notice is sometimes provided "in the most obvious way of all: by reading the regulations").  The discussion of affiliation swaps in the Second Report and Order did not render vague Note 11's express reference to the acquisition of the network affiliation of another station.  Nor did it purport to narrow Note 11's terms.[4]

## D

Gray contends that the forfeiture order interferes with its programming choices and violates the First Amendment and § 326 of the Communications Act, 47 U.S.C. § 326 ("Nothing in this chapter shall be understood or construed to give the [FCC] the power of censorship over the radio communications or signals transmitted by any radio station, and no regulation or condition shall be promulgated or fixed by the [FCC] which shall interfere with the

---

[4] Because Note 11 expressly referenced the acquisition of network affiliations, it was not ambiguous with respect to Gray's Denali transaction, and we have no need to consider whether the FCC's interpretation and application of Note 11 is entitled to deference.  *See Kisor v. Wilkie*, 588 U.S. 558, 573 (2019) (explaining that "the possibility of deference" to an agency interpretation of its own regulation "can arise only if a regulation is genuinely ambiguous").

right of free speech by means of radio communication.").  We reject the contention.[5]

The Supreme Court has "permitted more intrusive regulation of broadcast speakers than of speakers in other media" based on "the unique physical limitations of the broadcast medium." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 637–39 (1994) (declining to apply the scarcity rationale to cable television).  The "inherent physical limitation on the number of speakers who may use the broadcast medium has been thought to require some adjustment in traditional First Amendment analysis to permit the Government to place limited content restraints, and impose certain affirmative obligations, on broadcast licensees."  *Id.* at 638 (citing *Red Lion Broad. Co. v. F.C.C.*, 395 U.S. 367, 390 (1969)).  The First Amendment, therefore, "confers . . . no right to an unconditional monopoly of a scarce resource." *Red Lion*, 395 U.S. at 391.  *See, e.g., F.C.C. v. Nat'l Citizens Comm. for Broad. (NCCB)*, 436 U.S. 775, 796 (1978) (upholding FCC regulations governing permissibility of common ownership of radio or television broadcast stations and a daily newspaper located in the same community, and concluding in part that the FCC "acted rationally in finding that diversification of

---

[5] Gray treats § 326 as co-extensive with the First Amendment.  We do the same without opining on whether Gray's understanding is correct.

ownership would enhance the possibility of achieving greater diversity of viewpoints").[6]

The D.C. Circuit, applying rational basis review under cases like *Red Lion* and *NCCB*, upheld the Rule against a First Amendment challenge in *Sinclair Broadcasting Grp., Inc. v. F.C.C.*, 284 F.3d 148 (D.C. Cir. 2002). Because the Rule's prohibition against ownership or control of two top-four stations in the same DMA is content neutral—it applies to all licensees and is not based on the content of their programming, *see* 47 C.F.R. § 73.3555(b)(1)(i) (2020)—we agree with the D.C. Circuit's decision in *Sinclair Broadcasting* and quote from it at length:

> [T]he court applies a rational basis standard of review. Sinclair's contention that the *Local Ownership Order* [the Rule] regulates the content of speech and thus is subject to strict scrutiny review, fails under *NCCB,* where the Supreme Court reviewed analogous restrictions on common ownership in a local market and held that such restrictions are "not content related." 436 U.S. at 801 . . . Sinclair's alternative contention that the *Local Ownership Order* is subject to intermediate scrutiny is contrary to *Turner Broad.*, 512 U.S. at 637, where the Court refused to abandon the scarcity rationale as a reason for minimal scrutiny in the broadcast context. *Id.* . . . Although more than minimal scrutiny may be required when a class of

---

[6] The scarcity rationale has been criticized, *e.g.*, *Fox Television*, 556 U.S. at 530–35 (Thomas, J., concurring), but the Supreme Court has not overturned cases like *Red Lion*.

broadcasters is singled out, the *Local Ownership Order* makes no such distinction . . . Therefore, the only question is whether the *Local Ownership Order* is rationally connected to its goals of ensuring a diversity of voices and adequate competition in television broadcasting. *See NCCB*, 436 U.S. at 795–96; *Turner Broad.*, 512 U.S. at 663.

[B]ecause "there is no unabridgeable First Amendment right comparable to the right of every individual to speak, write, or publish" to hold a broadcast license, *NCCB*, 436 U.S. at 799 (quoting *Red Lion*, 395 U.S. at 388)[,] . . . Sinclair does not have a First Amendment right to hold a broadcast license where it would not, under the *Local Ownership Order,* satisfy the public interest. *NCCB*, 436 U.S. at 800. In *NCCB,* the Supreme Court upheld an ownership restriction analogous to the *Local Ownership Order,* based on the same reasons of diversity and competition, *id.* at 794–95, in recognition that such an ownership limitation significantly furthers the First Amendment interest in a robust exchange of viewpoints. *Id.* at 795, 796–97 . . . . The Court stated in *NCCB* that it saw "nothing in the First Amendment to prevent the Commission from allocating licenses so as to promote the 'public interest' in diversification of the mass communications media." [*Id.*] at 795 (quoting *Associated Press v. United States*, 326 U.S. 1, 20 (1945)). Sinclair's protest that *NCCB* is no longer controlling because it is undermined by the advent of cable television, DBS, and the internet, is to no avail. The rationale in *NCCB*, based on the necessity that the

Commission choose between competing applicants for the same channel and the idea that government allocation of broadcast frequencies is essential, 436 U.S. at 799, applies here. As this court recognized in *Tribune Co. v. F.C.C.*, 133 F.3d 61 (D.C. Cir. 1998), "nothing in the subsequent decisions of the [Supreme] Court has called the constitutional validity of the [*NCCB*] doctrine into question." *Id*. at 69.

*Id*. at 167–69 (some citations omitted).

Note 11, which is at issue here, is subject to the same rational basis standard of review as the Rule because it too is not content based. Its extension of the Rule to the acquisition of network affiliations is not based on the content of the licensees' programming. *See* 3 Rodney A. Smolla, Smolla & Nimmer on Freedom of Speech § 26.3 (Sept. 2024 update) ("In reviewing FCC regulation, courts have for the most part been reluctant to engage in searching First Amendment review of regulations that appear to primarily regulate the economic structure of media ownership.").

The FCC reasonably found that Note 11 furthers the public interest by promoting competition in local markets, much like the Rule itself, because it applies to transactions that have the same anti–competitive effect as those prohibited under the Rule. Because Note 11 is rationally related to the FCC's interest in promoting competition, its application and enforcement against Gray does not violate § 326 or the First Amendment. *Cf. NCCB*, 436 U.S. at 802 ("The regulations are a reasonable means of promoting the public interest in diversified mass communications; thus they do not

violate the First Amendment rights of those who will be denied broadcast license pursuant to them."); *Prometheus Radio Project v. F.C.C.*, 652 F.3d 431, 465 (3d Cir. 2011) ("There is no basis for CBS and Clear Channel's First Amendment claims that the media ownership rules are impermissible attempts by the FCC to manipulate content. These rules apply regardless of the content of programming.") (citations omitted).

## E

Finally, Gray challenges the FCC's forfeiture penalty amount for the Note 11 violation. It asserts that the FCC (a) applied a daily base forfeiture in a manner contrary to precedent and practice, (b) arbitrarily and capriciously made an "egregiousness" finding, (c) did not adequately consider the nature and circumstances of the violation or its good faith, and (d) did not have evidence to support its finding of substantial economic gain.

## 1

The Communications Act authorizes the FCC to impose a forfeiture penalty for certain violations. As relevant here, such a penalty may be imposed on those who "willfully or repeatedly fail to comply" with the Act or the FCC's rules, regulations, or orders. *See* 47 U.S.C. § 503(b)(1)(B); *United States v. WIYN Radio, Inc.*, 614 F.2d 495, 496 (5th Cir. 1980).

There are two ways to initiate the assessment of a forfeiture. The FCC may choose to impose a penalty after holding a hearing on the record, subject to judicial review. *See* § 503(b)(3)(A). In the alternative, as was done here, the FCC may file a NAL and give the

affected party "an opportunity to show, in writing, . . . why no such forfeiture penalty should be imposed." § 503(b)(4).

In determining the amount of a forfeiture penalty, the FCC is to "take into account the nature, circumstances, extent, and gravity of the violation and, with respect to the violator, the degree of culpability, any history of prior offenses, ability to pay, and such other matters as justice may require." § 503(b)(2)(E). A penalty may be imposed "for each violation or each day of a continuing violation." § 503(b)(2)(A).

The FCC has promulgated rules with adjustment criteria to depart from the statutory penalty based on certain aggravating or mitigating factors. *See* 47 C.F.R. § 1.80, note to (b)(8), § 2 (2020) (in effect at the time of the Denali transaction). For an upward adjustment, those factors are the egregiousness of the misconduct; the party's ability to pay; whether the violation was intentional; whether substantial harm resulted; whether there were any prior violations of FCC requirements; whether there was substantial economic gain; and whether the violation was repeated or continuous. *See id.* For a downward adjustment, those factors are whether the violation was minor; the regulated party's good faith or voluntary disclosure of the violation; history of overall compliance; and inability to pay. *See id.*

In the NAL, the FCC proposed a forfeiture penalty of $518,283—the then-statutory maximum—for Gray's violation of Note 11 of the Rule. It acknowledged that it had not previously proposed a forfeiture penalty for the acquisition of a network

affiliation in violation of Note 11, but found that the base forfeiture of $8,000 per day for an unauthorized transfer of control was sufficiently analogous to Gray's violation. The total amounted to $1.72 million but that sum was reduced to the statutory maximum of $518,283. *See* NAL, E.R. at 77–80.

The FCC explained in the NAL that Gray's violation was willful (i.e., it was conscious and deliberate, irrespective of any intent to violate the law), and was continuing in nature (lasting for 215 days). *See id.* It also pointed out that there were a number of bases for an upward adjustment: Gray was able to take advantage of "record-setting political advertising expenditures in the months leading up to the 2020 election," resulting in substantial economic gain; Gray had a "significantly higher-than-usual ability to pay"; and a high forfeiture penalty would "establish a deterrent to such transgressions in the future." *Id.* at 80. It considered possible grounds for a downward adjustment, including the limited precedent in the area and Gray's previous compliance, but did not find them "sufficiently compelling" to warrant a downward adjustment. *See id.*

In the final forfeiture order, the FCC imposed on Gray the $518,283 forfeiture penalty it had proposed in the NAL after considering the statutory and regulatory factors. *See Gray Television*, 37 FCC Rcd. at 13485. In its view, there was no reason for a downward adjustment from the statutory maximum penalty. First, it affirmed the base forfeiture amount of $8,000 per day of the violation. *See id.* at 13486. Second, it found that Gray engaged in a

continuing violation by failing to fulfill a continuing legal duty.  *See id.*  Third, it rejected Gray's interpretation of the statutory term "willful," and concluded that the term meant "the conscious and deliberate commission or omission" of any act, "irrespective of any intent to violate the law."  *Id.* (citing and quoting 47 U.S.C. § 312(f)(1)).

The FCC also reaffirmed that a number of factors would have supported an upward adjustment.  These included "the egregiousness of the misconduct, Gray's ability to pay, and the substantial economic gain Gray stood to achieve."  *Id.*  It then "clarif[ied]" that the upward adjustment factors "simply outweigh[ed] any of the downward adjustment factors, while noting there is no upward adjustment to be made when the violator is at the statutory cap." *Id.* at 13487.  Finally, it rejected the argument that the amount of the forfeiture penalty was inconsistent with "transfer-of-control precedent involving smaller fines," saying that Gray's "analysis relie[d] on a generalized comparison and d[id] not address the specific considerations" at issue.  *See id.*  It found that the forfeiture penalty was appropriate due to Gray's ability to pay, the need for deterrence, and the economic gain to be realized from the violation.  *See id.* at 13486–88.

In closing, the FCC described Gray's conduct as a "brazen attempt by the owner of the top-rated broadcast station in a market to acquire the affiliation of the second-ranked station in order to create the common ownership of two top-four stations."  *Id.* at 13488.  Again, the FCC labeled Gray's conduct as "egregious."  *See*

*id.* at 13487, 13488 (referring twice to the "egregiousness of [Gray's] misconduct").

### 2

Gray asserts that the imposition of an $8,000 per day forfeiture penalty is contrary to the FCC's precedent and practice. It points to *In re Enserch Corp.*, 15 FCC Rcd. 13551 (2000), as a case in which the FCC decided it was inappropriate to assess a daily forfeiture penalty for a similar violation that lasted a year until corrected and instead imposed a penalty of $150,000 (a downward adjustment from the $510,000 proposed in the NAL). We reject Gray's argument.

As a general matter, when an agency "departs from prior decisions, . . . it must explain the reasons for the new approach." *Mercedes-Benz U.S. Int'l v. Int'l Union, UAW*, 838 F.3d 1128, 1134 (11th Cir. 2016). But, as the Supreme Court has explained, a change in policy is reviewed under the traditional arbitrary and capricious standard and does not trigger heightened scrutiny under the APA:

> [T]he agency must show that there are good reasons for the new policy. But it need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates. This means that the agency need not always provide a more

detailed justification than what would suffice for a
new policy created on a blank slate.

*Fox Television*, 556 U.S. at 515.

In its final forfeiture order, the FCC sufficiently explained
why a daily $8,000 forfeiture penalty was appropriate for Gray's
continuing Note 11 violation and why *Enserch* did not mandate a
contrary result. *See Gray Television*, 31 FCC Rcd. at 13488. First,
*Enserch* was a factually different case, as it involved a wireless licen-
see which failed to file transfer-of-control applications. *See id.* Sec-
ond, the NAL cited *Enserch* only for the proposition that an unau-
thorized transfer of control is a continuing violation, and Gray did
not dispute that proposition. *See id.* Third, the penalty imposed on
Gray was justified due to the "nature, extent, and gravity of the
violation" and reflected the "brazen attempt by the owner of the
top-rated station in a market to acquire the affiliation of the second-
ranked station in order to create the common ownership of two
top-four stations." *Id.*

Whether or not we personally agree with the FCC, its expla-
nation as to why *Enserch* did not control on the amount of the for-
feiture penalty was satisfactory. It therefore was not arbitrary or
capricious. *See Fox Television*, 556 U.S. at 513–14.

### 3

Gray challenges, on a number of grounds, the FCC's finding
that its conduct was egregious. We agree with Gray that the FCC

did not provide adequate notice in the NAL that the proposed for-feiture penalty was based in part of a finding of egregiousness.[7]

As noted, one of the relevant regulations permits the FCC to consider the egregiousness of the conduct as one of the factors that might merit an upward adjustment of the forfeiture penalty. *See* 47 C.F.R. §§ 1.80, note to (b)(8), & 2 (2020).  The regulation does not define egregious, so we use the word's ordinary meaning, which is "[c]onspicuously bad or offensive."  American Heritage Dictionary of the English Language at 571.

An agency's failure to provide a party notice of the basis (or bases) for a proposed civil penalty can present due process prob-lems.  *See Greenbrier Nursing & Rehab. Ctr. v. U.S. Dep't of Health & Hum. Servs.*, 686 F.3d 521, 528–29 (8th Cir. 2012) (considering, but rejecting, the argument that a nursing facility did not have notice that the proposed penalty would be based on three instances of non-compliance).  Because the FCC issued a NAL, by statute Gray was "granted an opportunity to show, in writing, . . . why no . . . forfeiture penalty should be imposed."  47 U.S.C. § 503(b)(4).

---

[7] The FCC argues that this issue is not properly before us because Gray did not present it below.  We disagree.  The FCC made a finding of egregiousness for the first time in the final forfeiture order.  Unlike the statutory authority argument we declined to reach, this is not a "question[ ] of fact or law upon which the [FCC] . . . has been afforded no opportunity to pass."  47 U.S.C. § 405(a).

The FCC made a finding of egregiousness in its final forfeiture order, but made no such proposed finding in the NAL provided to Gray. *Compare Gray Television*, 37 FCC Rcd. at 13487–88, *with* NAL, E.R. at 77–80. As a result, Gray was unable to try to explain in its response to the NAL why its conduct was not egregious. By not providing Gray an opportunity to address the matter of egregiousness, the FCC failed to follow the dictates of § 503(b)(4) and its final forfeiture penalty was "not in accordance with law." 5 U.S.C. § 706(2)(A).

A number of federal statutes instruct us to determine whether the FCC's error was harmless. *See* 28 U.S.C. § 2111 ("On the hearing of any appeal . . . the court shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties."); 5 U.S.C. § 706 (in conducting review under the APA, "the court shall review the whole record . . . and due account shall be taken of the rule of prejudicial error"). And the Supreme Court has held that a statute with the same operative language as § 706 of the APA triggers "the same kind of 'harmless-error' rule that courts ordinarily apply in civil cases." *Shinseki v. Sanders*, 556 U.S. 396, 406 (2009) (interpreting 38 U.S.C. § 7261(b)(2)). We have said in other contexts, however, that "the complete denial of the opportunity to be heard on a material issue is a violation of due process which is never harmless error." *United States v. Smith*, 30 F.4th 1334, 1338 (11th Cir. 2022) (citation and internal quotation marks omitted).

We assume without deciding that harmlessness review is required, but even so we cannot affirm the forfeiture penalty. Gray sought a downward adjustment of the proposed penalty of $518,283 based on various grounds, but the FCC explained in the final forfeiture order that the downward adjustment factors were "heavily counterbalanced" and "simply outweigh[ed]" by the upward adjustment factors. *See Gray Television*, 37 FCC Rcd. at 13487. Egregiousness, as explained earlier, is one of the upward adjustment factors. So Gray's substantial rights were adversely affected by the egregiousness finding.

Although we are vacating on lack-of-notice grounds, we note as well that the FCC did not provide much of an explanation in the final forfeiture order as to why Gray's conduct was egregious. *Cf. Michigan v. E.P.A.*, 576 U.S. 743, 758 (2015) (repeating the "foundational principle of administrative law that a court may uphold agency action only on the grounds that the agency invoked when it took the action"). It did say that Gray engaged in a "brazen attempt" as the owner of the top-rated station in the Anchorage DMA to obtain control of two of the top four stations in that same DMA. *See Gray Television*, 37 FCC Rcd. at 13488. But every violation of Note 11 results in the prohibited ownership of two of the top four stations in a given DMA, and willfulness is already required for a forfeiture penalty. *See* 47 U.S.C. § 503(b)(1)(B). If the FCC meant to say that the conduct was egregious because Gray owned the *top*-rated station and sought to acquire the network affiliation of the *second*-rated station, it should make its stance clear and give Gray an opportunity to respond.

### 4

Gray also argues that the FCC ignored its good faith and the nature and circumstances of the Note 11 violation. It asserts that although the FCC "passively acknowledged" these factors in the forfeiture determination, it "did not account for" them in its analysis.

We agree that the FCC acted arbitrarily and capriciously in failing to adequately explain its consideration of Gray's good faith. When an agency uses "boilerplate" language and "merely parrots the language of a statute" or regulation "without providing an account of how it reached its results," it "has not adequately explained the basis for its decision." *Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1405 (D.C. Cir. 1995). In its response to the NAL, Gray asserted that it "immediately acted in good faith to address the [FCC]'s concerns even as it objected to the [FCC]'s claims" of a Note 11 violation. *See* Gray's Response to NAL, E.R. at 64. Moreover, Gray relied on the July 2020 Comscore ratings data and disagreed with the FCC's use of the June 2020 Nielsen ratings data. Although the final forfeiture order states that the FCC "identif[ied] factors that would support" a downward adjustment, *see Gray Television*, 37 FCC Rcd. at 13587, that statement is more akin to a threadbare assertion than a reasoned explanation. The FCC's analysis therefore lacked "sufficient clarity for us to discern the [agency]'s rationale." *McKinney v. Wormuth*, 5 F.4th 42, 47 (D.C. Cir. 2021). The FCC should have explained in a more fulsome way how it considered whether Gray acted in good faith in evaluating the forfeiture penalty.

We set aside the forfeiture penalty of $518,283 and remand to the FCC for further proceedings consistent with our opinion.[8]

### IV

We affirm the FCC's determination that Gray violated Note 11 to the Local Television Multiple Ownership Rule. We conclude, however, that the FCC's forfeiture penalty was contrary to law because it was based in part on an egregiousness finding that Gray was not given an opportunity to address, and was arbitrary and capricious because the FCC did not adequately explain its consideration of Gray's good faith. We therefore vacate the penalty and remand to the FCC for further proceedings.

**PETITION DENIED IN PART & GRANTED IN PART.**

---

[8] Given our vacatur of the forfeiture penalty, we need not address Gray's remaining challenge to the penalty (that there was insufficient evidence to support the FCC's finding of substantial economic gain).

BRASHER, Circuit Judge, joined by WILLIAM PRYOR, Chief Judge, concurring:

I join the Court's opinion. I write separately to explain my concern that Note 11 may exceed the authority given to the FCC by its organic statute—the Communications Act of 1934. 47 U.S.C. § 151 *et seq.* Had this issue been properly raised, I very likely would have voted to vacate the forfeiture order in its entirety. But because it was not thoroughly vetted in front of the FCC, I can't be confident on this front. There are, after all, good reasons why we require exhaustion before an agency. *See Deltona Corp. v. Alexander*, 682 F.2d 888, 893 (11th Cir. 1982). Accordingly, I am limited to flagging these issues so they can be fully vetted before the FCC and other courts.

## I.

Gray Television is the second largest broadcaster in the country. It owns numerous local television stations and has entered into affiliation agreements with all the major networks. Network television works through affiliation agreements between national networks and local stations: A company like Gray owns a local station. The local station needs a license from the FCC to broadcast on the airwaves. After getting that license, that local station may enter an "affiliation" agreement with a major network (the top four are NBC, CBS, ABC, and Fox), from whom it receives programming to broadcast.

Gray operates all over the country, including Anchorage, Alaska. Gray entered that market in 2016 by acquiring an NBC-

affiliated station. It then acquired a second station without a major network affiliation. Gray improved that station's rankings by adding its own new programming and upgrading the broadcasting facilities. By the summer of 2020, that second station was either the fourth or fifth highest rated station in the market, depending on the which month's data one uses. Gray's NBC station was ranked first.

Meanwhile, the local CBS affiliate was struggling and needed to sell assets to generate capital. It reached out to Gray to sell its affiliation with CBS. Gray agreed, and it purchased a number of broadcasting assets, including the CBS affiliation, for its second Anchorage station. Notably, Gray did not purchase the old CBS affiliate's license or its facilities, leaving the selling station free to operate independently or to affiliate with a different network. And, sure enough, the selling station affiliated with a different network by September of the next year and continued broadcasting. But purchasing the CBS affiliation made Gray's lower-ranked station climb to second place in the Anchorage market.

Among the many rules that the FCC has promulgated to promote competition in network broadcasting is one called Note 11. The Commission has the power to "grant construction permits and station licenses." 47 U.S.C. § 308(a). The FCC's rules provide that an entity may operate two stations in the same market as long as, "[a]t the time the application [for a license] to acquire or construct the station(s) is filed, at least one of the stations is not ranked among the top four stations." 47 C.F.R. § 73.3555(b)(1)(ii). Note 11, which is a note to this rule, prohibits a "change in network

affiliations [if it] would result in the licensee of the new affiliate . . . controlling two of the top-four rated television stations" in its area. *Id.* § 73.3555 n.11(a). The FCC may waive this prohibition if the licensee files an application and establishes that such a waiver would serve the public interest. *See id.* § 73.3555(b)(2).

The FCC approved Gray's purchase of two stations in the Anchorage market. But, when Gray bought the right to broadcast CBS's content on its second local station, it changed a network affiliation without permission. The FCC found that the change in affiliation "result[ed] in" Gray "controlling two of the top-four rated television stations" in Anchorage and imposed a $518,283 penalty.

## II.

The Court's opinion says, and I agree, that the FCC did not act arbitrarily or capriciously in finding that Gray violated Note 11. Gray argues that the FCC used the wrong month's ratings data to assess whether its purchase "result[ed] in" Gray "controlling two of the top-four rated television stations" and that the Denali transaction did not amount to the "functional equivalent" of a license transfer under Note 11. But the Court's opinion persuasively explains that the FCC's decision to use June's data, instead of July's, was not arbitrary and capricious and that the FCC reasonably rejected Gray's interpretation of Note 11.

The Court's opinion also explains that Gray raised a broader argument in this Court than it raised before the FCC. Specifically, it argued here that "the FCC exceeded its authority in its application of Note 11 to the Anchorage transaction" because the rule is

"untethered to its authority over license transfers or renewals." Br. at 20-21. *See also* Am. Br. of National Association of Broadcasters at 15 ("The Commission simply has no power to regulate local broadcast of network programming or contracts assigning programming rights."). But, before the FCC itself, Gray flagged this issue and "assum[ed] it," stating that the FCC's position on its authority to promulgate Note 11 "may or may not be correct."

Had this issue been preserved before the FCC, I likely would have voted to vacate the FCC's forfeiture award. The Administrative Procedure Act requires courts to "hold unlawful and set aside agency action, findings, and conclusions" when they are "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C). In doing so, we used to defer "to 'permissible' agency interpretations of the statutes those agencies administer—even when . . . [we] read[] the statute differently." *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2254 (2024). But, now, "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Id.* at 2273.

I have grave doubts that the FCC has statutory authority to enforce Note 11. No one contests the FCC's authority to license broadcasters to use the airwaves. *See* 47 U.S.C. § 310(d). But there is no statutory authority for the FCC to regulate the affiliation that provides the content that a licensed station broadcasts.

### A.

To determine whether an agency acted within its statutory authority, we start with the plain language of the relevant statute. *See Southern Co. v. FCC*, 293 F.3d 1338, 1343 (11th Cir. 2002). The FCC says that its licensing authority, 47 U.S.C. § 310(d), working alongside its ancillary authority, *id.* §§ 154(i), 303(r), justifies Note 11, *see In re 2014 Quadrennial Regul. Rev.*, 31 F.C.C. Rcd. 9864, 9882 n.122 (2016). I see scant support for this argument in the statute's text.

Let's start with the FCC's licensing authority. The Communications Act provides that "[n]o . . . *station license*, or any rights thereunder, shall be transferred, . . . to any person except upon application to the Commission." 47 U.S.C. § 310(d) (emphasis added). How far does this power extend? Well, "[i]n general, statutory definitions control the meaning of a statute's terms." *Stansell v. Revolutionary Armed Forces of Colombia*, 704 F.3d 910, 915 (11th Cir. 2013). And the Act defines "station license," as an "instrument of authorization required . . . for the use or operation of apparatus for transmission of . . . communications . . . by radio." 47 U.S.C. § 153(49).

Now let's consider the FCC's ancillary authority. The Communications Act provides that "[t]he Commission may . . . make such rules and regulations, . . . not inconsistent with [the Act], as may be necessary in the execution of its functions." 47 U.S.C. § 154(i). Later, it reassures the FCC that it can "[m]ake such rules and regulations . . . not inconsistent with law, as may be necessary to carry out the provisions of [the Act]." *Id.* § 303(r). But this

ancillary authority is not a source of independent statutory authority to act—the FCC must act under *delegated authority* before it can act under §§ 154(i) and 303(r). *See Motion Picture Ass'n of Am. v. FCC*, 309 F.3d 796, 806 (D.C. Cir. 2002).

Taken together, these provisions mean that the FCC can authorize or prevent the transmission of communications by radio waves (including through broadcast television), and it can adopt rules to carry out that power. But the FCC's licensing authority does not extend to the "supervisory control of the programs" that a station broadcasts. *FCC v. Sanders Bros. Radio Station*, 309 U.S. 470, 475 (1940). Note 11 prohibits certain programming agreements between networks and stations—it regulates what a licensee can broadcast, not whether it can use the airwaves to do it.

To be clear, this distinction between access to the airwaves and affiliation agreements is not something I've made up. Instead, at one time the FCC admitted that its licensing authority did not allow it to regulate affiliation swaps. It reasoned that, "[b]ecause . . . affiliation swaps do not involve the assignment or transfer of a station license, the transaction is not subject to prior Commission approval under" its licensing authority. *In re 2014 Quadrennial Regul. Rev.*, 29 F.C.C. Rcd. 4371, 4391 (2014) ("First Order"). But later, the FCC reversed course, concluding that its licensing authority allows it to regulate agreements to transfer affiliations, because they are "the functional equivalent" of a license transfer. *In re 2014 Quadrennial Regul. Rev.*, 31 F.C.C. Rcd. 9864, 9883 (2016) ("Second Order").

I see two problems with this reasoning.

First, it is not apparent to me that affiliation transfers are the "functional equivalents" of license transfers. A licensee does not give up its license to broadcast by changing which network's content it programs and an affiliation agreement does not necessarily travel with a license when it is transferred. Instead, an affiliation transfer involves a station exercising its right to dictate its programming, separate from its right to broadcast over the airwaves. The facts of this case bear out this distinction: Gray bought the right to affiliate with CBS from another local station, but that station didn't lose its right to broadcast on the airwaves. Instead, that station found another affiliation and continued broadcasting on the same air. The only thing that changed was the content on each station.

Second, even assuming affiliation transfers are the functional equivalent of license transfers, it's not clear to me that the FCC's licensing authority covers the "functional equivalent" of a license transfer at all. "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally or purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (cleaned up). Elsewhere in the Act, Congress laid out some rules for the FCC to follow when regulating mobile services, which depend on whether the FCC is regulating private or commercial mobile services. 47 U.S.C. § 332(d)(3). In doing so, Congress defined a private mobile service as one that "is not a commercial mobile service or the *functional equivalent* of a commercial mobile service, as specified by regulation by the Commission." *Id.* (emphasis added). Clearly, Congress

knows how to empower the FCC to address functional equiva-
lents. It explicitly did so there, but not here.

Likewise, Congress has been express when it has authorized
the FCC to regulate content. For example, the FCC can regulate
the transmission of profanity over the airwaves. *See* 18 U.S.C.
§ 1464. And it may promulgate regulations about broadcast time
for candidates for public office. *See* 47 U.S.C. §§ 315, 399. But there
is no law about which Anchorage-based TV station gets to carry
CBS's programing as a local affiliate.

*B.*

No doubt recognizing the precariousness of perching Note
11 solely on the text of the Act, the FCC also relies on precedent
upholding FCC rules as ancillary to or directly involving the FCC's
licensing authority. *See F.C.C. v. Nat'l Citizens Comm. for Broad.*, 436
U.S. 775 (1978) ("*NCCB*"); *United States v. Storer Broad. Co.*, 351 U.S.
192 (1956) ("*Storer*"); *Nat'l Broad. Co. v. United States*, 319 U.S. 190
(1943) ("*NBC*"). But none of those precedents apply.

The precedents are all about *licensing* decisions. In *NCCB*, the
FCC "prohibit[ed] a newspaper owner from acquiring a license for
a co-located broadcast station," and likewise forced "a broadcast li-
censee" to "dispose of its license" if it "acquires a daily newspaper
in the same market." 436 U.S. at 785 n.8. In *Storer*, the FCC an-
nounced that "[n]o license for a television broadcast station shall
be granted" if, among other things, it resulted in the ownership of
"more than five television broadcast stations." 351 U.S. at 195 n.1
(cleaned up). In *NBC*, the FCC adopted regulations that "provide,

in general, that no licenses shall be granted to stations or applicants having specified relationships with networks," as described in further detail not relevant here. 319 U.S. at 196.

The FCC tries to say that fining a broadcaster for acquiring an affiliation agreement is analogous to the rules in those cases. I think any fair-minded reader will conclude otherwise. By requiring the denial or disposal of station licenses, each of those rules regulated broadcasters' activities through the FCC's licensing power. Here, the FCC proposes something quite different: ostensibly regulating activities under its licensing authority not by controlling licenses, but by fining broadcasters. The FCC points to no precedents supporting such an expansion of its licensing power.

*C.*

The FCC's last refuge is policy. The FCC insists that the Act gave it licensing authority to promote competition in broadcasting, justifying Note 11. To be fair, the FCC does have a competition-promotion role to play. That's why "the Act does not restrict the Commission merely to supervision of the traffic." *Id.* at 215–16. Instead, "[i]t puts upon the Commission the burden of determining the composition of that traffic." *Id.* at 216.

But, like all policy determinations, the FCC's mandate to promote competition is not unlimited. Congress assigned the FCC a specific method by which it was supposed to promote competition, for a specific purpose. The Act commits the regulation of broadcasters to the FCC because "[t]he facilities of radio are not large enough to accommodate all who wish to use them." *Id.* It

gave the FCC licensing powers, in part, to promote competition *on those radio waves*.

Now the FCC has identified a potential loophole—affiliation agreements—that it really wishes its licensing powers covered, to pursue that pro-competition goal Congress identified. But wishing doesn't make it so. That it might promote competition does not allow the FCC to license streaming services, for example, despite their recent dominance. *See* Sara Fischer, *Streaming surpasses cable as top way to consume TV*, Axios, https://perma.cc/M7XR-VRZH (Aug. 18, 2022). Congress provided the FCC with limited tools to promote competition. The scope of the assigned end does not widen the scope of the delegated means.

It seems to me that those limited tools would have been enough here. The FCC easily could have promoted competition through power it *was* granted—licensing. Nothing is stopping it from announcing that it will decline to renew the license of any licensee that owns two top-four stations. Instead, the FCC is chasing Gray with powers it doesn't seem to have.

### III.

I am concerned that Note 11 exceeds the bounds of the FCC's statutory authority. If this issue had been fully presented, I would likely have voted to reverse on these grounds. In future enforcement actions, I encourage the FCC to address whether Note 11 is consistent with its statutory authority.